UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRONWORKERS LOCAL 580 – JOINT FUNDS; IRONWORKERS LOCALS 40, 361 & 417 – UNION SECURITY FUNDS; IRONWORKERS LOCAL 40 BUILDING AND GENERAL FUNDS; and BONNIE STEWART, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>          v.<br><br>LINN ENERGY, LLC; LINNCO, LLC; MARK E. ELLIS; KOLJA ROCKOV; DAVID B. ROTTINO; MICHAEL C. LINN; JOSEPH P. MCCOY; GEORGE A. ALCORN; DAVID D. DUNLAP; JEFFREY C. SWOVELAND; TERRENCE S. JACOBS; BARCLAYS CAPITAL INC.; CITIGROUP GLOBAL MARKETS INC.; RBC CAPITAL MARKETS, LLC; WELLS FARGO SECURITIES, LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; CREDIT SUISSE SECURITIES (USA) LLC; RAYMOND JAMES & ASSOCIATES, INC.; UBS SECURITIES LLC; GOLDMAN, SACHS & CO.; J.P. MORGAN SECURITIES LLC; ROBERT W. BAIRD & CO. INCORPORATED; BMO CAPITAL MARKETS CORP.; CRÉDIT AGRICOLE SECURITIES (USA) INC.; CIBC WORLD MARKETS CORP.; HOWARD WEIL INCORPORATED; and MITSUBISHI UFJ SECURITIES (USA), INC.,<br><br>          Defendants. | Case No. 1:13-cv-4875-CM<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>ECF Case<br><br>**JURY TRIAL DEMANDED** |

1136128.1

Lead Plaintiffs Ironworkers Local 580 – Joint Funds; Ironworkers Locals 40, 361 & 417 – Union Security Funds; Ironworkers Local 40 Building and General Funds (collectively, the "Ironworkers Funds"); and Bonnie Stewart (together with the Ironworkers Funds, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, for their Complaint against the defendants named herein (collectively, "Defendants"), present the allegations detailed below based on personal knowledge as to themselves and their own acts, and on information and belief as to all other matters through, *inter alia*, the ongoing investigation conducted by and through Plaintiffs' attorneys. That investigation has included, among other things, a review of public filings with the United States Securities and Exchange Commission ("SEC") by Linn Energy, LLC ("LINN" or the "Company") and LinnCo, LLC ("LNCO" or "LinnCo") (collectively, the "Companies"), wire and press releases published by the LINN Defendants, public conference calls, media and news reports concerning the Companies, securities analysts' reports and advisories about the Companies, and information readily obtainable on the Internet. Plaintiffs' allegations are also informed by counsel's analysis of LINN's accounting for certain "non-GAAP" measures during the Class Period.[1] Plaintiffs believe further substantial evidentiary support will exist for their allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

### Claims

1.      This is a federal securities class action arising from Defendants' misconduct in overstating key financial metrics bearing on LINN's ability to make periodic distributions to

---

[1] "Non-GAAP" financial measures refer to financial information not calculated and presented in accordance with generally accepted accounting principles ("GAAP").

investors in its "units," which are traded on the National Association of Securities Dealers

Automated Quotation ("NASDAQ") Global Select Market.  Plaintiffs assert:

- Claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78(t), respectively), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), on behalf of all persons and entities who (i) purchased or otherwise acquired LINN units between February 25, 2010 and September 17, 2013, inclusive (the "LINN Class Period"); and (ii) purchased or otherwise acquired LNCO common shares between October 12, 2012 and September 17, 2013, inclusive (the "LNCO Class Period") (together with the LINN Class Period, the "Class Period"); and

- Claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") (15 U.S.C. §§ 77k, 77l(a)(2), and 77o, respectively) on behalf of all persons and entities who purchased or otherwise acquired LNCO common shares pursuant or traceable to the registration statement and prospectus issued in connection with LNCO's initial public offering of common shares on or around October 12, 2012 (the "IPO"), or acquired LNCO common shares in the IPO directly from one of the Underwriter Defendants, or were successfully solicited by the Underwriter Defendants for their own financial gain.

2.      Plaintiffs plead both fraud and non-fraud claims in this Complaint.  With respect

to their Exchange Act claims, Plaintiffs allege that Defendants acted with knowledge of their

wrongdoing, or reckless disregard for the truth, in making false or misleading statements of

material fact to the market, including investors in LINN units and LNCO shares.  Separate and

independent of their allegations of fraud, Plaintiffs plead Securities Act claims against

Defendants based on the materially false or misleading statements in, or omissions from, the

offering documents issued in connection with the IPO, for which LINN, LNCO, and their

officers and directors identified below are strictly liable, and for which the underwriters for the

IPO (also identified below) are liable because they cannot demonstrate they acted reasonably.

With respect to their Securities Act claims, Plaintiffs expressly disclaim all allegations of fraud.

**Factual Background**

3.      LINN is an independent oil and natural gas company whose stated mission is to

acquire, develop, and maximize cash flow from its U.S. portfolio of long-life oil and natural gas

assets.  It has become one of the largest oil and gas development companies in the U.S. by

acquiring more than $10 billion of oil- and gas-related assets since its formation in 2003, with

more than $3 billion of those acquisitions occurring in 2012 alone.  LINN has financed its

acquisitions with equity and debt offerings or bank borrowings and, to the extent available, cash

flow from its operations.  LINN became a public entity in January 2006, when it publicly issued

"units" representing limited liability company ("LLC") interests in the Company.  The units are

listed and trade under the symbol "LINE" on the NASDAQ.

4.      LNCO, an affiliate of LINN, has no significant assets or operations other than its

ownership of units of LINN.  On October 12, 2012, LNCO completed its IPO of 34,787,500

common shares for approximately $1.2 billion in net proceeds, which were used to acquire

34,787,500 LINN units.  The IPO was conducted pursuant to several documents filed with the

SEC and disseminated to the investing public, including:  (i) LNCO's Registration Statement

dated June 1, 2012 and filed with the SEC on Form S-1, as amended by five subsequent

amendments (collectively referred to as the "Registration Statement"); and (ii) the final

prospectus, which was filed with the SEC on October 12, 2012 on Form 424(b)(1) (the

"Prospectus") and forms a part of the Registration Statement (the Registration Statement and

Prospectus are referenced collectively as the "Offering Documents").  LNCO's common shares

are listed on the NASDAQ Global Select Market under the symbol "LNCO."

5.      Because LNCO's sole asset is LINN units, LNCO's success depends entirely on

the operation and management of LINN, and LNCO's ability to pay dividends to its shareholders

depends entirely on LINN's ability to make distributions to its unitholders.  Reflecting this reality, all of LNCO's quarterly and annual financial reports since the IPO have included the equivalent quarterly and annual financial reports of LINN as exhibits, which were incorporated by reference into the relevant LNCO reports.  Accordingly, Defendants' statements regarding LINN's financial results and business prospects were material to LNCO shareholders.

6.      LINN's units attract investors seeking yield-based investments, as the Company's LLC agreement requires that it make quarterly distributions of all "available cash" to unitholders, as that term is defined by the agreement.  LINN's SEC filings represent that its "primary goal" is "to provide stability and growth of distributions for the long-term benefit of its unitholders." LINN maintains that it accomplishes its goal by acquiring long-life, high quality oil and gas properties; efficiently operating and developing its acquired properties; and employing hedging activities to reduce cash-flow volatility, including by purchasing commodity derivatives such as put options and swaps.  LINN further represented during the Class Period that "[a]n important part of the Company's business strategy includes hedging a significant portion of its forecasted production to reduce exposure to fluctuations in the prices of oil and natural gas and provide long-term cash flow predictability to pay distributions, service debt and manage its business."[2] LINN hedged up to 100% of its expected production for 4-6 years.  LINN reported, for example, that during the year ended December 31, 2010, the Company had commodity derivative contracts for approximately 114% of its natural gas production and 97% of its oil production, resulting in realized gains of approximately $308 million.[3]

---

[2] LINN 2012 Form 10-K at 2.

[3] *Id.* at 47.

7.    A put option "gives the holder the right to sell an asset at a certain price [(the strike price)] within a specific period of time."[4]  Generally, "the value of the put option to the holder is inversely proportionate to the value of the underlying [commodity] because the value of the put option increases if the price of the [commodity] falls below the strike price before the option expires."[5]  Furthermore:

> Upon the sale of a put option, the seller, or writer, becomes obligated to purchase the asset at the strike price if the holder exercises the option.  For this option a premium is paid, and the contract is worth more or less than the premium depending upon the direction of the market price of the underlying [commodity] relative to the striking price.[6]

8.    During the Class Period, Defendants significantly overstated LINN's available cash for distribution to its unitholders and misrepresented the true risk associated with LINN's ability to continue to issue stable or increasing distributions.  Defendants failed to disclose that during the Class Period, LINN disseminated key financial metrics to investors that (i) ***excluded*** the significant cost of settled put options it purchased as part of its hedging strategy, but ***included*** the proceeds it received from the sale or exercise of those options, and (ii) understated the expenditures required to maintain current levels of oil and gas production.  Accordingly, unbeknownst to investors, the amount of cash that LINN had available to cover the payment of quarterly distributions to unitholders was far less than reported and, further, LINN had to rely in part on other sources of funding, including raising money through equity and debt offerings, to pay the distributions.

---

[4] *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 98 (D. Conn. 2006) (alteration in original) (citation and internal quotation marks omitted).

[5] *Id.*

[6] *Id.* (citations and internal quotation marks omitted).

9.      Specifically, Defendants disclosed false and misleading "non-GAAP" financial measures—including *adjusted EBITDA*,[7] *distributable cash flow* (or "DCF"), *distribution coverage ratio*, and *Maintenance Capital Expenditures* (or "maintenance capex")—and made false and misleading statements about its DCF, in filings furnished to the SEC, company presentations freely available to the market on the Company's website, and statements made in conference calls with analysts.  In doing so, Defendants presented investors with a materially inflated view of the Company's cash flows available for distribution and, as a result, its ability to continue to sustain or grow its cash distributions.

10.     DCF is a non-GAAP liquidity-based measure designed to inform LINN's unitholders of the amount of cash flows available for distribution—in essence, whether or not LINN is generating enough cash flows at a level that can sustain its quarterly distribution rates in the future.

11.     As a starting point in its calculation of DCF, LINN used adjusted EBITDA, another non-GAAP metric, to "evaluate cash flow and the Company's ability to sustain or increase distributions."[8]  More specifically, LINN disclosed that "adjusted EBITDA is a measure used by Company management to indicate (prior to the establishment of any reserves by its Board of Directors) the cash distributions the Company expects to make to its unitholders," and observed that it "is also a quantitative measure used throughout the investment community with respect to publicly-traded partnerships and limited liability companies."[9]

12.     Additionally, LINN's distribution coverage ratio purportedly measured the amount of the declared distribution covered by DCF (*i.e.*, DCF for a period divided by total cash

---

[7] "EBITDA" refers to Earnings Before Interest, Taxes, Depreciation and Amortization.

[8] LINN Form 10-Q for first quarter ending March 31, 2012, at 34.

[9] *Id.*

distributions for that period).  Maintenance capex purportedly measured the estimated amount of

capital required to maintain production at current levels.

13.      LINN measured its success based on cash distribution coverage ratios and

distributable cash flows.  During the Class Period, LINN passed most of its available cash flow

to its unitholders and boasted that its unitholder distributions were significantly higher than

distributions paid by other similarly prominent energy giants.[10]  In reality, however, LINN was

not generating sufficient cash flow to cover its distributions and was only able to sustain those

inflated distributions with money raised through equity and debt offerings as well as through

manipulations of its DCF calculations.  This scheme was first uncovered in 2013 by several

articles published by *Barron's*, which ultimately triggered an SEC investigation.  As a result of

the SEC investigation, LINN recently announced it "no longer uses the term 'distributable cash

flow.'"[11]  On that news, the price of LINN units fell $0.94, or approximately 3.4%, from their

closing price of $27.91 on September 17, 2013, to close at $26.97 on September 18, 2013, on

unusually high trading volume.  LNCO shares also fell $1.03 per share, or 3.3%, from their

closing price of $30.93 on September 17, to close at $29.90 on September 18, on elevated trading

volume.

14.      The SEC has promulgated regulations directly related to the disclosure of non-

GAAP financial measures, including DCF.  Those regulations, which became effective on March

28, 2003 as a result of the Sarbanes-Oxley Act of 2002 ("SOX"), are described in Regulation G

and Item 10(e) of Regulation S-K.[12]  As explained more fully below, those regulations prohibit

false or misleading non-GAAP financial disclosures, including inaccurate reporting of DCF.

---

[10] LINN 2012 10-K at 29-30.

[11] LINN Form S-4/A dated September 17, 2013.

[12] *See* SEC Release No. 34-47226, 17 C.F.R. Parts 228, 229, 244, and 249.

15.    Defendants violated the SEC's regulations by improperly failing to account for costs associated with settled put options when calculating DCF.  That is, LINN should have disclosed the premiums paid for its settled puts and should have deducted the costs of the put premiums in calculating its DCF.  It was not until June 3, 2013, in an amended registration statement filed in connection with LINN's proposed acquisition of Berry Petroleum Company ("Berry Petroleum" or "Berry"), that LINN finally disclosed the premiums it paid for put options that settled during the three months ended March 31, 2013 and March 31, 2012 and during the years ended December 31, 2012, 2011, and 2010.  (Subsequently, in an August 8, 2013 press release announcing its results for the second quarter of 2013, LINN disclosed the premiums it paid for put options that settled during the three months ended June 30, 2013 and June 30, 2012 and during the six months ended June 30, 2013 and June 30, 2012.)

16.    As an example of its false reporting of DCF and related metrics, for 2010 and 2012 LINN reported coverage ratios above 1.0:  1.233 for 2010 and 1.138 for 2012.  Had LINN properly deducted the premiums for the settled puts, its DCF ratio would have been below 1.0 in both of those years.  A coverage ratio below 1.0 would have reflected that LINN was not generating enough cash to pay its distributions.

17.    Moreover, Defendants were aware that the market regarded LINN's non-GAAP financial metrics as important in assessing the Company's value as an investment.  Indeed, LINN recently acknowledged that adjusted EBITDA—the starting reference point for the Company's DCF calculation—is used not only by LINN's management, but also by "external users of the Company's financial statements such as investors, lenders under the Company's Credit Facility, research analysts, rating agencies and others" to assess, among other things, the Company's operating performance and ability to generate sufficient cash to pay distributions to unitholders.

1136128.1

18.    Accounting for put-option premiums would have signaled to the investment community that LINN was overstating its DCF, and that the Company therefore could not make or sustain distributions at the levels it had told unitholders to expect.  Defendants' failure to disclose that seminal information misled LINN unitholders, as well as LNCO shareholders, regarding the LINN Defendants' financial condition and prospects, thereby causing the prices of LINN units and LNCO shares to be artificially inflated during the Class Period.

19.    LINN thus violated the SEC's disclosure requirements and misled investors about the purported stability and growth of its quarterly distributions and the Company's overall financial performance.  Furthermore, having chosen to speak about its distributions, LINN had a duty to provide complete and accurate disclosure regarding its DCF.

20.    When the calculation of these financial metrics, and, consequently, the actual amount of cash available and the true risks associated with the stability and growth of LINN distributions became known to the marketplace, the price of LINN units and LNCO shares declined significantly, causing Plaintiffs and other Class members to suffer significant damages. From the time *Barron's* published its February 16, 2013 positing that LINN was overstating its DCF through September 18, 2013—the day after the last day of the Class Period—the price of LINN's units has declined approximately 58.7%; LINN's units have fallen approximately 24.9%, and LNCO shares have fallen approximately 27.3%, in response to the revelations of Defendants' wrongful conduct.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 21 of the Securities Act, and Section 27 of the Exchange Act.

22.    Venue is proper in this District pursuant to Section 21 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts forming the basis of

Plaintiffs' claims, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

23.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the NASDAQ Global Select Market, an electronic securities exchange located in this District.

## PARTIES

### Plaintiffs

24.     On October 4, 2013, this Court appointed the Ironworkers Local 580 – Joint Funds; Ironworkers Locals 40, 361 & 417 – Union Security Funds; Ironworkers Local 40 Building and General Funds; and Bonnie Stewart as Lead Plaintiffs in accordance with the Private Securities Litigation Reform Act of 1995.

25.     As set forth in their Certifications, which were previously filed with this Court, the Ironworkers Funds purchased LNCO shares at artificially inflated prices during the LNCO Class Period, including purchasing shares pursuant or traceable to the Registration Statement, and have been damaged upon the revelation of the partial disclosures.  The Ironworkers Funds purchased securities in the IPO on October 12, 2012, the first day of the offering, at the offering price of $36.50, directly from one of the Underwriter Defendants.  As set forth in her Certification, which was previously filed with this Court, Bonnie Stewart purchased LINN units during the LINN Class Period at artificially inflated prices and has been damaged upon the revelation of the partial disclosures.

### Defendants

#### *LINN and LNCO*

26.    Defendant LINN is a Delaware limited liability company that began its operations in March 2003.  The Company maintains its principal executive offices at 600 Travis Street, Suite 5100, Houston, TX 77002.

27.    Defendant LNCO is a Delaware limited liability company.  As noted above, LNCO has no significant assets or operations other than its ownership of units representing LLC interests of LINN.  LNCO's cash flow is completely dependent on LINN's distributions to its unitholders and, therefore, LNCO's success turns on the operation and management of LINN and its resulting performance.  As of December 31, 2012, LNCO owned approximately 15% of LINN's outstanding units and LINN owned 100% of LNCO's sole voting share.  Additionally, according to LNCO's Form 10-K for the year ending December 31, 2012, "LINN Energy has agreed to indemnify LinnCo and its officers and directors for damages suffered or costs incurred (other than income taxes payable by LinnCo) in connection with carrying out LinnCo's activities."  LNCO's principal executive offices are located at the same location as LINN's principal executive offices, namely, 600 Travis Street, Suite 5100, Houston, TX 77002.

### *Individual Defendants*

28.    Defendant Mark E. Ellis, who joined LINN in December 2006, served at all relevant times as President and Chief Executive Officer of LINN and LNCO.  On December 31, 2011, Ellis became Chairman of LINN's Board of Directors.  Ellis is also Chairman of LNCO's Board of Directors.

29.    Defendant Kolja Rockov, who joined LINN in March 2005, served at all relevant times as Executive Vice President and Chief Financial Officer of LINN and LNCO.  According to the Companies' websites, Rockov "oversees all finance and accounting functions, investor relations and business development," plays "a key role in sourcing and evaluating potential

acquisitions," and is also "the primary corporate contact with bankers, lenders and private capital providers for obtaining new sources of capital to finance growth and execute the [C]ompany's hedging activities."

30.    Defendant David B. Rottino, a Certified Public Accountant, served at all relevant times as Senior Vice President, Finance and Business Development, and Chief Accounting Officer of LINN and LNCO.  According to the Companies' websites, Rottino "oversees the [C]ompany's business development, accounting, financial reporting, treasury, tax and internal control functions."

31.    Defendant Michael C. Linn founded LINN in 2003.  Linn served at all relevant times as a member of the Boards of Directors of both LINN and LNCO and, until his retirement on December 31, 2011, as Executive Chairman of LINN's Board of Directors.

32.    Defendant Joseph P. McCoy served at all relevant times as a member of the Boards of Directors of LINN and LNCO and as Chair of the Boards' respective Audit Committees.  McCoy is also a member of LINN's Compensation Committee and Nominating Committee.  As an Audit Committee member, McCoy was responsible for the Companies' oversight of financial reporting.

33.    Defendant George A. Alcorn served at all relevant times as a member of the Boards of Directors of LINN and LNCO, and is a member of the Boards' respective Audit Committees.  As an Audit Committee member, Alcorn was responsible for the Companies' oversight of financial reporting.  Alcorn also served at all relevant times as a member of the Compensation Committee and as Chair of the Nominating Committee of LINN's Board of Directors.

34.     Defendant David D. Dunlap served at all relevant times since May 22, 2012 as a member of LINN's Board of Directors and its Audit Committee, Compensation Committee, Nominating Committee, and Conflicts Committee.  In addition, Dunlap served as a member of LNCO's Board of Directors between May 22, 2012 until his resignation on February 19, 2013 to form a Conflicts Committee to evaluate LINN's merger with Berry Petroleum (discussed further below).  As an Audit Committee member, Dunlap was responsible for LINN's oversight of financial reporting.

35.     Defendant Jeffrey C. Swoveland served at all relevant times as a member of LINN's Board of Directors and its Audit Committee, Compensation Committee, Nominating Committee, and Conflicts Committee.  In addition, Swoveland served as a member of LNCO's Board of Directors at all relevant times until his resignation on February 19, 2013 to form a Conflicts Committee to evaluate LINN's merger with Berry Petroleum.  As an Audit Committee member, Dunlap was responsible for LINN's oversight of financial reporting.

36.     Defendant Terrence S. Jacobs served as a member of LNCO's Board of Directors since April 2012 and as a member of its Audit Committee since July 2012.  In addition, at all relevant times, Jacobs served as a member of LINN's Board of Directors and, since January 2012, as Lead Director, until his resignation on February 19, 2013 to create a Conflicts Committee to evaluate LNCO's acquisition of Berry Petroleum.  As an Audit Committee member, Jacobs was responsible for LNCO's oversight of financial reporting.

37.     Defendants Ellis, Rockov, and Rottino are referenced collectively as the "Officer Defendants."  Defendants Linn, McCoy, Alcorn, Dunlap, Swoveland, and Jacobs are referenced collectively as the "Director Defendants."  The Officer Defendants and the Director Defendants are referenced collectively as the "Individual Defendants."

38.    The Individual Defendants approved the IPO, signed the Registration Statement (including all amendments), and served as directors of LNCO at the time of the IPO.  They further participated in LINN and/or LNCO Board meetings and conference calls.  In their capacities as signatories of the Registration Statement, as well as by virtue of their authority to approve the IPO, the Individual Defendants possessed the power and authority to control the contents of the Offering Documents, as well as other SEC filings, press releases, and investor and media presentations.

39.    Additionally, the Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of LINN units and LNCO shares by disseminating materially false and misleading statements and/or concealing material adverse facts during the Class Period.  The scheme:  (i) deceived the investing public regarding LINN's and LNCO's business, operations, and management, and thus the intrinsic value of LINN units and LNCO shares, which caused investors to purchase LINN units and LNCO shares at artificially inflated prices and later suffer significant losses when revelations about Defendants' misconduct resulted in declines in the prices of those units and shares; (ii) allowed LINN and LNCO to obtain additional capital by issuing and selling securities at artificially inflated prices; and (iii) enabled certain LINN and LNCO insiders to sell more than $34 million of their personally held LINN units during the Class Period.

40.    LINN, LNCO, and the Individual Defendants are sometimes referenced collectively in this Complaint as the "LINN Defendants."

### *Underwriter Defendants*

41.    Defendant Barclays Capital Inc. ("BCI"), headquartered at 745 Seventh Avenue, New York, New York 10019, is a British-based global investment bank, and a division of

Barclays PLC.  BCI acted as an underwriter for LNCO's IPO.  LNCO agreed to pay BCI a structuring fee equal to 0.375% of the gross proceeds of IPO, up to a cap of $5,000,000, for the evaluation, analysis, and structuring of LNCO.

42.    Defendant Citigroup Global Markets Inc. ("Citigroup"), headquartered at 388 Greenwich Street, New York, New York 10006, is the brokerage and securities arm of Citigroup, Inc., and provides investment banking services to corporate, institutional, government, and retail clients.  Citigroup acted as an underwriter for LNCO's IPO.

43.    Defendant RBC Capital Markets, LLC ("RBC"), headquartered at 60 South 6th Street, Minneapolis, Minnesota 55402, is the corporate and investment banking arm of Royal Bank of Canada.  RBC acted as an underwriter for LNCO's IPO.  Defendants disclosed in the Prospectus that an affiliate of RBC will receive more than 5% of the net proceeds of the IPO as a repayment by LINN of borrowings under its credit facility.

44.    Defendant Wells Fargo Securities, LLC ("Wells Fargo"), headquartered at 550 South Tryon Street, Charlotte, North Carolina 28202, is a registered broker-dealer and a subsidiary of Wells Fargo & Company that provides capital markets and investment banking services.  Wells Fargo acted as an underwriter for LNCO's IPO.  Defendants disclosed in the Prospectus that an affiliate of Wells Fargo will receive more than 5% of the net proceeds of the offering as a repayment by LINN of borrowings under its credit facility.

45.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), headquartered at 4 World Financial Center, North Tower, New York, New York 10080, is a registered broker-dealer and investment adviser, and is a wholly-owned subsidiary of Bank of America Corporation.  Merrill Lynch acted as an underwriter for LNCO's IPO.

46.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse"), headquartered at 11 Madison Avenue, New York, New York 10010, provides investment banking services in the United States, and is a subsidiary of Credit Suisse (USA), Inc. Credit Suisse acted as an underwriter for LNCO's IPO.

47.     Defendant Raymond James & Associates, Inc. ("Raymond James"), headquartered at 880 Carillon Parkway, St. Petersburg, Florida  33716, is a registered broker-dealer and wholly owned subsidiary of Raymond James Financial.  Raymond James acted as an underwriter for LNCO's IPO.

48.     Defendant UBS Securities LLC ("UBS"), headquartered at 677 Washington Boulevard, One Stamford Forum, 2nd Floor, Stamford, Connecticut 06901, is a U.S. broker-dealer and a wholly owned subsidiary of UBS AG that provides securities underwriting, trading, and brokerage activities, as well as M&A advisory activities in the U.S.  UBS acted as an underwriter for LNCO's IPO.

49.     Defendant Goldman, Sachs & Co. ("Goldman Sachs"), headquartered at 200 West Street, 29th Floor, New York, New York 10282, is a full-service global investment banking and securities firm, and is a subsidiary of Goldman Sachs Group.  Goldman Sachs acted as an underwriter for LNCO's IPO.

50.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan"), headquartered at 383 Madison Avenue, New York, New York 10179, is a broker-dealer and future commission merchant, and is the investment banking arm of J.P. Morgan Chase and an affiliate of JPMorgan Chase Bank, N.A.  J.P. Morgan acted as an underwriter for LNCO's IPO.

51.     Defendant Robert W. Baird & Co. Incorporated ("Baird"), headquartered at 777 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, is an international wealth management,

capital markets, private equity, and asset management firm.  Baird acted as an underwriter for LNCO's IPO.

52.    Defendant BMO Capital Markets Corp. ("BMO"), headquartered at 3 Times Square, New York, New York 10036, is a full-service North American financial services provider offering, among other things, equity and debt underwriting, and is a member of BMO Financial Group (formerly known as the Bank of Montreal).  BMO acted as an underwriter for LNCO's IPO.

53.    Defendant Crédit Agricole Securities (USA) Inc. ("Crédit Agricole"), headquartered at 1301 Avenue of the Americas, New York, New York 10019, is a full service institutional broker/dealer and is a U.S. non-bank subsidiary of Crédit Agricole CIB.  Crédit Agricole acted as an underwriter for LNCO's IPO.

54.    Defendant CIBC World Markets Corp. ("CIBC"), headquartered at 425 Lexington Avenue, New York, New York 10017, provides credit and capital market products, investment banking, and merchant banking services in North America and worldwide, and is a subsidiary of the Canadian Imperial Bank of Commerce.  CIBC acted as an underwriter for LNCO's IPO.

55.    Defendant Howard Weil Incorporated ("Howard Weil"), headquartered at 1100 Poydras Street, Suite 3500, New Orleans, Louisiana 70163, is an energy investment boutique that provides investment banking services, and is a part of Scotia Capital (USA) Inc., which, in turn, operates as a subsidiary of Scotia Capital, Inc., owned by Toronto-based Scotiabank. Howard Weil acted as an underwriter for LNCO's IPO.

56.    Defendant Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi"), headquartered at 1633 Broadway, 29th Floor, New York, New York 10019, provides investment banking and brokerage products and services to institutional clients, and is a member of the Mitsubishi UFJ

Financial Group, Inc., a Japanese global financial services company. Mitsubishi acted as an underwriter for LNCO's IPO.

57.    The defendants named in ¶¶ 41-56 above are referenced collectively as the "Underwriter Defendants."

58.    In addition to purchasing from the issuer 30,250,000 common shares of LNCO for sale to the public, the Underwriter Defendants were granted an option for a period of 30 days to purchase up to an additional 4,537,500 shares on the same terms and conditions as the initial 30,250,000 shares.  The option was exercisable in the event the Underwriter Defendants were to sell more shares than the 30,250,000 allotted shares.  The IPO was slated to raise $1.054 billion ($1.213 billion if the Underwriter Defendants exercised their option to purchase additional shares in full).  Each Underwriter Defendant agreed to purchase a specific number of shares in the offering, for a total of 30,250,000 shares (the entirety of the shares offered in the IPO), in a firm commitment underwriting.[13]  The Prospectus informed investors that "[t]he representatives of the underwriters have advised us that the underwriters propose to offer the shares directly to the public at the public offering price on the cover of this prospectus and to selected dealers, which may include the underwriters, at such offering price less a selling concession not in excess of $0.903 per share."  On October 11, 2012, the Underwriter Defendants exercised in full their option to purchase the option units.  The Offering closed on October 17, 2012.

59.    Affiliates of most of the Underwriter Defendants were lenders under LINN's revolving credit facility and stood to benefit—and in fact benefited greatly—from the offering if

---

[13] Firm commitment underwriting requires the underwriter to purchase all of the offered securities from the issuer and in turn offer them for sale to the general public. That type of underwriting is distinguished from a "best efforts" underwriting, in which the underwriter acts only as the issuer's agent in selling securities to the public and does not bear the risk that shares remain unsold. *See* Louis Loss, *Fundamentals of Securities Regulation* 77–78 (2d ed. 1988).

LINN elected to use the proceeds received to repay debt outstanding under that facility.  The

Prospectus disclosed that LINN "will use the proceeds it receives from the sale of [LINN] units

to repay debt outstanding under its revolving credit facility" and that "a substantial portion of the

net proceeds from this offering will be used in the form of [LINN]'s repayment of borrowings

under its credit facility."  LINN planned to use $1.052 billion of the $1.054 billion raised from

the IPO to repay debt outstanding under its revolving credit facility.  The Prospectus further

noted that "[a]ffiliates of most of the underwriters are lenders under [LINN]'s credit facility and,

accordingly, each will ultimately receive their pro rata share of such repayment," and that "an

affiliate of Wells Fargo Securities, LLC and an affiliate of RBC Capital Markets, LLC will each

receive more than 5% of the net proceeds of this offering."  This conflict of interest created an

incentive for the Underwriters to overlook LINN's false DCF statements and calculations.

60.    The Underwriter Defendants (i) participated in drafting the Offering Documents;

(ii) marketed and promoted the IPO, including via roadshows; (iii) solicited purchasers and

disseminated the Offering Documents; and (iv) purchased all of the LNCO shares in the IPO for

distribution.  The Underwriter Defendants collectively were paid more than $45 million in

connection with the IPO (not including the additional fees or other payments to BCI, RBC, and

Wells Fargo noted above).

61.    The Underwriter Defendants had a duty to conduct meaningful and thorough due

diligence to ensure the Offering Documents did not contain untrue statements of material facts or

omit material facts necessary to make the statements, in light of the circumstances in which they

were made, not misleading.  Particularly as LINN's stated "primary goal" is "to provide stability

and growth of distributions for the long-term benefit of its unitholders," and given that LNCO's

financial condition and results of operations depended entirely on the performance of LINN, the

Underwriter Defendants were acutely aware that LINN's ability to maintain LINN's distributable cash flow to a level where it could sustain its distribution was material to investors. Unlike the investing public, the Underwriter Defendants had access to information, including the amounts paid by LINN for the settled premiums of its put derivatives. That information readily confirmed that LINN was overstating its distributable cash flow, which in turn inflated the price of its units and overstated LINN's ability to make or sustain its distributions. But the Underwriter Defendants failed to perform reasonable and meaningful due diligence. Their failure constituted a substantial factor leading to the harms giving rise to Plaintiffs' claims.

62.     The Underwriter Defendants, as well as the LINN Defendants, are liable under the Securities Act for the false and misleading statements incorporated into the Offering Documents.

## LINN'S IMPROPER ACCOUNTING

63.     As briefly discussed above, the SEC has promulgated regulations directly related to the disclosure of non-GAAP financial measures. Regulation G applies to all public disclosures (*i.e.*, earnings releases, press releases, or other public announcements), including those disclosures made in SEC filings on or after March 28, 2003. Regulation G applies to both oral and written statements.[14]

64.     Regulation G includes the general disclosure requirement that a registrant, or a person acting on its behalf, "shall not make public" a non-GAAP financial measure that, taken together with the information accompanying that measure, "contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the

---

[14] *See* SEC Release No. 34, 47226, "Conditions for Use of Non-GAAP Financial Measures."

non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading."[15]

65.    Item 10(e) of Regulation S-K applies additional, more stringent, requirements to periodic reports and other documents filed with the SEC that include non-GAAP financial measures.  Under Item 10, a company is prohibited from "exclud[ing] charges or liabilities that required, or will require, cash settlement, or would have required cash settlement absent an ability to settle in another manner, from non-GAAP liquidity measures, other than the measures earnings before interest and taxes (EBIT) and earnings before interest, taxes, depreciation, and amortization (EBITDA).[16]

66.    During the Class Period, Defendants materially overstated LINN's DCF by failing to account for the cost of the Company's settled put options—which misled investors regarding LINN's ability to pay distributions on its units at the levels the Company had told them to expect.

67.    In its SEC filings during the Class Period, LINN represented that it hedged a significant portion of its forecasted oil and gas production to reduce exposure to fluctuations in the prices of those commodities so that it could enhance the predictability of its long-term cash flows, pay distributions, service debt, and manage its business.  LINN's commodity derivatives primarily included swap contracts and put options.  The premiums for commodity derivatives related to the put options, which required LINN to pay to a counterparty a premium equal to the fair value of the option at the purchase date, with LINN to receive from the counterparty the excess, if any, of the fixed price floor over the market price at the "settlement" date.  LINN paid

---

[15] SEC Release No. 34-47226 II.3.a (footnote omitted).

[16] SEC Release No. 34-47226-229.10(ii)(A).

premiums for contracts that enabled the Company to receive fixed payments for its production of oil and gas until the expiration of the option, which could be up to five years after the purchase date.

68.     LINN represented that it used debt to finance the premiums paid to purchase the put options.[17]  By its own account, since its inception, LINN has raised $1 billion to finance puts.[18]

69.     LINN failed to deduct **any** premiums associated with settled put options in its DCF calculations.  The deductions for those premiums should have typically included the cost of premiums paid on put options settled during a given financial reporting period.  Under Regulations G and S-K, LINN should have deducted the costs for the settled premiums in its DCF calculations, because settled premiums represent the cost associated with the revenues that the Company received in that period.  Furthermore, LINN should have deducted the premiums paid for put options that settled during the period in order to recover funds needed to repay the principal on the debt or to purchase additional put options.  By failing to deduct those premiums, LINN materially overstated its DCF computations by anywhere from 14.91% to 28.56% (*see* chart at ¶ 71 below).[19]

70.     It was not until June 3, 2013—buried in a footnote on page 257 of the Form S-4/A filed in connection with LINN's proposed acquisition of Berry Petroleum—that LINN disclosed the premiums paid for put options that settled during **any** period.  Accordingly, during the Class

---

[17] *See* LINN 2012 Form 10-K at 52.

[18] *See* page 3 of Exhibit 99.1 to LINE's Form 8-K dated February 15, 2013.

[19] LINN represented that "premiums paid for commodity derivatives…are not included in adjusted EBITDA."  Indeed, the premiums were capitalized and added to the DCF calculation.  *See* LINN and LNCO presentation, "LINN Energy Response to Another Round of Short Seller Comments, April 1, 2013" (the "April 1, 2013 Presentation") at 3.  At no point did LINN deduct any of the premiums in arriving at DCF.

Period, investors and the market had no way of calculating the "true" DCF, as the premiums paid for put options that settled during each period were not revealed to the public.

71.    By failing to deduct the costs of the premiums in its DCF calculations, LINN masked its ability to sustain its DCF and thus to make distributions to investors at the levels the Company had told them to expect.  This fact has been borne out, as demonstrated in the chart below:

| Linn Energy Corp. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Analysis of Distributable Cash Flows Including Costs of Put Premiums on Settled Puts | | | | | | | | |
| | 2010 | 2011 | 2012 | | Q1 2012 | Q2 2012 | Q1 2013 | Q2 2013 |
| Adjusted EBITDA | $ 732,131 | $ 997,621 | $ 1,402,694 | | $ 302,139 | $ 319,135 | $ 356,056 | $ 362,312 |
| Interest Expense | (186,410) | (240,116) | (360,989) | | (73,632) | (91,347) | (95,224) | (98,281) |
| Maintenance Capital Expenditure | (88,245) | (167,281) | (362,430) | | (67,369) | (88,269) | (110,298) | (111,912) |
| Distributable Cash Flow | $ 457,476 | $ 590,224 | $ 679,275 | | $ 161,138 | $ 139,519 | $ 150,534 | $ 152,119 |
| Distributable Cash Flow/Unit | $ 3.18 | $ 3.40 | $ 3.30 | | $ 0.83 | $ 0.70 | $ 0.64 | $ 0.65 |
| Premiums of Commodity Der. Settled | (94,000) | (88,000) | (148,000) | | (26,000) | (36,000) | (43,000) | (43,000) |
| Actual Distributable Cash Flow | 363,476 | 502,224 | 531,275 | | 135,138 | 103,519 | 107,534 | 109,119 |
| Actual Distributable Cash Flow/Unit | 2.53 | 2.89 | 2.58 | | 0.70 | 0.52 | 0.46 | 0.47 |
| Percentage Difference | -20.55% | -14.91% | -21.79% | | -16.14% | -25.80% | -28.56% | -28.27% |
| Amount Distributed/Unit | $ 2.58 | $ 2.73 | $ 2.90 | | $ 0.73 | $ 0.73 | $ 0.73 | $ 0.73 |
| Actual Coverage Ratio | 0.979 | 1.060 | 0.890 | | 0.960 | 0.716 | 0.631 | 0.643 |
| NOTE: | | | | | | | | |
| All DCF information was taken from the presentations section of the investors link on the Linn Energy website | | | | | | | | |
| All Premiums paid for commodity derivates settled during the period were taken from the Form S-4/A dated June 4, 2013 and Form 8-K dated August 8, 2013 | | | | | | | | |

72.    As illustrated above, when the premiums paid for settled put options are accounted for, **_LINN's available DCF per unit was significantly less than it reported_**:  (i) for 2010, $2.53 actual vs. $3.18 reported (20.55% less than the reported DCF); (ii) for 2011, $2.89 actual vs. $3.40 reported (14.91% less than the reported DCF); and (iii) for 2012, $2.58 actual vs. $3.30 reported (21.79% less than the reported DCF).  Moreover, had LINN included the

premiums paid for the settled put options in its DCF computation, ***the Company would have lacked the cash flow necessary to support its distributions to unitholders in 2010 and 2012***.

73.     The risks associated with LINN's improper methodology for computing DCF, and the Company's corresponding false and misleading representations, began to materialize in the second quarter of 2012 and the first two quarters of 2013 when, even under LINN's improper calculations, the Company was paying more in distributions than its available distributable cash flow per unit.  Specifically, in Q2:2012, LINN distributed $0.73/unit even though its available distributable cash flow per unit was only $0.70; in Q1:2013, LINN distributed $0.73/unit when its available distributable cash flow per unit was $0.64/unit; and in Q2:2013 the Company distributed $0.73/unit when its available distributable cash flow was only $0.65/unit.

74.     Taking the appropriate deductions for settled puts, LINN's actual distributable cash flow per unit in 2010 would have been only $2.53, less than its distribution of $2.58/unit.  Similarly, accounting for the settled premiums in 2012, LINN's actual distributable cash flow per unit would have been only $2.58, less than the $2.90/unit it distributed that year.  In reality, LINN was only able to sustain its inflated distributions with money it raised through private and public equity and debt offerings and through credit facilities—effectively running a Ponzi scheme.

75.     The coverage ratio for LINN's DCF further demonstrates that the Company's ability to make distributions at the levels it did—or, for 2010 and 2012, to make distributions at all—turned on LINN's improper accounting with respect to put options.  The distribution coverage ratio, calculated by dividing DCF per unit by distributions per unit, compares total distributable cash flow to the quantity paid out to shareholders.  The coverage ratio thus is important because it reflects the cushion LINN has to pay its distributions.  A coverage ratio

below 1.0 indicates that a company is not generating adequate cash to cover its distributions.  For 2010 and 2012, LINN misleadingly reported coverage ratios above 1.0: 1.233 for 2010 and 1.138 for 2012.  Had LINN properly accounted for the costs of the settled puts, its DCF ratio would have been below 1.0 in 2010 and 2012, demonstrating that LINN was not generating enough cash to cover its distributions.  In reality, LINN's coverage ratio was 0.979 for 2010 and 0.890 for 2012.  Indeed, even under LINN's improper DCF calculations, which failed to account for put-option premiums, LINN's DCF coverage ratio was below 1.0—specifically, 0.966—in Q2:2012.  Accounting for the put premiums, LINN's DCF coverage ratio would have been below 1.0 in 2012 and 2013:  0.960 for Q1:2012; 0.716 for Q2:2012; 0.631 for Q1:2013; and 0.643 for Q2:2013.   (It is not currently possible to calculate LINN's actual DCF ratio for Q3:2012 and Q4:2012 because LINN still has not provided the costs of the premiums paid for the settled puts for those periods.)

76.    Moreover, LINN failed to provide a meaningful reconciliation of its non-GAAP measure (DCF) to its most directly comparable GAAP financial measure—cash flow from operations—as required by SEC Regulation G.[20]

77.    LINN instead purported to reconcile net income, a GAAP metric, to adjusted EBITDA, a non-GAAP metric, which in turn LINN used to arrive at DCF.  By beginning with net income as opposed to cash flow from operations, however, LINN failed to use the most directly comparable financial measure presented in accordance with GAAP.  Because DCF is a cash flow measure, the appropriate GAAP financial measure should have begun with cash flow from operations.  Not until LINN was forced to respond to a short seller report on April 1, 2013 did the Company finally change its reconciliation methodology, which appropriately used cash

---

[20] *See* SEC Release No. 34-47226-II.3.b.

flow from operations as a starting point for its DCF computation.[21]   But that purported

reconciliation was nonetheless false or misleading, as LINN continued to fail to properly account

for the cost of premiums for settled put options during the period when calculating DCF.

78.    LINN's DCF calculations departed drastically from how comparable companies

arrived at DCF.  As reported by *Barron's*, New York hedge fund Green Owl Capital

Management studied more than 30 energy companies and found none that employed LINN's

(improper) DCF calculations.[22]

79.    By failing to properly account for the premiums in its DCF calculations, LINN

issued materially false and misleading statements about its DCF and its ability to sustain and

increase its distributions to unitholders, in violation of the federal securities laws.  Those

misrepresentations misled the market regarding LINN's and LNCO's financial condition and

ability to continue paying distributions at the levels they told investors to expect, which in turn

inflated the prices of LINN and LNCO securities.

80.    Only recently, having been exposed by *Barron's* and under investigation by the

SEC, did LINN announce it "no longer uses the term 'distributable cash flow.'"[23]

A.    **The IPO Offering Documents Contained Materially False and Misleading
Statements, in Violation of the Securities Act.**

81.    On June 25, 2012, LNCO and LINN filed a Registration Statement with the SEC

on Form S-1 in connection with the IPO.  The fifth and final amendment to the Registration

Statement, which incorporated the Prospectus, was filed on or about October 2, 2012 and became

effective on October 11, 2012.  The Offering Documents, which were used in connection with

---

[21] *See* April 1, 2013 Presentation.

[22] *See* Andrew Barry, *Twilight of a Stock-Market Darling*, *Barron's*, May 4, 2013, at 4, *available at* http://online.barrons.com/article/SB50001424052748703591404578456911269145042.html.

[23] LINN Form S-4/A dated September 17, 2013, at 235.

the offer and sale of LNCO shares as well as the offer and sale of LINN units to be acquired by

LNCO with the proceeds from the IPO, contained untrue statements of material facts or omitted

to state other facts necessary to make the statements made therein not misleading.

82.    The Offering Documents indicated that "[o]n April 24, 2012, [LINN's] Board of

Directors approved an increase in the quarterly cash distribution from $0.69 per unit to $0.725

per unit with respect to the first quarter of 2012, representing an increase of 5%," and that [o]n

July 24, 2012, [LINN's] Board of Directors declared a cash distribution of $0.725 per unit with

respect to the second quarter of 2012."  Annualized to $2.90 per unit, the yield on LINN's units

as of the date of the IPO was over 7%.  LNCO was thus positioned as a stock for investors

seeking income, and the value of its shares was tied primarily to the likelihood that LINN would

continue to have the capacity to pay substantial and increasing distributions to its unitholders.

83.    The Offering Documents contained other statements indicating that the yield on

LINN units would be lucrative and stable, and thus that LNCO stock would be an attractive

investment.  Observing, for example, that "[w]e currently estimate that for each of the periods

ending December 31, 2012, 2013, 2014 and 2015, LinnCo's income tax liability will be between

2% and 5% of the cash [LINN] distributes to us," LNCO stated in the Prospectus:

> ***Accordingly, if LINN were to maintain its current
> annualized distribution of $2.90 per unit through 2015,
> the annual LinnCo dividend would be between $2.75 and
> $2.84 per share.  For example, we currently estimate that,
> for the period ending December 31, 2013, our dividend
> will be $2.84 per share on an annualized basis***.[24]

84.    The Offering Documents also steered investors towards another metric LNCO

identified as material to LINN's business:  adjusted EBITDA.  Specifically, the Offering

Documents represented that LINN's management utilized adjusted EBITDA as a financial metric

---

[24] Unless otherwise specified, all emphasis in text quoted this Complaint has been added.

to gauge LINN's ability to pay distributions, and that it is used as an important quantitative

measure by similar companies:

> Adjusted EBITDA is a measure used by LINN's management to indicate (prior to the establishment of any reserves by the board of directors) the cash distributions LINN expects to make to its unitholders. Adjusted EBITDA is also a quantitative measure used throughout the investment community with respect to publicly traded partnerships and limited liability companies.

      85.    The Offering Documents defined adjusted EBITDA as "net income (loss) plus the

following adjustments":

- Net operating cash flow from acquisitions and divestitures, effective date through closing date;

- Interest expense;

- Depreciation, depletion and amortization;

- Impairment of long-lived assets;

- Write-off of deferred financing fees;

- (Gains) losses on sale of assets and other, net;

- Provision for legal matters;

- Loss on extinguishment of debt;

- Unrealized (gains) losses on commodity derivatives;

- Unrealized (gains) losses on interest rate derivatives;

- Realized (gains) losses on interest rate derivatives;

- Realized (gains) losses on canceled derivatives;

- Realized gain on recovery of bankruptcy claim;

- Unit-based compensation expenses;

- Exploration costs;

- Income tax (benefit) expense; and

- Discontinued operations.

86.    The Offering Documents presented a reconciliation of net income to adjusted EBITDA, which shows net losses for some years, but positive adjusted EBITDA:

| | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2011 | 2012 |
| | | | (in thousands) | | |
| Net income (loss) | $(298,192) | $(114,288) | $ 438,439 | $ (209,573) | $   230,884 |
| Plus: | | | | | |
| Net operating cash flow from acquisitions and divestitures, effective date through closing date | 3,708 | 42,846 | 57,966 | 36,359 | 45,127 |
| Interest expense, cash | 74,185 | 129,691 | 249,085 | 125,181 | 129,652 |
| Interest expense, noncash | 18,516 | 63,819 | 10,640 | 644 | 42,257 |
| Depreciation, depletion and amortization | 201,782 | 238,532 | 334,084 | 145,711 | 260,782 |
| Impairment of long-lived assets | — | 38,600 | — | — | 146,499 |
| Write-off of deferred financing fees | 204 | 2,076 | 1,189 | 1,189 | 7,889 |
| (Gains) losses on sale of assets and other, net | (23,051) | 3,008 | 124 | (916) | 991 |
| Provision for legal matters | — | 4,362 | 1,086 | 740 | 795 |
| Loss on extinguishment of debt | — | — | 94,612 | 94,372 | — |
| Unrealized (gains) losses on commodity derivatives | 591,379 | 232,376 | (192,951) | 261,851 | (250,406) |
| Unrealized (gains) losses on interest rate derivatives | (16,588) | (63,978) | — | — | — |
| Realized losses on interest rate derivatives | 42,881 | 8,021 | — | — | — |
| Realized (gains) losses on canceled derivatives | (48,977) | 123,865 | (26,752) | — | — |
| Realized gain on recovery of bankruptcy claim | — | — | — | — | (18,277) |
| Unit-based compensation expenses | 15,089 | 13,792 | 22,243 | 11,181 | 14,834 |
| Exploration costs | 7,169 | 5,168 | 2,390 | 995 | 817 |
| Income tax (benefit) expense | (4,221) | 4,241 | 5,466 | 5,868 | 9,430 |
| Discontinued operations | 2,351 | — | — | — | — |
| Adjusted EBITDA | $ 566,235 | $ 732,131 | $ 997,621 | $ 473,602 | $   621,274 |

87.    The Offering Documents further reported that LINN's "adjusted EBITDA" for the six months ended June 30, 2012 was $621 million, up from $473 million for the six months ended June 30, 2011.  While that adjusted EBITDA figure included realized gains on LINN's settled put options, it did not include any deduction for the cost of those options.

88.    The Offering Documents also referred to another non-GAAP metric: "distribution coverage ratio," defined as DCF divided by total cash distributions to unitholders. As explained above, that metric was significant because it (purportedly) reflected LINN's ability to generate sufficient cash to meet its distributions.  In turn, DCF was defined in the Offering Documents as adjusted EBITDA less cash interest expense and "maintenance capital."  While "maintenance capital" was not defined in the Offering Documents, LINN subsequently explained that "maintenance capital" is a non-GAAP forward-looking 12-month calculation of the amount of capital required to approximately hold production and reserves flat.

-30-

89.    The Offering Documents estimated that, as of January 2012, for the 2011 fiscal year, the distribution coverage ratio was 1.25x, thus representing to investors that the distribution coverage ratio was more than adequate (by 25%) to cover the distribution:

| | Revised Budget Target* | Revised Budget Range* | 2011 Estimated Performance as of January 2012[1] |
|---|---|---|---|
| **Operations** | | | |
| Volumes (MMcfe/day) | 393 | 364-422 | 369 |
| Cash Costs (Lease Operating Expenses and General and Administrative Expenses) (in millions) | $ 317 | $ 301-333 | $ 343 |
| Cash Costs (Lease Operating Expenses and General and Administrative Expenses) ($/Mcfe) | $ 2.21 | $ 2.32-2.10 | $ 2.52 |
| **Ability to Pay Distributions** | | | |
| Cash Flow (Adjusted EBITDA less Interest Expense) (in millions) | $ 745 | $ 690-800 | $ 758 |
| Cash Flow/Unit (Cash flow divided by units outstanding) | $ 4.01 | $ 3.71-4.31 | $ 4.36 |
| Distribution Coverage Ratio | 1.22x | 1.10-1.34x | 1.25x |

\*    Budget targets and ranges were updated throughout the year to reflect acquisition activity, debt and equity offerings and distribution increase.

(1)    The Compensation Committee based its decisions on estimates of 2011 performance available at the January 2012 Committee Meeting. Actual final results were released in LINN's Annual Report on Form 10-K for the year ended December 31, 2011 and LINN's Earnings Release, filed on Current Report on Form 8-K, each filed on February 23, 2012.

90.    The representations in the Offering Documents referenced in ¶¶ 81-89 were materially false and misleading because:

a.    LINN's and LNCO's presentation of adjusted EBITDA, DCF, and distribution coverage ratio were not accurate or reliable metrics for gauging LINN's ability to continue making stable or increasing distributions to LINN unitholders, as the metrics did not properly reflect the cost of settled put options purchased by LINN, but included the proceeds it received from the sale or exercise of those options, and, further, overstated the amount of available cash to cover distributions; and

b.    As a result, the Offering Documents materially overstated LNCO's ability to pay stable and increasing dividends and misled investors about the risk of investing in LNCO.

91.    Due to the materially false and misleading misstatements in, or omissions from, the Offering Documents, Defendants are liable under the Securities Act, as specified in ¶¶ 272-

297 below.

**B.**     **In Addition to the Materially False and Misleading Statements in the Offering Documents, LINN, LNCO, and the Individual Defendants Knowingly or Recklessly Made Materially False or Misleading Statements Throughout the Class Period, in Violation of the Exchange Act.**

92.     In addition to Defendants' liability for the materially false or misleading

statements in the Offering Documents, LINN, LNCO, and the Individual Defendants (*i.e.*, the

LINN Defendants) are liable under the Exchange Act for knowingly or recklessly making

materially false or misleading statements during the Class Period concerning LINN's and

LNCO's financial condition and prospects.  Like the Offering Documents, those other Class

Period statements reflected the LINN Defendants' improper accounting for put options, which

materially affected key non-GAAP measures such as DCF.

93.     Those Class Period statements, which are recounted below, were each materially

false and misleading when made because they misrepresented and failed to disclose the

following adverse facts, which were known to the LINN Defendants or recklessly disregarded by

them:

a.     LINN and LNCO failed to adequately disclose how LINN's reported

adjusted EBITDA, DCF, distribution coverage ratio, and maintenance capex were derived;

b.     LINN and LNCO failed to disclose that LINN's reported adjusted

EBITDA, DCF, and distribution coverage ratio excluded the costs of premiums LINN paid for

settled put options, but included the proceeds from the sale or exercise of those options;

c.     LINN and LNCO understated the capital required to maintain current

production levels at LINN's oil and natural gas properties;

d.     As a result of (a) – (c), LINN's reported adjusted EBITDA, DCF, and

distribution coverage ratio were materially overstated and the amount of available cash to cover

distributions was significantly less than reported; indeed, had LINN properly accounted for the costs for its settled premiums in arriving at DCF, it would have been unable to make and sustain its distributions;

        e.      As a result of (a) – (c), LINN was in violation of SEC Regulations G and S-K, Item 10(e);

        f.      The LINN Defendants materially misrepresented the true risk associated with LINN's ability to continue to issue stable or increasing distributions;

        g.      LINN's and LNCO's disclosure controls were materially deficient and its representations concerning them were materially false and misleading;

        h.      SOX certifications issued by Defendants Ellis and Rockov were materially false and misleading; and

        i.      Based on the foregoing, the LINN Defendants lacked a reasonable basis for their positive statements concerning LINN and LNCO and their financial prospects.

94.     On February 25, 2010, for example, LINN issued a press release announcing its financial results for its fiscal 2009 fourth quarter and year end, the periods ended December 31, 2009.  For the year, the Company reported a loss from continuing operations of $296 million, or $2.48 per unit, including a non-cash loss of $591 million, or $4.95 per unit, from the change in fair value of hedges covering future oil and gas production.  Notwithstanding those results, the Company reported a 10% increase in its adjusted EBITDA, from $514 million in 2008 to $566 million in 2009.  For 4Q:2009, the Company reported a loss from continuing operations of $66 million, or $0.52 per unit, including a non-cash loss of $129 million, or $1.01 per unit, from the change in fair value of hedges covering future oil and gas production.

95.     Defendant Ellis commented on the results, stating the Company "***delivered a return to our unitholders of more than 100 percent***, grew production, ***generated a record level of adjusted net income***, strengthened our balance sheet and hedge portfolio and announced acquisitions totaling $268 million dollars."

96.     With respect to the sufficiency of its cash flows, LINN stated that its 2009 distribution coverage ratio was 1.14x, compared to mid-point guidance of 1.13x and that it generated adjusted EBITDA of $566 million in 2009 compared to $514 million in 2008.  The press release also noted that adjusted EBITDA was "***a measure used by Company management to evaluate cash flow and the Company's ability to sustain or increase distributions***," and included the following purported explanation and reconciliation of the Company's adjusted EBITDA:

Schedule 1
LINN Energy, LLC
Explanation and Reconciliation of Adjusted EBITDA

*Adjusted EBITDA*

Adjusted EBITDA (a non-GAAP financial measure), as defined by the Company, may not be comparable to similarly titled measures used by other companies. Therefore, adjusted EBITDA should be considered in conjunction with income from continuing operations and other performance measures prepared in accordance with GAAP, such as operating income or cash flow from operating activities. Adjusted EBITDA should not be considered in isolation or as a substitute for GAAP measures, such as net income, operating income or any other GAAP measure of liquidity or financial performance.

The Company defines adjusted EBITDA as income (loss) from continuing operations plus the following adjustments:

- Net operating cash flow from acquisitions and divestitures, effective date through closing date;
- Interest expense;
- Depreciation, depletion and amortization;
- Impairment of goodwill and long-lived assets;
- Write-off of deferred financing fees and other;
- (Gain) loss on sale of assets, net;
- Unrealized (gain) loss on commodity derivatives;
- Unrealized (gain) loss on interest rate derivatives;
- Realized (gain) loss on interest rate derivatives;
- Realized (gain) loss on canceled derivatives;
- Unit-based compensation expenses;
- Exploration costs; and
- Income tax (benefit) expense.

Adjusted EBITDA is a measure used by Company management to indicate (prior to the establishment of any reserves by its Board of Directors) the cash distributions the Company expects to pay unitholders. Adjusted EBITDA is also a quantitative measure used throughout the investment community with respect to publicly-traded partnerships and limited liability companies.

7

---

Schedule 1 – Continued
LINN Energy, LLC
Explanation and Reconciliation of Adjusted EBITDA

The following presents a reconciliation of income (loss) from continuing operations to adjusted EBITDA:

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| | (in thousands) | | | |
| Income (loss) from continuing operations | $ (65,965) | $ 888,054 | $ (295,841) | $ 825,657 |
| Plus: | | | | |
| Net operating cash flow from acquisitions and divestitures, effective date through closing date [1] | 115 | (872) | 3,708 | 3,436 |
| Interest expense, cash | 23,195 | 16,782 | 74,185 | 81,704 |
| Interest expense, noncash | 3,810 | 6,536 | 18,516 | 12,813 |
| Depreciation, depletion and amortization | 49,848 | 46,834 | 201,782 | 194,093 |
| Impairment of goodwill and long-lived assets | — | 50,505 | — | 50,505 |
| Write-off of deferred financing fees and other | — | — | 204 | 6,728 |
| (Gain) loss on sale of assets, net | 239 | (98,763) | (23,051) | (98,763) |
| Unrealized (gain) loss on commodity derivatives | 128,652 | (884,865) | 591,379 | (734,732) |
| Unrealized (gain) loss on interest rate derivatives | (10,261) | 44,634 | (16,588) | 50,638 |
| Realized loss on interest rate derivatives [2] | 11,252 | 4,557 | 42,881 | 16,036 |
| Realized (gain) loss on canceled derivatives | — | — | (48,977) | 81,358 |
| Unit-based compensation expenses | 3,616 | 3,301 | 15,089 | 14,699 |
| Exploration costs | 2,544 | 4,654 | 7,169 | 7,603 |
| Income tax (benefit) expense | (4,600) | 1,665 | (4,221) | 2,712 |
| Adjusted EBITDA from continuing operations | $ 142,445 | $ 83,022 | $ 566,235 | $ 514,487 |

(1) Includes net operating cash flow from acquisitions and divestitures.

(2) During 2009, the Company revised its definition of adjusted EBITDA to include realized (gains) losses on interest rate derivatives in order to match the related interest expense. Amounts reported in adjusted EBITDA for all prior periods have been reclassified to conform to current period presentation. This reclassification had no effect on the Company's reported net income.

1136128.1

97.     Similar purported explanations and reconciliations of LINN's a d j u s t e d EBITDA were included in press releases and earnings presentations on LINN's website during the Class Period.

98.     LINN's Class Period statements regarding its use of adjusted EBITDA, as well as the Company's purported calculations of adjusted EBITDA, were materially false or misleading in light of the LINN Defendants' improper accounting for put option premiums, and thus false reporting of DCF.

99.     Following LINN's 4Q:2009 and year-end earnings announcement, the Company held a conference call with analysts and investors to discuss its earnings and operations. During the conference call, the LINN Defendants made positive statements about the Company's EBITDA and cash flows.

100.     For example, Defendant Rockov stated that during 2009, the Company "delivered a return to unit holders of more than 100%, announced $268 million in acquisitions and made a strategic entry into the Permian Basin," as well as "strengthened our balance sheet and hedge portfolio *and generated a record level of adjusted EBITDA and net income*." He also touted the Company's distribution of $0.63 per unit for the quarter, which "marked Linn's 16th consecutive quarterly cash distribution since its IPO in January of 2006 and represents $9 per unit in cash distributions paid to unit holders since that time." Rockov further stated:

> For the fourth quarter, we generated strong cash flow ahead of guidance. We *generated adjusted EBITDA of $142 million* for the fourth quarter, compared to midpoint guidance of $139 million. And *$566 million for fiscal 2009* compared to a midpoint guidance of $563 million.
>
> On a per-unit basis, our *distributable cash flow was $0.66 per unit for the fourth quarter and $2.88 per unit for the full year 2009*. Compared to our cash distribution of $0.63 per unit, we achieved a *favorable distribution coverage ratio of 1.04 for the fourth*

> *quarter 2009 compared to a guidance of 1.0; and 1.14 for the full year 2009 compared to guidance of 1.13*.
>
> Looking forward to 2010 at the midpoint of our guidance ranges, we expect to generate *adjusted EBITDA of approximately $138 million in the first quarter and $570 million for the full year. Distributable cash flow is estimated to be approximately $87 million for the first quarter and $364 million for the year,* which implies a *distribution coverage ratio of 1.06 for the first quarter and 1.10 for the fiscal year 2010*.

101. Also on that call, during an exchange with an analyst concerning LINN's DCF and distributions, Rockov represented, "*we're going to have a lot of excess cash flow going forward*."

102. Also on February 25, 2010, LINN filed with the SEC its Form 10-K, signed by Defendants Ellis, Rockov, Rottino, Linn, Alcorn, Jacobs, and McCoy, for the year ended December 31, 2009 (the "2009 Form 10-K"). The 2009 Form 10-K contained the foregoing materially false and misleading statements about the Company's adjusted EBITDA, which the Form 10-K stated is "used by management to evaluate cash flow and the Company's ability to sustain or increase distributions."

103. The 2009 Form 10-K also included materially false or misleading representations by Ellis and Rockov in certifications mandated by SOX. In particular, Ellis and Rockov attested in those certifications that based on their knowledge, (i) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and (ii) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

104.    The above representations about the Company's disclosure controls, and Defendants Ellis's and Rockov's certifications thereon, were repeated, in all material respects, in the Forms 10-K and 10-Q that LINN later filed with the SEC during the Class Period.

105.    On March 29, 2010, LINN completed a public offering of 17,250,000 units at $25.00 per unit, yielding the Company net proceeds of approximately $413.7 million.

106.    On March 30, 2010, LINN and its wholly owned subsidiary, Linn Energy Finance Corp., announced a private offering of $1.3 billion in aggregate principal amount of 8.625% senior unsecured notes due 2020 at an offering price equal to 97.552% of par.

107.    On April 29, 2010, LINN issued a press release announcing its financial results for its 2010 first quarter, the period ended March 31, 2010.  For the quarter, the Company reported income from continuing operations of $65 million, or $0.50 per unit, including a non-cash gain of $33 million, or $0.26 per unit, from the change in fair value of hedges covering future production.

108.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.26x, compared to 1.04x for the fourth quarter 2009, and that it generated adjusted EBITDA of $152 million during the first quarter 2010, compared to $142 million for the fourth quarter 2009.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

109.    In commenting on the results, Ellis stated the Company "***again delivered strong operational and financial results that exceeded our performance targets***" and "***enhanced our hedge portfolio, which provides more certainty to our cash flow and supports future distributions***."

110.    Following the Company's 2010 first quarter earnings announcement, LINN held a

conference call with analysts and investors to discuss the Company's earnings and operations.

During the conference call, Defendants made positive statements about the Company's adjusted

EBITDA and cash flows.  Ellis stated, for example, that the Company "***generated stronger than***

***expected cash flow and achieved distribution coverage of 1.26 times for the first quarter***."  And

Rockov made several representations concerning LINN's present and future distributions:

> For the first quarter we generated strong cash flow ahead of
> guidance.  We generated ***adjusted EBITDA of approximately***
> ***$152 million*** for the first quarter compared to midpoint guidance
> of $138 million.  On a per unit basis ***our distributable cash flow***
> ***was $0.79 per unit.  When compared to our cash distribution of***
> ***$0.63 per unit we achieved the strongest distribution coverage***
> ***ratio of 1.26 times for the first quarter 2010, well exceeding our***
> ***guidance of 1.06 times***.
>
> Looking forward to the remainder of 2010, at the midpoint of our
> guidance ranges we expect to generate ***adjusted EBITDA of***
> ***approximately $165 million in the second quarter and***
> ***approximately $660 million for the full year.  Distributable cash***
> ***flow is estimated to be approximately $100 million for the second***
> ***quarter and $410 million for the year which implies a***
> ***distribution coverage ratio of 1.06 times for the second quarter***
> ***and 1.13 times for fiscal year 2010***.
>
> *                *                *
>
> As a result of our hedging activities we now have a six-year hedge
> book with approximately 90% of our current expected production
> hedged on an equivalent basis through 2013.  This provides more
> certainty to our cash flow and supports future distributions.  We
> believe we are well positioned both financially and operationally to
> continue to grow and we are aggressively pursuing additional
> acquisitions to capitalize on our momentum.
>
> On April 27 we announced a cash distribution of $0.63 per unit for
> the first quarter 2010 which we will be paid on May 14 to
> unitholders of record as of the close of business on May 7.  This
> distribution represents our 17th consecutive quarterly distribution.
> At yesterday's closing price of $26.51 per unit our yield is
> approximately 9.5% based on our current annualized distribution
> rate of $2.52 per unit.

111.    That same day, April 29, 2010, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2010 first quarter ended March 31, 2010 (the "2010 Q1 Form 10-Q").  The 2010 Q1 Form 10-Q contained materially false and misleading statements as described above about the Company's adjusted EBITDA and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

112.    On July 29, 2010, LINN issued a press release announcing its financial results for its 2010 second quarter, the period ended June 30, 2010.  For the quarter, the Company reported income from continuing operations of $60 million, or $0.41 per unit, including a non-cash gain of $41 million, or $0.27 per unit, from the change in fair value of hedges covering future production.

113.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.20x, compared to 1.26x for the first quarter 2010, and that it generated adjusted EBITDA of $175 million during the second quarter 2010, compared to $152 million for the first quarter 2010.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

114.    Defendant Ellis commented on the results, noting the Company's "***strong potential for future growth in distributions***."

115.    Following the Company's 2010 second quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  Ellis, for example, stated that "[b]etter than expected production, lower operating expenses, ***helped generate record EBITDA in a strong***

*coverage ratio of 1.2x*." And, as he had done the previous quarter, Rockov made detailed

representations concerning LINN's current and future distributions:

> For the second quarter, we generated strong cash flow ahead of guidance. We generated *adjusted EBITDA of approximately $175 million to the second quarter*, compared to mid-point guidance of $164 million. *On a per unit basis, our distributable cash flow was $0.76 per unit. When compared to our cash distribution of $0.63 per unit, we achieved a strong distribution coverage ratio of 1.2 times for the second quarter of 2010*, well exceeding our guidance of 1.06 times.
>
> Looking forward to the remainder of 2010, at the mid-point of our guidance ranges, we expect to generate *adjusted EBITDA of approximately $178 million for the third quarter and approximately $689 million for the full-year*.
>
> *Distributable cash flow is estimated to be approximately $107 million for the third quarter and $433 million for the year, which implies the healthy distribution coverage ratios of 1.15 times for the third quarter and 1.2 times for the fiscal 2010*.
>
> Adding further stability to our long-term cash flow, in April, we opportunistically hedged additional natural gas volumes for 2012 through 2015, and added to our oil positions for 2011 through 2013 at very attractive prices compared to the current forward strip. A detailed hedge table is included in the supplemental information available on our website.
>
> *            *            *
>
> Additionally, *given the expected quarter-to-quarter increase of EBITDA, we estimate the distribution coverage ratio will steadily climb beginning next quarter and increase through 2011 and beyond*. Combined with our enhanced ability from new long-term hedges, nearly $1 billion of acquisition activity year-to-date, and unique growth potential from Granite Wash drilling, *we believe we will be well positioned to increase the current distribution in the near future*.

116.    That same day, July 29, 2010, LINN filed with the SEC its Form 10-Q, signed by

Defendant Rottino, for the second quarter ended June 30, 2010 (the "2010 Q2 Form 10-Q"). The

2010 Q2 Form 10-Q contained materially false and misleading statements as described above

about the Company's adjusted EBITDA and cash flows, and included false or misleading SOX

certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

117.    On September 8, 2010, LINN and its Linn Energy Finance Corp. subsidiary

announced a private offering of $1 billion in aggregate principal amount of 7.75% senior

unsecured notes due 2021 at an offering price equal to 98.264% of par.

118.    On October 13, 2010, Defendants Ellis and Rockov participated in the

Independent Petroleum Association of America Oil & Gas Investment Symposium in San

Francisco, California, during which Rockov described the Company as "***poised to raise the***

***distribution***." He added, "Right now with the kind of cash flow growth that we're experiencing

just organically, growing at 25%, 30% a year, we're obviously poised to not only increase the

distribution but also increase coverage as we do it." Indeed, Rockov later reiterated "the . . .

point that you can't overemphasize enough": that "***we are poised to grow the distribution while***

***also increasing the coverage ratio.***" He further specified, "If we're growing at 30% a year, I can

assure you we're not going to grow our distribution at that rate. So basically, you're going to

have increasing coverage and better debt metrics as you go. So combining the two things that we

really pride ourselves on, which is stability and growth."

119.    On October 25, 2010, LINN announced a 5% increase in its quarterly cash

distribution to $0.66 per unit.

120.    On October 28, 2010, LINN issued a press release announcing its financial results

for its 2010 third quarter, the period ended September 30, 2010. For the quarter, the Company

reported income from continuing operations of $4 million, or $0.03 per unit, including non-cash

losses of $39 million, or $0.26 per unit, from the change in fair value of hedges covering future

production.

121.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.18x, compared to 1.20x for the second quarter 2010, and that it generated adjusted EBITDA of $185 million during the third quarter 2010, compared with $175 million for the second quarter 2010.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

122.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

> ***LINN's quarterly cash distribution increase reflects our positive outlook for the future, given our acquisition success, projected organic growth and extensive commodity hedge portfolio.***  We already have approximately $1.2 billion in acquisitions pending or closed this year, and we currently have an undrawn $1.5 billion credit facility, which positions us to continue pursuing accretive acquisitions.  We believe that our strengthened commodity hedge portfolio, continued accretive acquisitions and projected organic growth will ***provide us with the ability to grow future distributions while simultaneously growing our distribution coverage ratio***.

123.    Following the Company's 2010 third quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and DCF.  For example, Defendants stated, in pertinent part, as follows:

> Defendant Ellis:
>
> On Monday, we ***announced a 5% increase in LINN's cash distribution to $0.66 per unit for the third quarter of 2010 or $2.64 per unit on an annualized basis***.  This increase reflects our positive outlook for the future.  We believe that our strength in commodity hedge book, continued accretive acquisitions, and projected organic growth will provide us with the ability to ***consistently grow future distributions while simultaneously growing our distribution coverage ratio***.

*        *        *

We were resilient in 2008, consistently paying a stable distribution. *In 2009, we climbed to new heights, delivering more than 100% total return to our unitholders.  This year we have continued this assent with record production levels and adjusted EBITDA as well as an increased distribution*.  We look forward to continuing this trend.

Defendant Rockov:

For the third quarter, we generated strong cash flow ahead of guidance.  *Adjusted EBITDA for the third quarter was up 30% year-over-year to $185 million and also compared favorably to the midpoint guidance of $178 million*.

*On a per unit basis, our distributable cash flow was $0.75 per unit, which resulted in a distribution coverage ratio of 1.18 times compared to guidance of 1.15 times*.  Adjusting for our recently announced 5% distribution increase of $0.03, coverage for the quarter was 1.13 times.

Looking forward to the fourth quarter 2010 at the midpoint of our guidance ranges, we expect to generate adjusted EBITDA of approximately $205 million.  *Distributable cash flow per unit is estimated to be approximately $0.79, which implies a strong distribution coverage ratio of 1.2 times for the fourth quarter*.

We are very pleased to be on a fourth-quarter run rate of 1.2 times coverage including the recent 5% distribution increase.  Our expected organic growth rate of more than 25% year-over-year gives us the *confidence to deliver not only further distribution increases but increasing distribution coverage ratios as well*.

Hedging a significant amount of our production has always been a key component to our strategy and has allowed us to deliver stable distributions through some of the most turbulent markets.  As we look forward, our organic growth rate is expected to be very strong and should give us the opportunity to *consistently grow distributions*.

*        *        *

What is unique to our hedge profile today is that we have hedged not only our current production but also our strong expected organic growth profile.  This gives us even more confidence that *we should be able to deliver growth and distributions and strong coverage ratios for many years* to come in spite of any negative downward trend in commodity prices.

-44-

\*    \*    \*

> This week we announced a 5% increase to our distribution, which is now $2.64 per year. This increase reflects management['s] and the Board of Directors' confidence in the stability and future growth of the Company. We are pleased the market has begun to recognize the strong future growth potential of Linn Energy. However with a current yield of 7.8%, we also look forward to this trend continuing.

124.    During the conference call, the following exchange also occurred between

Defendants Ellis, Rockov and an analyst concerning LINN's distribution coverage ratio:

> Eric Anderson, Analyst, Hartford Financial:
>
> Good morning. I'd like to also congratulate you on all you've been able to accomplish in 2010. I just wanted to get a little bit of sense from you folks as to how we should think about your increasing the distribution on a go forward basis with your desires to maintain a certain level of coverage given the sort of prolific growth that I think everyone expects to possibly see out of both the Texas and the Oklahoma side of the Granite Wash.
>
> Defendant Ellis:
>
> Good question, Eric, and *our plans are to grow the distribution consistently each year*. Exactly how much and over what time frame or when, I can't really comment about that too much now. But in terms of our current projections of future distributable cash flow growth at around 25%, *implies not only our ability to meaningfully grow the distribution but also grow coverage* as well.
>
> Eric Anderson:
>
> Do you want to maintain sort of the current coverage level that you've got now?
>
> Defendant Rockov:
>
> We are in a little bit of a high-class problem right now, where our run rate on coverage is 1.2 and our coverage ratio is accelerating into next year. So I think that you are going to see both. *You're going to see meaningful distribution increases and meaningful coverage increases*. I don't think we can be exactly specific as to which one.

125.    That same day, October 28, 2010, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the 2010 third quarter ended September 30, 2010 (the "2010 Q3 Form 10-Q"). The 2010 Q3 Form 10-Q contained materially false and misleading statements as described above about the Company's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

126.    On December 14, 2010, LINN completed a public offering of 11,500,000 units at $35.92 per unit yielding the Company net proceeds of approximately $396 million.

127.    On February 24, 2011, LINN issued a press release announcing its financial results for its fiscal 2010 fourth quarter and year ending December 31, 2010. For the year, the Company reported a loss from continuing operations of $114 million, or $0.80 per unit, including a non-cash loss of $232 million, or $1.63 per unit, from the change in fair value of hedges covering future production. For the 2010 fourth quarter, the Company reported a loss from continuing operations of $244 million, or $1.64 per unit, including a non-cash loss of $267 million, or $1.80 per unit, from the change in fair value of hedges covering future production.

128.    With respect to the sufficiency of its cash flows, however, the Company reported 2010 distribution coverage ratio of 1.23x, compared to 1.14x for the 2009 year, and that it generated adjusted EBITDA of $732 million during 2010, compared to $566 million in 2009. In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

129.    Defendant Ellis commented on the results, noting LINN "***increased our distribution by 5 percent and delivered a total return of more than 45 percent to our unitholders***" and stating, "We believe our strong balance sheet will enable us to continue

capitalizing on future acquisition opportunities that, when coupled with significant growth from

our organic activities, should provide us with the potential for *future distribution increases*."

130.     Following the Company's 2010 fourth quarter and year-end earnings

announcement, LINN held a conference call with analysts and investors to discuss the

Company's earnings and operations.  During the conference call, Defendants made positive

statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants

stated, in pertinent part, as follows:

> Defendant Ellis:
>
> During 2010, we ***increased the distribution about 5% and
> delivered a return to unit holders of more than 45%***.  On
> February 14, we paid our fourth quarter 2010 cash distribution of
> $0.66 per unit or $2.64 on an annualized basis.  Additional
> accretive acquisitions and significant production growth, combined
> with the strength of our commodity hedge portfolio, ***should
> provide us with the ability to increase future distributions***.
>
> Last year, ***we increased adjusted EBITDA by almost 30% to $732
> million, compared to $566 million in 2009***.  Production increased
> during the fourth quarter by approximately 43% to $370 million--
> or $307 million a day, from $215 million a day in 2009.
>
> Defendant Rockov:
>
> For the fourth quarter, ***adjusted EBITDA increased by more than
> 50% to $221 million and by almost 30% to $732 million for full-
> year 2010***.  On a per-unit basis, ***our distributable cash flow is
> $0.88 per unit for the fourth quarter and $3.18 per unit for the
> full year 2010***.  When compared to our cash distribution of $0.66
> per unit, ***we achieved an exceptional distribution coverage ratio
> of 1.34 times for the fourth quarter and 1.23 times for the full
> year 2010***.
>
> *     *     *
>
> Turning to commodity hedges on an equivalent basis, we have
> hedged approximately 100% of our expected oil and natural gas
> volumes through 2013, 80% in 2014 and 50% in 2015 at favorable

prices. Our hedge position today not only covers our current production but also our strong expected organic growth profile. This gives us confidence that *we should be able to grow distributions and deliver strong coverage ratios for many years to come*.

\*       \*       \*

For full year 2011 at the midpoint of our guidance range, we *expect to generate adjusted EBITDA of approximately $880 million*. Distributable cash flows are estimated to be approximately $525 million, *implying a distribution coverage ratio of 1.24 times for the year*.

As noted in our full-year guidance estimates*, we expected adjusted EBITDA and our distribution coverage ratio to significantly increase from the first quarter and continue to increase throughout 2011. Strong distribution coverage*, coupled with additional accretive acquisitions *should provide us with the ability to grow future distributions*.

131.    During the conference call, the following exchange occurred between Defendants and analysts concerning LINN's distribution coverage ratio:

<u>Douglas Clifford, Analyst, Omega Advisors</u>:

I had a question on your coverage, that's 1.34 on the fourth quarter. And logic would say with the drilling more Granite Wash wells, that that coverage may stay elevated for kind of an extended period of time. How do you feel about that versus sort of previous sense of seeking a 1.2 coverage ratio?

<u>Defendant Rockov</u>:

Are you talking about first quarter, or are you talking about --

<u>Douglas Clifford</u>:

No. No, I'm talking about going out a year or more. Do you think that --

<u>Defendant Rockov</u>:

Yes, well, I mean, I think if you look at it, Doug, there's a couple things that impacted the Q4 to Q1 comparison, I suppose. The hedge debt that you have in 2010 is different than in '11, so some of the growth that we see on the production side is a little bit muted

by a little bit lower prices.  And then you've got the weather impacts that Mark talked about in the first quarter.

But if you've got a 1.24 coverage for the entire year and a 1.0 coverage for the first quarter, you know, we can all do the math. That *implies a pretty strong coverage ratio* for the balance of the year, particularly as you exit the year because it's a ramping coverage ratio.  So I think you're going to see that coverage ratio compare very favorably even to the fourth quarter numbers.  *So we're pretty pleased on the trajectory that we're on.*  I hope that answers your question.

*      *      *

<u>Noah Lerner, Analyst, Hartz Capital</u>:

Okay, great. I guess my last question, and I'll tap dance around it a little bit, which is, you know, the distribution growth potential.  I was just wondering, are you kind of waiting on some of the wells to be frac'd and come online in the Stiles Ranch and Dyco areas, since those are two new areas where a lot of the drilling activity laid out for 2011 are going on?  So you can see kind of how that compares to the other areas that have already been drilled, before you kind of get a sense of, you know, how you might be going about feeding the investors during 2011?

<u>Defendant Ellis</u>:

Yes, Noah, that's one way to look at it.  I mean, Kolja mentioned in his comments that *coming off of first quarter at a 1.0 coverage and still posting a 1.24 for the year shows that we've got a lot of momentum in terms of coverage growth through the remainder portion of the year*.

132.    LINN also posted a presentation on its website entitled "4th Quarter and Year-End 2010 Supplemental Financial and Operational Results" that reiterated its reported financial results for the fourth quarter and full year 2010, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for 2011.  The presentation also contained the following explanation for the calculation of LINN's DCF and distribution coverage ratio for the fourth quarter and full year 2010:

-49-

## Coverage Ratio Calculation

**LINN ENERGY, LLC**
**COVERAGE RATIO CALCULATION**

| | Three Months Ended | | Year Ended |
| | December 31, 2010 | September 30, 2010 | December 31, 2010 |
|---|---|---|---|
| | (in thousands, except unit and ratio amounts) | | |
| Adjusted EBITDA [(1)] | $ 220,685 | $ 184,964 | $ 732,131 |
| Less: interest expense [(2)] | (61,388) | (49,982) | (186,410) |
| Less: maintenance capital expenditures | (27,105) | (25,015) | (88,245) |
| Distributable cash flow | $ 132,192 | $ 109,967 | $ 457,476 |
| | | | |
| Distributable cash flow per unit | $ 0.88 | $ 0.75 | $ 3.18 |
| Distribution per unit [(3)] | $ 0.66 | $ 0.66 | $ 2.58 |
| Units outstanding (millions) | 149.7 | 147.4 | 144.0 |
| Distribution coverage ratio | 1.34x | 1.13x | 1.23x |

(1)  Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

(2)  Includes cash payments for interest expense, and accrued interest on the Company's outstanding senior notes and the effects of the Company's interest rate swaps.

(3)  Based on quarterly distribution of $0.63 per unit, or $2.52 per unit on an annualized basis, for Q1 and Q2 2010, and quarterly distribution of $0.66 per unit, or $2.64 per unit on an annualized basis, for Q3 and Q4 2010.

133.    The above representation was materially false or misleading, primarily because it failed to account for the cost of premiums paid for put options that settled during the periods included in the representation.

134.    On February 28, 2011, LINN filed with the SEC its Form 10-K, signed by Defendants Ellis, Rockov, Rottino, Linn, Alcorn, Jacobs, and McCoy, for the year ended December 31, 2010 (the "2010 Form 10-K").  The 2010 Form 10-K contained materially false and misleading statements about the Company's adjusted EBITDA and cash flows, as described above, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

135.    On or about March 4, 2011, LINN completed a public offering of 16,726,067 units at $38.82 per unit yielding the Company net proceeds of approximately $623 million.

136.    On April 28, 2011, LINN issued a press release announcing its financial results for its 2011 first quarter, the period ended March 31, 2011.  For the quarter, the Company

1136128.1

reported a net loss of $447 million, or $2.75 per unit, including a non-cash loss of $425 million, or $2.62 per unit, from the change in fair value of hedges covering future production.

137.    With respect to the sufficiency of its cash flows, however, the Company reported a quarterly distribution coverage ratio of 1.15x, compared to 1.34x for the fourth quarter 2010 and that it generated adjusted EBITDA of $210 million during the first quarter 2011, compared to $221 million for the fourth quarter 2010.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

138.    Defendant Ellis commented on the results, stating:  "With our successful acquisition activity and impressive organic growth profile, we increased 2011 guidance.  ***We believe our distribution coverage ratio for the remainder of the year will average approximately 1.40x, which should provide us with the ability to increase our distribution this year***."

139.    Following the Company's 2011 first quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants Ellis and Rockov stated, in pertinent part, as follows:

> Mark Ellis:
>
> Our successful acquisition activity and impressive organic growth profile allowed us to increase 2011 guidance. ***Our distribution coverage ratio for the remainder of the year is estimated to average approximately 1.4 times, which should provide the ability to increase the distribution this year***. This coverage ratio does not reflect additional future accretive acquisitions, which we expect would further increase our distributable cash flow per unit. I will now turn the call over to Kolja Rockov.

Kolja Rockov:

*Adjusted EBITDA for the first quarter of 2011 increased 39% over the first quarter 2010 to $210 million. On a per unit basis, our distributable cash flow was $0.76 per unit for the first quarter. When compared to our cash distribution of $0.66 per unit, we achieved a distribution coverage ratio of 1.15 times for the quarter*.

\*     \*     \*

Turning to guidance for the full year 2011, at the midpoint of our guidance range, *we expect to generate adjusted EBITDA of approximately $1 billion. Distributable cash flow is estimated to be approximately $612 million applying a distribution coverage ratio of approximately 1.34 times for the year*.

Given our recent acquisitions and successful drilling programs so far this year, *we expect coverage to continue to increase each quarter during the year and average 1.4 times for the remainder of the year.* As Mark mentioned, we made a positive revision to our guidance for 2011. We believe we have the acquisition and drilling opportunities, balance sheet and access to capital to continue to accelerate our growth profile.

The outlook for a stronger distribution coverage ratio coupled with additional accretive acquisitions should provide us with the ability to *increase the distribution while maintaining continuous growth of our distribution coverage ratio*.

140. That same day, April 28, 2011, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the first quarter ended March 31, 2011 (the "2011 Q1 Form 10-Q"). The 2011 Q1 Form 10-Q contained materially false and misleading statements, as described above, about the Company's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

141. LINN also posted a presentation on its website entitled "Supplemental Q1 2011 Financial and Operational Results" that reiterated its reported financial results for the first quarter of 2011, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the second quarter and full year 2011. The presentation also contained the following

explanation for the calculation of LINN's DCF and distribution coverage ratio for the first

quarter:

## Coverage Ratio Calculation

| | | Three Months Ended | | |
|---|---|---|---|---|
| | | March 31, 2011 | | December 31, 2010 |
| | | (in thousands, except unit and ratio amounts) | | |
| Adjusted EBITDA [1] | | $ 209,996 | $ | 220,685 |
| Less: interest expense [2] | | (58,751) | | (61,388) |
| Less: maintenance capital expenditures | | (26,400) | | (27,105) |
| Distributable cash flow | | $ 124,845 | $ | 132,192 |
| | | | | |
| Distributable cash flow per unit | | $ 0.76 | $ | 0.88 |
| Distribution per unit [3] | | $ 0.66 | $ | 0.66 |
| Units outstanding (millions) | | 164.8 | | 149.7 |
| Distribution coverage ratio | | 1.15x | | 1.34x |

[1]   Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

[2]   Includes cash payments for interest expense and accrued interest on the Company's outstanding senior notes.

[3]   Based on quarterly distribution of $0.66 per unit, or $2.64 per unit on an annualized basis.

142.    The above representation was materially false or misleading, primarily because it

failed to account for the cost of premiums paid for put options that settled during the periods

included in the representation.

143.    In May 2011, The American Oil & Gas Reporter published an article on LINN's

hedging strategies entitled "LINN Energy LLC Hedging Strategies Maximize Cash Flow, Fuel

Organic Growth."[25]   In the article, defendant Ellis touted LINN's "low-risk growth strategy"

which made its units as "an appealing buy," further stating:  "***Our investors are looking for***

***current income, which they find in our distribution***. Our overall strategy gives us a lower cost

---

[25] Colter Cookson, *LINN Energy LLC Hedging Strategies Maximize Cash Flow, Fuel Organic Growth,* May 2011, The American Oil & Gas Reporter, *available at* http://www.aogr.com/index.php/magazine/editors-choice/linn-energy-llc-hedging-strategies-maximize-cash-flow-fuel-organic-growth.

of capital, which provides us with a competitive advantage relative to the publicly traded C-

corps."

144.     In the same article, defendant Rockov commented on LINN's hedging strategy

and how unitholders benefit from the resulting "predictable cash stream" and "stability," as

follows:

> "Hedging protects our profit margins, which allows us to have the
> predictable cash stream that drives our quarterly distribution,"
> Rockov remarks.
>
> *        *        *
>
> "Our unit holders appreciate that we buy low-risk assets, remove
> the commodity price risk, capture the margin between oil prices
> and acquisition costs, and send our excess cash flow back to unit
> holders through a quarterly distribution," he says. ***We have
> stability, so we trade at a significant cost-of-capital advantage.***

145.     On July 26, 2011, LINN announced a 5% increase in its quarterly cash

distribution to $0.69 per unit.

146.     On July 28, 2011, LINN issued a press release announcing its financial results for

its 2011 second quarter, ending June 30, 2011.  For the quarter, the Company reported net

income of $237 million, or $1.34 per unit, including a non-cash gain of $163 million, or $0.93

per unit, from the change in fair value of hedges covering future production.

147.     With respect to the sufficiency of its cash flows, the Company reported a

quarterly distribution coverage ratio of 1.42x (excluding above noted 5 percent distribution

increase), compared to 1.15x for the first quarter 2011, and that it generated adjusted EBITDA of

$264 million during the second quarter 2011, compared to $210 million for the first quarter

2011.  In addition, the press release included a representation purporting to explain and reconcile

LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

148.   Defendant Ellis commented on the results, stating, in pertinent part, as follows:

We have already closed more than $850 million in acquisitions, setting a strong pace for the year.  In addition, our organic growth program is on track to deliver an estimated 30 percent growth year-over-year.  Our strong second quarter results, coupled with our projected future growth, ***positioned us to raise our distribution by 5 percent.  This is the second time we have raised the distribution in the last nine months, and represents a 10 percent increase since the second quarter 2010***.

149.   Following the Company's 2011 second quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendants stated, in pertinent part:

Defendant Ellis:

Now as the results indicate, during the second quarter Linn continued its positive momentum by closing acquisitions totaling approximately $620 million, ***generating record adjusted EBITDA, and raising our distribution by 5% for the second time within nine months***.

Defendant Rockov:

***Adjusted EBITDA*** (technical difficulty) ***second quarter 2011 increased 50% over the second quarter 2010 to $264 million, a record for LINN.  On a per unit basis our distributable cash flow was $0.94 for the second quarter.***  When compared to our cash distribution of $0.69 per unit for the quarter, ***we achieved a distribution coverage ratio of 1.42 times, excluding the 5% distributions increase, and 1.36 times including the recent increase***.

\*        \*        \*

Turning to guidance, for the full year 2011 at the midpoint of our guidance range ***we expect to generate adjusted EBITDA of approximately $1 billion.  Distributable cash flow is estimated to be approximately $590 million, implying a distribution coverage ratio of approximately 1.25 times for the year***.

This week *we announced another 5% increase to our quarterly distribution, which is now $2.76 per year*. This increase reflects management and the Board's confidence in the stability and growth of the Company.

150.    During the conference call, the following exchange also occurred between

Defendants Ellis, Rockov, and an analyst concerning LINN's distribution coverage ratio and

maintenance capex:

Ethan Bellamy, Analyst, Robert W. Baird:

So can you give us a sense for you have got basically 30% or 40% excess distributable cash flow coverage. What portion of that would you describe as sort of flush production, excess coverage that you wouldn't have if you didn't have such a high decline rate?

Kolja Rockov:

Actually, the way we have calculated coverage that impact has been dialed into the maintenance number, and so I think you are going to see us continually adjust maintenance to reflect that. *So the coverage is actually accurate.*

Maintenance for us, I think as a company, as we have been developing these assets, has been ticking up. *But obviously the production that you get and the cash flows that you get outweighs whatever that increase is.* So look for us to continue to adjust that number up and *have an accurate coverage number* that we feel good about.

Ethan Bellamy:

Appreciate that, Kolja. Can you give us some insight into how you are calculating that maintenance number?

Mark Ellis:

The maintenance is -- this is Mark. *The maintenance is based on what our cost to replenish both rate and reserves*, and so a good way to think about it is really kind of a developed cost basis.

Ethan Bellamy:

Okay. So are you guys doing sort of bottom-up project assumption to get to that number or is it --?

<u>Mark Ellis</u>:

Yes, I mean it's a project specific calculation. We take our best inventory and that goes into our maintenance program. It's what you would do if all you were going to do as a company was spend maintenance, you are going to high-grade your program and spend -- do your best projects. And that is what drives our maintenance program.

151.    That same day, July 28, 2011, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the second quarter ended June 30, 2011 (the "2011 Q2 Form 10-Q").  The 2011 Q2 Form 10-Q contained materially false and misleading statements, as described above, about the Company's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

152.    LINN also posted a presentation on its website entitled "Supplemental Q2 2011 Financial and Operational Results" that reiterated its reported financial results for the second quarter of 2011, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the third quarter and full year 2011.  The presentation also contained the following explanation for the calculation of LINN's DCF and distribution coverage ratio for the second quarter:

## Coverage Ratio Calculation

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2011 | | March 31, 2011 | |
| | (in thousands, except unit and ratio amounts) | | | |
| Adjusted EBITDA [(1)] | $ | 263,606 | $ | 209,996 |
| Less: interest expense [(2)] | | (57,798) | | (58,751) |
| Less: maintenance capital expenditures | | (40,229) | | (26,400) |
| Distributable cash flow | $ | 165,579 | $ | 124,845 |
| Distributable cash flow per unit | $ | 0.94 | $ | 0.76 |
| Distribution per unit [(3)] | $ | 0.69 | $ | 0.66 |
| Units outstanding (millions) | | 176.9 | | 164.8 |
| Distribution coverage ratio | | 1.36x | | 1.15x |

[(1)]  Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

[(2)]  Includes cash payments for interest expense and accrued interest on the Company's outstanding senior notes.

[(3)]  Based on quarterly distribution of $0.66 per unit, or $2.64 per unit on an annualized basis, for Q1 2011 and quarterly distribution of $0.69 per unit, or $2.76 per unit on an annualized basis, for Q2 2011.

153.    The above representation was materially false or misleading, primarily because it failed to account for the cost of premiums paid for put options that settled during the periods included in the representation.

154.    On October 27, 2011, LINN issued a press release announcing its financial results for its 2011 third quarter, the period ended September 30, 2011.  For the quarter, the Company reported net income of $838 million, or $4.74 per unit, including a non-cash gain of $732 million, or $4.15 per unit, from the change in fair value of hedges covering future production.

155.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 1.10x, compared to 1.42x for the second quarter 2011 and that it generated adjusted EBITDA of $243 million during the third quarter 2011, compared to $264 million for the second quarter 2011.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

156.    Defendant Ellis commented on the results, stating, in pertinent part:

LINN's ***capital program continues to deliver positive results with quarter-over-quarter production growing 6 percent***.  Our organization has the ability to quickly assess current market conditions and act on them.  In the third quarter, we capitalized on the volatility of the markets by repurchasing a portion of our units and strengthening our commodity hedge positions for 2012 and 2013.  Our strategy enables us to prosper during turbulent markets, as evidenced by our strong relative performance compared to major indices in both the E&P and MLP markets.

157.    Following the Company's 2011 third quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  Defendants stated  as follows:

Defendant Ellis:

So far this year we have closed or signed agreements for approximately $1 billion in acquisitions.  We also marked our 23rd consecutive quarterly cash distribution by announcing our third-quarter distribution in the amount of $0.69 per unit.  Notably, we increased our distribution by 5% on two separate occasions over the past 12 months, for a total of 10%.  Now, ***since our IPO in 2006, we will have paid $13.70 per unit in distributions and generated a total return of over 200%.***

Defendant Rockov:

***Adjusted EBITDA for the third quarter 2011 increased 30% over the third quarter 2010 to $243 million.  On a per-unit basis, our distributable cash flow was $0.76 for the third quarter.  When compared to our cash distribution of $0.69 per unit for the quarter, we achieved a distribution coverage ratio of 1.1 times***.

\*        \*        \*

Now we'll turn to guidance for the fourth quarter 2011.  At the midpoint of our guidance range, ***we expect to generate adjusted EBITDA of approximately $252 million.  Distributable cash flow is estimated to be approximately $137 million, which implies a distribution coverage ratio of approximately 1.12 times for the fourth quarter***.

At the midpoint of guidance for the full year 2011, *we expect to generate adjusted EBITDA of approximately $969 million.*

*Distributable cash flow is estimated to be $562 million, which implies a distribution coverage ratio of approximately 1.18 times for the full year 2011.*

LINN has continued to provide stable distributions to our unit holders since our IPO in 2006.  We have increased that distribution by 73% since our IPO and 10% in the last 12 months.  We have the financial strength and flexibility to capitalize on the active acquisition market.  *The strength of our strategy has driven strong unit holder returns that have outperformed the major E&P and MLP indices during a very turbulent market this year.*

158.    During the conference call, the following exchange also occurred between

Defendant Rockov and an analyst concerning LINN's maintenance capex, DCF, and distribution

coverage ratio:

Noah Lerner, Analyst, Hartz Capital:

Okay. I just want to see if -- oh, I guess the last question I have, at what point -- I mean, clearly there's the big spike from the IP, and then when it settles down and comes down to a slope and we get to the tail. At what point does the cash flow from each of these new wells get factored into the DCF computation and impact the decision-making process and whether or not it's time to start distributing the cash flow from that well or not?

*           *           *

KOLJA ROCKOV: It goes into the DCF immediately. You know, we do take a calculation of maintenance, and as you can see, our growth rate is up, what, 30% year over year, but maintenance has gone up from about 13% of EBITDA in the first quarter, to 21%, 22% in the fourth.  So we've been adjusting for it all along, Noah. So I guess some of the fun out of all of the returns has been mitigated a bit by increasing that maintenance number.  But we feel like every time we print a DCF number for the quarter, I mean, that's the number.  *And the maintenance number is accurate, so the coverage is correct quarter over quarter*.  So a lot of moving pieces in that calculation.  Don't know if I answered your question exactly right, but it's not --

159.    That same day, October 27, 2011, LINN filed with the SEC its Form 10-Q, signed

by Defendant Rottino, for the third quarter ended September 30, 2011 (the "2011 Q3 Form 10-

Q").  The 2011 Q3 Form 10-Q contained materially false and misleading statements about the

Company's adjusted EBITDA and cash flows, as described above, and included false or

misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶

103 above.

160.    LINN also posted a presentation on its website entitled "Supplemental Q3 2011

Financial and Operational Results" that reiterated its reported financial results for the third

quarter of 2011, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its

guidance for the fourth quarter and full year 2011.  The presentation also contained the following

explanation for the calculation of LINN's DCF and distribution coverage ratio for the third

quarter:

## Coverage Ratio Calculation

| | Three Months Ended | | | |
|---|---|---|---|---|
| | September 30, 2011 | | June 30, 2011 | |
| | (in thousands, except unit and ratio amounts) | | | |
| Adjusted EBITDA [1] | $ | 243,266 | $ | 263,606 |
| Less: interest expense [2] | | (61,266) | | (57,798) |
| Less: maintenance capital expenditures | | (47,901) | | (40,229) |
| Distributable cash flow | $ | 134,099 | $ | 165,579 |
| | | | | |
| Distributable cash flow per unit | $ | 0.76 | $ | 0.94 |
| Distribution per unit [3] | $ | 0.69 | $ | 0.69 |
| Units outstanding (millions) | | 176.8 | | 176.9 |
| Distribution coverage ratio | | 1.10x | | 1.36x |

[1]  Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

[2]  Includes cash payments for interest expense and accrued interest on the Company's outstanding senior notes and credit facility.

[3]  Based on quarterly distribution of $0.69 per unit, or $2.76 per unit on an annualized basis.

161.    The above representation was materially false or misleading, primarily because it failed to account for the cost of premiums paid for put options that settled during the periods included in the representation.

162.    On or about January 19, 2012, LINN completed a public offering of 19,550,000 units at $35.95 per unit yielding the Company net proceeds of approximately $674 million.

163.    On February 23, 2012, LINN issued a press release announcing its financial results for its fiscal 2011 fourth quarter and year ending December 31, 2011.  For the year, the Company reported net income of $438 million, or $2.52 per unit, including a non-cash gain of $193 million, or $1.11 per unit, from the change in fair value of hedges covering future production.  For the 2011 fourth quarter, the Company reported a net loss of $190 million, or $1.09 per unit, including a non-cash loss of $278 million, or $1.60 per unit, from the change in fair value of hedges covering future production.

164.    With respect to the sufficiency of its cash flows, the Company reported a 2011 distribution coverage ratio of 1.24x, compared to 1.23x for the 2010 year, and that it generated adjusted EBITDA of $998 million during 2011 compared to $732 million in 2010.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

165.    Defendant Ellis commented on the results, stating, in pertinent part:

> LINN delivered exceptional results in 2011.  ***Most significant to our unitholders, our performance enabled us to raise our quarterly cash distribution by 5 percent for the second year in a row*** and pay our 23rd consecutive distribution.  The company achieved record organic production growth of 30 percent, and closed approximately $1.5 billion in acquisitions that added 579 billion cubic feet equivalent of reserves.  Through organic growth and acquisitions, combined, we replaced more than 670 percent of our production.

Our diverse asset base allows us to focus organic growth on high-return, liquids-rich plays in the year ahead, and we expect to generate 20 percent organic production growth in 2012. Our balance sheet and access to capital markets position us to continue growing through acquisitions as well. We are currently evaluating numerous acquisition opportunities, which lead us to believe that 2012 could be another robust acquisition year. *Organic and acquisition growth, coupled with our strong commodity hedge portfolio, provides both stability and potential for future distribution growth*.

166.     Following the Company's 2011 fourth quarter and year-end earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA, DCF, and distribution coverage ratio. Defendant Rockov stated as follows:

For the fourth quarter, *adjusted EBITDA increased by more than 27% to $281 million and 36% to $998 million for the full year 2011. On a per-unit basis, our distributable cash flow was $0.94 per unit for the fourth quarter, and $3.40 per unit for the full year 2011*.

When compared to our quarterly cash distribution of $0.69 or annualized distribution of $2.76 per unit, *we achieved an exceptional distribution coverage ratio of 1.36 times for the fourth quarter, and 1.24 times for the full year 2011*.

*          *          *

On the other hand, with oil trading well above $100 per barrel today, our put contracts allow us to enjoy the benefits of a strong oil price environment on a portion of our oil production. At the midpoint of our guidance range, *we expect to generate adjusted EBITDA of approximately $270 million for the first quarter 2012, and $1.2 billion for the full year 2012. Distributable cash flow is estimated to be approximately $136 million for the first quarter and $624 million for the full year, implying a distribution coverage ratio of 1.05 times for the first quarter and 1.15 times for the year*.

*          *          *

-63-

1136128.1

As noted in our full-year guidance estimates, ***we expect adjusted EBITDA and our distribution coverage ratio to significantly increase from the first quarter and continue to increase throughout 2012***.  We currently anticipate a very active year on the acquisition front, which is not included in our current guidance.

167.    On February 23, 2012, LINN filed with the SEC its Form 10-K, signed by Defendants Ellis, Rockov, Rottino, Linn, Alcorn, Jacobs, and McCoy, for the year ended December 31, 2011 (the "2011 Form 10-K").  The 2011 Form 10-K contained materially false and misleading statements, as described above, about the Company's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

168.    LINN also posted a presentation on its website entitled "Supplemental Q4 2011 Financial and Operational Results" that reiterated its reported financial results for the fourth quarter and full year 2011, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the first quarter and full year 2012.  The presentation also contained the following purported explanation for the calculation of LINN's DCF and distribution coverage ratio for the fourth quarter and full year 2011:

# Coverage Ratio Calculation

**LINN ENERGY, LLC**
**COVERAGE RATIO CALCULATION**

| | Three Months Ended | | | | Year Ended | |
|---|---|---|---|---|---|---|
| | December 31, 2011 | | September 30, 2011 | | December 31, 2011 | |
| | (in thousands, except unit and ratio amounts) | | | | | |
| Adjusted EBITDA [1] | $ | 280,753 | $ | 243,266 | $ | 997,621 |
| Less: interest expense [2] | | (62,300) | | (61,266) | | (240,116) |
| Less: maintenance capital expenditures | | (52,751) | | (47,901) | | (167,281) |
| Distributable cash flow | $ | 165,702 | $ | 134,099 | $ | 590,224 |
| | | | | | | |
| Distributable cash flow per unit | $ | 0.94 | $ | 0.76 | $ | 3.40 |
| Distribution per unit [3] | $ | 0.69 | $ | 0.69 | $ | 2.73 |
| Units outstanding (millions) | | 176.6 | | 176.8 | | 173.8 |
| Distribution coverage ratio | | 1.36x | | 1.10x | | 1.24x |

(1) Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

(2) Includes cash payments for interest expense, and accrued interest on the Company's outstanding senior notes and credit facility.

(3) Based on quarterly distribution of $0.66 per unit, or $2.64 per unit on an annualized basis, for Q1 2011, and quarterly distribution of $0.69 per unit, or $2.76 per unit on an annualized basis, for Q2, Q3, and Q4 2011.

169.    The above representation was materially false or misleading, primarily because it failed to account for the cost of premiums paid for put options that settled during the periods included in the representation.

170.    On February 28, 2012, LINN and its subsidiary, Linn Energy Finance Corp., announced a private offering to eligible purchasers of $1.8 billion in aggregate principal amount of its 6.25% senior unsecured notes due 2019 at an offering price equal to 99.989 percent of par.

171.    On April 24, 2012, LINN announced a 5% increase in its quarterly cash distribution to $0.725 per unit.

172.    On April 26, 2012, LINN issued a press release announcing its financial results for its 2012 first quarter, the period ended March 31, 2012.  For the quarter, the Company reported a net loss of $6 million, or $0.04 per unit, including a non-cash loss of $53 million, or $0.28 per unit, from the change in fair value of hedges covering future production.

173.    With respect to the sufficiency of its cash flows, however, the Company reported a quarterly distribution coverage ratio of 1.14x (including above noted 5 percent distribution increase), compared to 1.36x for the fourth quarter 2011, and that it generated adjusted EBITDA of $302 million during the first quarter 2012, compared to $281 million for the fourth quarter 2011.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

174.    Defendant Ellis commented on the results, stating, in pertinent part:

> LINN has already announced approximately $1.8 billion of transactions in the first quarter, exceeding our total acquisitions for the full-year 2011.  Based on this jumpstart to the year and our outlook for the remainder of 2012, our Board of Directors ***approved a 5 percent increase in our distribution to $0.725 per unit, or $2.90 per unit on an annualized basis, for the first-quarter 2012.  This will mark the third consecutive year we have increased the distribution by 5 percent***.
>
> Our ***strong balance sheet and access to capital markets*** position us to continue to capitalize on the robust acquisition market and pursue our organic growth strategy.  Consistent with our hedging strategy, we also further strengthened our industry-leading hedge positions to provide approximately 100 percent coverage on natural gas for six years and oil for four years.  We had a phenomenal first quarter, and we expect continued strong performance for the remainder of the year.

175.    Following the Company's 2012 first quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  Defendants stated as follows:

> Defendant Ellis:
>
> ***This week we announced a 5% increase to our cash distribution for the first quarter.  T***he ***distribution of $0.725 per unit, or $2.90 per unit on an annual basis***, will be paid May 15, 2012, to unit holders of record as of the close of business on May 8, 2012.  Now

this marks the **third consecutive year we have increased the distribution by 5%.**

\*       \*       \*

I'm happy to report the Company delivered excellent operational and financial results across the board in the first quarter. Our active acquisition and organic programs drove a 51% increase in year over year production for the first quarter to an average of 471 million cubic feet equivalent per day. **Our distribution coverage ratio for the first quarter of 2012 was strong at 1.14 times, which includes the recent 5% distribution increase. We anticipate coverage to average more than 1.2 times for the second half of the year**.

Defendant Rockov:

**Adjusted EBITDA for the first quarter 2012 increased 44% over the first quarter of 2011 to $302 million.  On a per unit basis, our distributable cash flow was $0.83 for the first quarter.  We achieved a distribution coverage ratio of l.14 times, which includes the recent 5% distribution increase**.

Turning to guidance for the full year 2012, at the midpoint of our range, **we expect to generate adjusted EBITDA of approximately $1.37 billion.  Distributable cash flow is estimated to be approximately $676 million, implying a distribution coverage ratio of approximately 1.18 times for the year, which includes the impact of the recent 5% distribution increase**.  Most importantly, our 5% distribution increase reflects our bullish outlook on the remainder of 2012.  **We project coverage to be over 1.2 times for the third and fourth quarters of 2012**, including the 5% increase, and obviously, does not include accretion from any additional acquisitions.

\*       \*       \*

**We believe our industry-leading hedging strategy is not only providing the obvious, which is excellent distribution stabilit**y through commodity price downturns, but, in addition, it protects our assets and cost of capital.  In other words, it positions LINN in an environment like today to be a buyer when others are experiencing weakness.  At the end of the day, given our pace of acquisition growth, this is really the key.

As we have always said, we do not try to predict price movements. We stay true to our strategy and let acquisition velocity and organic growth more than make up for any upside we may or may

>not participate in.  However, ***it is also important to note, again, that 30% to 40% of our hedge portfolio is in the form of puts, which allows us to realize significant upside as well***.

176.    That same day, April 26, 2012, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the first quarter ended March 31, 2012 (the "2012 Q1 Form 10-Q"). The 2012 Q1 Form 10-Q contained materially false and misleading statements, as described above, about the Company's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

177.    LINN also posted a presentation on its website entitled "Supplemental Q1 2012 Financial and Operational Results" that reiterated its reported financial results for the first quarter of 2012, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the second quarter and full year 2012.  The presentation also contained the following explanation for the calculation of LINN's DCF and distribution coverage ratio for the first quarter:

## Coverage Ratio Calculation

| | Three Months Ended | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (in thousands, except unit and ratio amounts) | |
| Adjusted EBITDA [1] | $ 302,139 | $ 280,753 |
| Less: interest expense [2] | (73,632) | (62,300) |
| Less: maintenance capital expenditures | (67,369) | (52,751) |
| Distributable cash flow | $ 161,138 | $ 165,702 |
| | | |
| Distributable cash flow per unit | $ 0.83 | $ 0.94 |
| Distribution per unit | $ 0.725 | $ 0.69 |
| Units outstanding (millions) | 195.1 | 176.6 |
| Distribution coverage ratio | 1.14x | 1.36x |

(1) Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

(2) Includes cash payments for interest expense, and accrued interest on the Company's outstanding senior notes and credit facility.

178.    The above representation was materially false or misleading, primarily because it failed to account for the cost of premiums paid for put options that settled during the periods included in the representation.

179.    On July 26, 2012, LINN issued a press release announcing its financial results for its 2012 second quarter, the period ended June 30, 2012.  For the quarter, the Company reported net income of $237 million, or $1.19 per unit, including a non-cash gain of $304 million, or $1.52 per unit, from the change in fair value of hedges covering future production.

180.    With respect to the sufficiency of its cash flows, the Company reported a quarterly distribution coverage ratio of 0.97x, compared to 1.14x for the first quarter 2012, and that it generated adjusted EBITDA of $319 million during the second quarter 2012, compared to $302 million for the first quarter 2012.  In addition, the press release included a representation

purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation

reproduced in ¶ 96 above.

181.    Defendant Ellis commented on the results, stating, in pertinent part:

> Our second-quarter distribution coverage ratio was negatively
> impacted by historically low NGL prices, which were 38 percent
> lower than first-quarter 2012 prices.  However, ***with a full-year
> impact from 2012 acquisitions, robust organic growth and
> industry-leading oil and natural gas hedge positions, we expect
> our distribution coverage ratio to be approximately 1.2x in 2013***.
> Furthermore, we believe the current weakness in commodity prices
> will continue to present LINN with additional accretive acquisition
> opportunities.

182.    Following the Company's 2012 second quarter earnings announcement, LINN

held a conference call with analysts and investors to discuss the Company's earnings and

operations.  During the conference call, Defendants made positive statements about the

Company's adjusted EBITDA and cash flows.  Defendants stated as follows:

> Defendant Ellis:
>
> ***Our acquisition success, operational performance and hedge
> [book] enabled us to increase the distribution 5% last quarter for
> the third year in a row due almost entirely to lower than expected
> NGL prices***. ***Our distribution coverage ratio for quarter was 0.97
> times.*** However, with a full year impact on 2012 acquisitions, a
> shift away from liquids-rich drilling to oil and strong hedge
> positions, we expect our distribution coverage ratio to rapidly
> return to stronger levels, even absent a full recovery of NGL
> prices.
>
> Defendant Rockov:
>
> ***I'd like to echo Mark's enthusiasm in LINN's performance to
> date this year.  It has been a record year and we believe this
> momentum will continue.***  As you're probably aware, the industry
> is currently experiencing historically low prices for natural gas
> liquid.  Price of the average NGL barrel decreased 38% during the
> second quarter. This drastic decrease would [beat] LINN's
> expected EBITDA by approximately 27 million for the quarter
> which represents a reduction of approximately 0.18 times in our
> distribution coverage ratio.

-70-

*Adjusted EBITDA for the second quarter of 2012 was $319 million.  On a per-unit basis, our distributable cash flow was $0.70 for the second quarter.  Due to the impact of historically low NGL prices, we reported a distribution coverage ratio of 0.97 times*.

Turning to guidance for the full year 2012, we continue to see weaknesses in NGL pricing during the second half of the year and have adjusted guidance accordingly.  *At the midpoint of our range, we expect to generate adjusted EBITDA of approximately $1.4 billion.  Distributable cash flow is estimated to be approximately $618 million.  We project coverage to be approximately 1.1.times for the second half of the year*.

Looking forward into 2013 and our shift to oil-weighted drilling and the full financial impact from acquisitions we have announced to date*, we project coverage to be in a range of 1.2 times even absent a full recovery of NGL pricing.*

\*       \*       \*

We believe *our industry-leading hedging strategy is providing the obvious -- excellent distribution stability* through a commodity price downturn, and we've also protected our assets and cost of capital.  In the current environment, our hedge book positions LINN to be a buyer when other companies are sellers.  This trend is clearly evident in our $2.8 billion of announced acquisitions and joint venture so far this year.

183.    That same day, July 26, 2012, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the second quarter ended June 30, 2012 (the "2012 Q2 Form 10-Q").  The 2012 Q2 Form 10-Q contained materially false and misleading statements, as described above, about the Company's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

184.    LINN also posted a presentation on its website entitled "Supplemental Q2 2012 Financial and Operational Results" that reiterated its reported financial results for the second quarter of 2012, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the third quarter and full year 2012.  The presentation also contained the following

explanation of the calculation of LINN's DCF and distribution coverage ratio for the second quarter:

## Coverage Ratio Calculation

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2012 | | March 31, 2012 | |
| | (in thousands, except unit and ratio amounts) | | | |
| Adjusted EBITDA [1] | $ | 319,135 | $ | 302,139 |
| Less: interest expense [2] | | (91,347) | | (73,632) |
| Less: maintenance capital expenditures | | (88,269) | | (67,369) |
| Distributable cash flow | $ | 139,519 | $ | 161,138 |
| | | | | |
| Distributable cash flow per unit | $ | 0.70 | $ | 0.83 |
| Distribution per unit | $ | 0.725 | $ | 0.725 |
| Units outstanding (millions) | | 199.4 | | 195.1 |
| Distribution coverage ratio | | 0.97x | | 1.14x |

(1)  Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

(2)  Includes cash payments for interest expense and accrued interest on the Company's outstanding senior notes and credit facility.

185.    The above representation was materially false or misleading, primarily because it failed to account for the cost of premiums paid for put options that settled during the periods included in the representation.

186.    On October 11, 2012, LINN posted a presentation on its website entitled "LinnCo Overview" that described, among other things, the strategic rationale for the formation of LNCO, and LNCO's structure and financial highlights, including: an estimated annual dividend of $2.84 per LNCO share, current distribution of $2.90 per LINN unit, and LINN's recent increase in its guidance for its distribution coverage ratio (+12% to 1.25x).  The Overview also emphasized LINN's  purported strong performance and growth in Adjusted EBITDA and other financial measures, as well as the purported stability and growth in LINN's distributions.

187.    On October 25, 2012, LINN issued a press release announcing its financial results for its 2012 third quarter, the period ended September 30, 2012.  For the quarter, the Company reported net loss of $430 million, or $2.18 per unit, including a non-cash loss of $520 million, or $2.63 per unit, from the change in fair value of hedges covering future production.

188.    With respect to the sufficiency of its cash flows, however, the Company reported a quarterly distribution coverage ratio of 1.40x, compared to .97x for the second quarter 2012, and that it generated adjusted EBITDA of $402 million during the third quarter 2011, compared to $319 million for the second quarter 2012.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

189.    Following the Company's 2012 third quarter earnings announcement, LINN held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendants made positive statements about the Company's adjusted EBITDA and cash flows.  For example, Defendant Rockov stated, in pertinent part, as follows:

> *For the third quarter, adjusted EBITDA was $402 million*.  On a per-unit basis, *our distributable cash flow was $1.01.  We achieved a greater than expected distribution coverage ratio of 1.4 times*, which was driven by higher volumes and lower costs.

> *        *        *

> Now we'll turn to guidance for the fourth quarter 2012.  At the midpoint of our guidance range, *we expect to generate adjusted EBITDA of approximately $382 million.  Distributable cash flow is estimated to be approximately $180 million, which implies a distribution coverage ratio of approximately 1.08 times in the fourth quarter*.

> At the midpoint in the guidance for the full year 2012, *we expect to generate adjusted EBITDA of approximately $1.4 billion. Distributable cash flow is estimated to be $684 million, which implies a distribution coverage ratio of approximately 1.14 times for the full year 2012*.

Looking forward to 2013, ***we continue to believe our coverage ratio is on pace to be approximately 1.2 times***.  Obviously, potential accretive acquisitions should allow us to exceed the 1.2 coverage, which creates the potential to continue to grow the distribution at an attractive rate.

190.    During the conference call, the following exchange also occurred between

Defendant Ellis and an analyst concerning LINN's guidance with respect to distributions and its

distribution coverage ratio:

> BERNIE COLSON: Okay, great. And I was you hoping maybe could just talk a little bit about distribution policy here, given how high the coverage is this quarter and the fact that you have completed so many acquisitions this year. Are we just on that kind of schedule for an increase every four quarters? If you had any color around that, it'd be helpful. Thanks.
>
> MARK ELLIS: Well, we've always said that when we look at distributions, ***we want our distribution rates to be meaningful***. We talked about our target coverage ratio being around 1.2 times. And when you look at that and you think about distribution increase, you try and look over the long term in terms of what is sustainable in the business. And so we did raise it at the end of the first quarter this year 5%. And like we said, ***we've always said we're going to be on kind of that track record each and every year, and so we want to position ourselves for that with a strong 1.2 coverage***.

191.    That same day, October 25, 2012, LINN filed with the SEC its Form 10-Q, signed

by Defendant Rottino, for the third quarter ended September 30, 2012 (the "LINN 2012 Q3 Form

10-Q").  The LINN 2012 Q3 Form 10-Q contained materially false and misleading statements, as

described above, about the Company's adjusted EBITDA and cash flows, and included false or

misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶

103 above.

192.    On October 26, 2012, LNCO also filed with the SEC its Form 10-Q, signed by

Defendant Rottino, for the third quarter ended September 30, 2012 (the "LNCO 2012 Q3 Form

10-Q") that incorporated LINN's 2012 Q3 Form 10-Q.   The LNCO 2012 Q3 Form 10-Q also

contained materially false and misleading statements about LINN's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov, that were substantially similar to those described in ¶ 103 above.

193.    LINN also posted a presentation on its website entitled "Supplemental Q3 2012 Financial and Operational Results" that reiterated its reported financial results for the third quarter of 2012, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the fourth quarter and full year 2012.  The presentation also contained the following explanation of the calculation of LINN's DCF and distribution coverage ratio for the third quarter:

## Coverage Ratio Calculation

|  | | Three Months Ended September 30, 2012 |
| --- | --- | --- |
| (in thousands, except unit and ratio amounts) | | |
| Adjusted EBITDA [1] | $ | 402,446 |
| Less: interest expense [2] | | (99,954) |
| Less: maintenance capital expenditures | | (100,488) |
| Distributable cash flow | $ | 202,004 |
|  | | |
| Distributable cash flow per unit | $ | 1.01 |
| Distribution per unit | $ | 0.725 |
| Units outstanding (millions) | | 199.6 |
| Distribution coverage ratio | | 1.40x |

(1)  Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

(2)  Includes cash payments for interest expense, and accrued interest on the Company's outstanding senior notes and credit facility.

194.    The above representation was materially false or misleading, primarily because it failed to account for the cost of premiums paid for put options that settled during the periods included in the representation.

195.    On February 15, 2013, LINN posted a presentation on its website entitled

"LINN's Hedging Strategy and Response to Inaccurate Statements Made By An Anonymous

Short Seller," apparently in response to a short seller's criticism of LINN's hedging strategy and

its impact on the Company's reported financial results.  LINN's response contained a number of

purported "Facts" about its financial statements and its accounting for its hedging strategies, in

relevant part:

> **Fact #1 – LINN is confident in the validity and accuracy of its**
> **audited financial statements.**
>
> **Fact #2 – LINN generates sufficient cash flow to cover its**
> **distributions.**
>
> • Since the company's IPO in 2006, LINN has paid its distribution
> for 27 straight quarters. These distributions were paid in CASH.
>
> • Amortization of puts is a non-cash expense and should not be
> deducted from EBITDA (hence the definition of EBITDA;
> earnings before interest, taxes, depreciation and
> AMORTIZATION).
>
> • LINN considers the cost of puts as a "capital" investment and
> views it as an additional cost of an acquisition (hence the target to
> spend up to 10% of the cost of an acquisition on puts). No one
> disputes that "depreciation" of oil and natural gas assets should be
> excluded from EBITDA or distributable cash flow because it is a
> "capital" expense, and the company views puts the same way.
>
> • When LINN purchases puts, the company pays 100% of the cost
> in upfront cash and capitalizes them as an asset on the balance
> sheet.
>
> • The cost of LINN's puts is deducted from Net Income over time.
> Net Income is not a cash metric.
>
> • What does flow through to Distributable Cash Flow per Unit is
> the cost of debt and equity securities (interest and distributions)
> that were needed to purchase both the oil and natural gas assets and
> the puts. This is a CASH expense.
>
> • Anonymous short sellers are improperly mixing the definitions of
> cash flow and non-cash flow metrics (Net Income vs. Cash Flow).

-76-

196.    In sum, Defendants' statements referenced above in ¶¶ 94-96, 99-103, 107-116, 118-125, 127-132, 134, 136-141, 143-152, 154-160, 163-168, 171-177, 179-184, and 186-193 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

a.    LINN and LNCO failed to adequately disclose how LINN's reported adjusted EBITDA, DCF, distribution coverage ratio, and maintenance capex were derived;

b.    LINN and LNCO failed to disclose that LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio excluded the costs of premiums LINN paid for settled put options, but included the proceeds from the sale or exercise of those options;

c.    LINN and LNCO understated the capital required to maintain current production levels at LINN's oil and natural gas properties;

d.    As a result of (a) – (c), LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio were materially overstated and the amount of available cash to cover distributions was significantly less than reported; indeed, had LINN properly accounted for the costs for its settled premiums in arriving at DCF, it would have been unable to make and sustain its distributions;

e.    As a result of (a) – (c), LINN was in violation of SEC Regulations G and S-K, Item 10(e);

f.    Defendants materially misrepresented the true risk associated with LINN's ability to continue to issue stable or increasing distributions;

g.    LINN's and LNCO's disclosure controls were materially deficient and its representations concerning them were materially false and misleading;

h.     SOX certifications issued by Defendants Ellis and Rockov associated with

LINN's and LNCO's disclosure controls were materially false and misleading; and

i.     Based on the foregoing, Defendants lacked a reasonable basis for their

positive statements concerning LINN and LNCO and their financial prospects.

## BEGINNING IN FEBRUARY 2013, THE INFORMATION DEFENDANTS HAD BEEN MISSTATING OR FAILING TO DISCLOSE BEGAN TO EMERGE IN THE MARKET, THOUGH THE LINN DEFENDANTS CONTINUED TO DISSEMINATE MATERIALLY FALSE OR MISLEADING STATEMENTS.

197.    On Saturday, February 16, 2013, *Barron's* published an article entitled "Drilling

Into the Numbers."[26]  The article noted that LINN may be overstating its cash flow available for

distribution, by not deducting the cost of financial derivatives, stating, in pertinent part, as

follows:

> Linn (ticker: LINE) hedges all of its oil and natural-gas output with
> financial derivatives, the better to provide a steadily growing level
> of income to unit holders.  The company pays an annualized
> distribution-the MLP equivalent of a dividend-of $2.90 per unit,
> which equates to a yield of 8%, based on its current share price of
> $36.
>
> That yield has attracted investors, but they could be overpaying.
> Linn's units trade for 10 times 2012 pretax cash flow, roughly
> double the valuation of energy exploration and production
> companies such as Apache (APA), Devon Energy (DVN), and
> Canada's Suncor Energy (SU), and in excess of valuations
> accorded smaller energy producers structured as MLPs.
>
> Moreover, Linn may be overstating the cash flow available for
> distribution, by not deducting the cost of financial derivatives-
> mainly put options-from its realized gains on hedging activities in
> its quarterly results.  Bears argue that funds invested in derivatives
> should be treated as an expense, and at least one of Linn's major
> competitors follows that approach.  Linn says its energy
> derivatives are an integral part of its corporate strategy and amount

---

[26] *See* Andrew Barry, *Drilling Into the Numbers*, Barron's, February 16, 2013, *available at*
http://online.barrons.com/article/SB50001424052748704852604578298253512225108.html#articleTabs_
article%3D1.

to an asset, much like an oil and gas property.  The value of such assets typically gets depreciated over their useful life.

*       *       *

Wall Street analysts have ignored the derivatives issue until now. Thirteen of the 18 analysts who follow the company rate it Buy, and bulls note that Linn's energy production, including oil, gas, and natural-gas liquids, more than doubled in last year's third quarter, to the equivalent of 782 million cubic feet per day.

But David Amoss, an analyst at Howard Weil, broke ranks on Friday and downgraded Linn to Sector Perform from Outperform, citing the company's treatment of its hedging costs.  Amoss cut his estimate of 2013 distributable cash flow to $2.45 per unit from $3.03, "to better reflect the underlying cost of the hedges" that he estimates at $120 million annually, he wrote in a client note.  Linn might have to make accretive acquisitions this year to cover its $2.90 distribution, he added.  Alternately, it is possible the distribution could be cut.  Linn shares fell 3.8% on Friday, but still trade for two times book value.

Linn has projected distributable cash flow of $684 million, or $3.31 a share, for 2012.  It is due to report fourth-quarter results on Thursday.

Hedging gains contribute a sizable percentage of Linn's distributable cash flow.  The company spent $583 million on derivatives purchases in the first nine months of 2012, and hedging gains in that period totaled $281 million, or 55% of distributable cash flow of $503 million.  The company's financial reports don't break out the derivatives costs that are included in gains, but Linn's history of derivatives purchases suggests annual costs of $100 million to $150 million.  Amoss' $120 million estimate is squarely in that range.

Linn expenses the cost of puts and other derivatives over a multiyear period when calculating net income, as mandated by accounting rules.  But it doesn't deduct such costs from distributable cash flow, a financial measure that isn't compiled in accordance with GAAP, or generally accepted accounting principles.  This means companies have leeway in making the latter calculations.  Usually, they subtract interest expense and maintenance capital expenditures from gross cash flow to derive the amount of cash available to be distributed to holders.

While net income is the most common financial yardstick for corporations, it can be of little use in evaluating MLPs, particularly partnerships like Linn that make heavy use of derivatives for hedging. Quarterly changes in the value of a multiyear hedge portfolios can overwhelm and distort operating results.

Linn reported a net loss of $430 million in the third quarter, for instance. But it determined that distributable cash flow totaled $202 million. The discrepancy was caused primarily by $520 million of unrealized losses in its derivatives book, which occurred in a quarter when energy prices rose.

Linn's derivatives portfolio has insulated the company from a weak natural-gas market, and allowed it to pay a steadily rising distribution. In the third quarter, it received a price of $2.71 per thousand cubic feet for its natural gas, but realized more than $5 per Mcf after accounting for hedging gains.

MLPs and other energy companies can use swaps or purchase put options to lock in future oil and gas prices. (Puts give the holder the right to sell a security or commodity at a fixed price by a predetermined date.) Some companies prefer swaps to puts because puts are more expensive. Most swaps are executed "at the money," meaning they are based on future oil and gas prices implied in the futures market. The advantage of a put is that the holder gets upside above the put price.

It appears from Linn's financial statements that the company bought a considerable amount of in-the-money put options on natural gas last year. These are more expensive than at-the-money puts. Specifically, Linn bought a lot of puts struck at $5 per Mcf from 2013 through 2017 at a time when the "strip" (the average price for that five-year period) was in the $4 to $4.50 range. The puts would have had an intrinsic value of 50 cents or more. Gas now trades around $3.15 per Mcf, after averaging $3 in 2012, making the puts more valuable still.

The likelihood of such gains explains why Linn spent almost $600 million on derivatives purchases in the nine months ended in September, up from just $134 million in all of 2011. Given Linn's accounting for derivatives, the put purchase prices eventually should be reflected as a hedging gain in cash flow. Linn says last year's hefty derivatives purchases reflected sizable acquisitions. It spent $2.8 billion on energy deals in 2012.

On February 19, 2013, the next trading day following the publication of the *Barron's* article, LINN units opened at $34.57, or nearly 4 percent lower than its closing price on February 15, 2013 of $35.93, and traded as low as $34.27 that day. Similarly, LNCO shares opened at $35.98 on February 19, 2013, or approximately 2% lower than its closing price on February 15, 2013 of $36.66, and traded as low as nearly $35.51 that day. The *Barron's* article, however, did not fully reveal the true condition of LINN and LNCO. Defendants continued to make materially false and misleading statements about the Company's financial performance and prospects and failed to disclose material facts that rendered their positive statements false and misleading. LINN units and LNCO shares accordingly continued to trade artificially inflated levels throughout the remainder of the Class Period.

198.    On February 21, 2013, LINN and LNCO jointly issued a press release announcing LINN's financial results for its fiscal 2012 fourth quarter and year ending December 31, 2012. For the year, LINN reported a net loss of $387 million, or $1.92 per unit, including a non-cash loss of $278 million, or $1.39 per unit, from the change in fair value of hedges covering future production. For the 2012 fourth quarter, LINN reported a net loss of $187 million, or $0.83 per unit, including a non-cash loss of $8 million, or $0.03 per unit, from the change in fair value of hedges covering future production.

199.    With respect to the sufficiency of its cash flows, however, LINN reported a 2012 distribution coverage ratio of l.14x, compared to 1.24x for the 2011 year, and that it generated adjusted EBITDA of $1.4 billion during 2012 compared to $998 million in 2011. In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

200.    Defendant Ellis commented on the results, stating, in pertinent part:

LINN delivered a record-setting 2012, closing approximately $2.9 billion in acquisitions and joint-venture agreements and increasing organic production by 15 percent.  Through organic growth and acquisitions, the company increased reserves by 42 percent to 4.8 Tcfe.  ***Most significant to our unitholders, our outstanding performance enabled us to raise our quarterly cash distribution by five percent for the third year in a row*** and pay our 28th consecutive distribution.

We created LinnCo to provide an additional way for institutional and retail shareholders to invest in LINN and to give the company greater access to capital.  In addition, as evidenced today with our announcement of a merger agreement with Berry, LinnCo has provided us with the right currency and structural flexibility to merge with C-Corps in a tax efficient manner.  We believe LinnCo will continue to give LINN the ability to capitalize on the very robust acquisition environment we anticipate in 2013.

201.    Following LINN's 2012 fourth quarter and year-end earnings announcement, the company held a conference call with analysts and investors to discuss the Company's earnings and operations.  During the conference call, Defendants made positive statements about the LINN's adjusted EBITDA and cash flows.  For example, Defendant Rockov stated as follows:

For the fourth quarter, ***adjusted EBITDA increased by 35% to $379 million and 40% to $1.4 billion for the full year 2012***.  On a per unit basis, our ***distributable cash flow was $0.77 per unit for the fourth quarter and $3.30 per unit for the full year 2012***.  When compared to our quarterly cash distribution of $0.725 per unit, our annualized distribution of $2.90 per unit, ***we achieved a distribution coverage ratio of 1.07 times for the fourth quarter and 1.14 times for the full year 2012***.  We delivered adjusted net income for the fourth quarter 2012 of $0.41 per unit and $1.44 per unit for the full year 2012.

Our strategy of acquiring mature oil and gas assets across the US has been very successful.  During our Company's history, we have made 57 acquisitions, totaling approximately $10 billion which is resulted in distribution growth of 81% since our IPO in 2006.  But today, we have broken new ground with the help of another visionary management team at a Berry Petroleum.  Just like mature oil and gas assets belong in an MLP, we believe C Corps with mostly mature assets also belong in an MLP.  We very much thank the Berry management and board for giving us the opportunity to demonstrate how much value can be created by tax-efficiently

converting a C Corp with the right assets into an MLP/LLC.  Our combination is expected to result in significant accretion distributable cash flow per unit.

\*        \*        \*

There is a detailed table outlining expected quarterly distributions for both securities included in our acquisition press release issued this morning. Accretion is expected to increase further in 2014 and '15, but it is too early for us to give specific guidance to that effect. What we can say is that after transaction close, which is expected on or before June 30, 2013, ***our average coverage ratio for the second half of the year is expected to be 1.2 times after taking into account the recommended distribution and dividend increases***.

202.    Later on the conference call, when a securities analyst tried to get clarification

with regard to the amortization of the Company's hedging securities, Defendant Rockov was

dismissive of his request and terminated that conference call, stating, in pertinent part:

> Sonny Ciccone - SunTrust Robinson Humphrey- Analyst:
>
> On the hedges, what's the-- I don't know if you could gave figure earlier but what is the amortization on the previously put-on-puts basically per quarter?
>
> Defendant Rockov:
>
> We got into that issue as well, the cost of the puts is flowing through to our mark-to-market accounting, and I would refer you to the document that we filed last Friday.  I don't want to get into every little detail of every quarter and every year.
>
> Operator:
>
> This concludes our question-and-answer session for today.  If anyone has any further questions, you can follow up with LINN's Investor Relations department.  Now would like to hand the call back over to Mark Ellis for closing remarks.

203.    On February 21, 2013, LINN also filed with the SEC its Form 10-K, signed by

Defendants Ellis, Rockov, Rottino, Linn, Alcorn, Jacobs, and McCoy, for the year ended

December 31, 2012 (the "LINN 2012 Form 10-K").  The LINN 2012 Form 10-K contained

materially false and misleading statements about the company's adjusted EBITDA and cash flows, as described above, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.

204.    On February 28, 2013, LNCO also filed with the SEC its Form 10-K, signed by Defendants Ellis, Rockov, Rottino, Linn, Alcorn, Jacobs, and McCoy, for the year ended December 31, 2012 (the "LNCO 2012 Form 10-K") that incorporated LINN's 2012 Form 10-K. The LNCO 2012 Form 10-K also included materially false and misleading representations about LINN's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov, that were nearly identical to those contained in the LINN 2012 Form 10-K.

205.    LINN also posted a presentation on its website entitled "Supplemental Q4 2012 Financial and Operational Results" that reiterated its reported financial results for the fourth quarter and full year 2012, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the first quarter and full year 2013.  The presentation also contained the following explanation of the calculation of LINN's DCF and distribution coverage ratio for the fourth quarter and full year 2012:

# Coverage Ratio Calculation

| | Three Months Ended | | | | Year Ended | |
| --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2012 | | | September 30, 2012 | | December 31, 2012 |
| | (in thousands, except unit and ratio amounts) | | | | | |
| Adjusted EBITDA [(1)] | | 378,974 | $ | 402,446 | $ | 1,402,694 |
| Less: interest expense [(2)] | | (96,055) | | (99,954) | | (360,989) |
| Less: maintenance capital expenditures | | (106,303) | | (100,488) | | (362,430) |
| Distributable cash flow | $ | 176,616 | $ | 202,004 | $ | 679,275 |
| | | | | | | |
| Distributable cash flow per unit | $ | 0.77 | $ | 1.01 | $ | 3.30 |
| Distribution per unit [(3)] | $ | 0.725 | $ | 0.725 | $ | 2.90 |
| Units outstanding (millions) | | 228.4 | | 199.6 | | 205.7 |
| Distribution coverage ratio | | 1.07x | | 1.40x | | 1.14x |

(1) Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

(2) Includes cash payments for interest expense, and accrued interest on the Company's outstanding senior notes and credit facility.

(3) Based on quarterly distribution of $0.725 per unit, or $2.90 per unit on an annualized basis.

206.    Defendants' statements referenced above in ¶¶ 198-205 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

a.    LINN and LNCO failed to adequately disclose how LINN's reported adjusted EBITDA, DCF, distribution coverage ratio, and Maintenance capex were derived;

b.    LINN and LNCO failed to disclose that LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio excluded the costs of premiums LINN paid for settled put options, but included the proceeds from the sale or exercise of those options;

c.    LINN and LNCO understated the capital required to maintain current production levels at LINN's oil and natural gas properties;

d.    As a result of (a) – (c), LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio were materially overstated and the amount of available cash to cover distributions was significantly less than reported; indeed, had LINN properly accounted for the

costs for its settled premiums in arriving at DCF, it would have been unable to make and sustain its distributions;

e.      As a result of (a) – (c), LINN was in violation of SEC Regulations G and S-K, Item 10(e);

f.      Defendants materially misrepresented the true risk associated with LINN's ability to continue to issue stable or increasing distributions;

g.      LINN's and LNCO's disclosure controls were materially deficient and its representations concerning them were materially false and misleading;

h.      SOX certifications issued by Defendants Ellis and Rockov associated with LINN's and LNCO's disclosure controls were materially false and misleading; and

i.      Based on the foregoing, Defendants lacked a reasonable basis for their positive statements concerning LINN and LNCO and their financial prospects.

207.    On February 21, 2013, LINN, LNCO and Berry announced the signing of a definitive merger agreement pursuant to which LINN and LNCO will acquire all of Berry's outstanding shares for total consideration of $4.3 billion, including the assumption of debt.

208.    On March 21, 2013, before the market opened, Bloomberg reported that Kevin Kaiser, an energy sector analyst at Hedgeye, claimed that LINN's distributable cash flow was insufficient to fund current distributions.[27]  According to the article,

> Linn Energy future FCF [*i.e.*, Free Cash Flow] may be significantly lower than amount required to fund current distributions, Hedgeye Risk Mgmt analyst Kevin Kaiser says.
>
>  * Actual DCF during 2006-12 may have been as much as 70% lower than reported

---

[27] *See* Arie Shapira, *Linn Business Model 'Unsustainable'; Short LNCO, BRY:  Hedg eye* [sic], Bloomberg, March 21, 2013.

* LINN fair value $15-shr, implying downside 60%

* Recommends shorting LNCO, which trades at 5% premium to LINN, and shorting BRY, which has inexpensive borrow

* LINN has 14 buys, 5 holds w/ avg PT $44

* LNCO has 7 buys, 4 holds w/ avg PT $43

* Short interest as % of float, according to Markit data: LINN

3% (active utilization qty 96.24), LNCO 5.8%, BRY 4.9%

* NOTE: Feb. 21, Bronte Capital's John Hempton said in interview he is short LINN, said deal "lousy" for BRY holders who take LINN/LNCO stock; said LINN will eventually "run out of money"

Later that same day, Hedgeye reportedly hosted a conference call with investors during which one of its analysts reportedly said that LINN's business model was "unsustainable," that LINN did not have enough free cash flow, that LINN's accounting for its options trades was unusual, and that its Maintenance capex metric understated the actual costs of business. On this news, the price of LINN units fell $0.67, or approximately 2%, from its closing price of $37.58 on March 20, 2013, to close at $36.91, on unusually high trading volume. Similarly, LNCO shares fell $0.59 per share, or approximately 2%, from its closing price of $39.19 on March 20, 2013 to close at $38.60 on March 21, 2103.

209.    On March 25, 2013, Hedgeye published an article by Kaiser on its website that questioned LINN's accounting practices, as follows, in relevant part:

LINN is a Master Limited Partnership (MLP), a tax-advantaged corporate structure that traditionally attracts individual investors looking for a mix of above-average yield and safety. Oil and gas exploration and production (E&P) MLPs typically acquire and operate older producing oil and gas fields with low decline rate fields (approximately 10% per year). These fields tend to throw off decent revenues and, since the MLP does not pay corporate income taxes, the company distributes excess cash flow to its unit holders.

-87-

These so-called "upstream" MLPs typically grow through acquisition of producing fields, rather than through exploration, which is an expensive and capital intensive process. Simply, E&P MLPs are in the cash flow business, and the MLP structure mandates them to distribute the majority (+90%) of their excess cash flows to unit holders.

Today there are 11 publicly-traded upstream MLPs in the US. LINN is the largest with a $19B enterprise value.  Pro forma LINN's recent acquisition of Berry Petroleum, the stock trades at ten times 2013 EBITDA.  LINN shares closed Friday at $36.40. Kaiser says his analysis indicates the stock is probably worth about $15 a share based on multiple of cash flow and net asset valuation approaches.

Are E&P MLPs Over-Valued?

Oil and gas wells are, by definition, declining assets, and cash distributions rely on the MLPs ability to manage its properties to sustain stable production – an difficult task, as any oil company executive will tell you.  Kaiser believes the upstream MLP sector is overvalued and riskier than most investors recognize, but no company more so than LINN.

Kaiser points to two key generators of cash flow: hedging and maintenance capex.

In both cases, he says, LINN's accounting practices appear nontransparent.  Kaiser re-calculated certain of LINN's key cash flow metrics using more conventional accounting approaches and arrives at the conclusion that LINN's distribution is not sustainable.  In the period 2006-2012, LINN paid out approximately $2.2 billion to unitholders.  During that period – according to Kaiser's calculations – actual free cash flow was a deficit of approximately $1 billion. ***In short, distributions are paid with capital raises as opposed to free cash flow***.  This cannot continue indefinitely.

Among key issues Kaiser raises are LINN's accounting for their hedging.  The purpose of hedging is to offset fluctuations in revenues from their oil and gas properties. ***LINN appears to be accounting for its options hedge strategy in a way that makes all put option transactions look profitable, and appears to be***

> *accounting for its hedge transactions as part of the company's
> recurring cash flow.*[28]

210.    On April 1, 2013, LINN and LNCO jointly issued a press release announcing that

a presentation had been posted that day on LINN's website to address recent comments by

shortsellers.  The presentation, entitled "Linn Energy Response to Another Round of Shortseller

Comments, April 1, 2013 (the "April 1, 2013 Presentation"), assured that LINN "has <u>fully</u>

<u>covered</u> its distribution and maintenance capex and since 2009 has generated ~$325 million of

excess cash to fund growth capex," and that  "'[p]remiums paid for derivatives' is the only

material reason anyone could claim otherwise."  The presentation addressed three topics,

namely, cash flow from operating activities, Maintenance capex, and Net Asset Value, and

contained a purported reconciliation of GAAP cash flow from operating activities to DCF, as

follows, in relevant part:

    1. <u>Cash flow from operating activities</u>

- Historical cash flow from operating activities was prepared in accordance
  with generally accepted accounting principles ("GAAP").  In accordance
  with GAAP, premiums paid for derivatives are included in cash flow from
  operating activities.

- Historical GAAP cash flow from operating activities was sufficient to
  cover the distribution with only one material reconciling item, premiums
  paid for derivatives, in calculating the non-GAAP financial metric of
  distributable cash flow ("DCF").  As stated before, LINN views puts as a
  "capital" cost and considers the premiums it pays for derivatives as part of
  the investment in its business.

- LINN has not purchased any puts in 2013 and currently has no plans to do
  so.  If it does not buy additional puts, GAAP cash flow from operating
  activities is expected to support LINN's distribution and the maintenance
  portion of its development capital expenditures ("maintenance capex")
  going forward.

---

[28] *See* Hedgeye Risk Management, *Looking at Linn Energy,* March 25, 2013, *available at*
http://app.hedgeye.com/unlocked_content/27487-looking-at-linn-energy.

- Further evidence of this stability is included in the 3-year forecast provided in the Joint Proxy Statement / Form S-4 ("proxy") filed on March 22, which shows an implied distribution coverage ratio of 1.13x, 1.13x and 1.18x for LINN on a stand-alone basis (pre-Berry acquisition) for 2013E, 2014E and 2015E, respectively, without any adjustments related to put purchases.

2. <u>Maintenance capex</u>

- Maintenance is defined as the cost to hold reserves and production flat and is a supportable metric. LINN continually ranks its extensive inventory of future drilling locations and other maintenance activities based on efficiency and implements the most efficient projects in its maintenance program.

- Maintenance capex alone understates the amount of money LINN spends on maintenance activities. Maintenance activities are not all "capital" and certain maintenance activities are included in lease operating expenses ("LOE"). From 2009 to 2012, maintenance activities included in LOE totaled $174 million, which if included in maintenance capex would have increased that metric by 24%.

- Depreciation, depletion and amortization ("DD&A") per unit is not a good representation of LINN's maintenance capex per unit because of important differences in their definitions. DD&A represents the amortization of historical costs paid for oil and natural gas properties and does not represent the current development costs and specific development opportunities.

3. <u>Net asset value</u>

- LINN is undervalued in the current market ($37.97 per unit as of March 28) relative to its net asset value ("NAV").

- Internal NAV analysis implies an equity value of $44.74 - $64.74 per unit.

- Third-party advisor analysis (as documented in the proxy) values LINN at $37.34 - $51.15 per unit.

- LINN has upside of up to ~70% (pre-Berry acquisition) based on its NAV relative to its current market price.

1136128.1

211.    The presentation also contained the following "Cash Flow Reconciliation," which again failed to deduct the costs for the settled puts in arriving at DCF:

## Cash Flow Reconciliation

| ($ in millions, except per-unit amounts) | Historical | | | | | Projected[4] |
| DCF Reconciliation | 2009A | 2010A | 2011A | 2012A | Totals | 2013E |
|---|---|---|---|---|---|---|
| GAAP cash flow from operating activities | $427 | $271 | $519 | $351 | $1,568 | $1,241 |
| Premiums paid for derivatives[1] | 94 | 120 | 134 | 583 | 931 | --- |
| Acquisition-related cash flow[2] | 4 | 43 | 58 | 81 | 186 | --- |
| Realized (gains) losses on canceled derivatives[3] | (49) | 124 | (27) | --- | 48 | --- |
| Working capital and other adjustments | (31) | (13) | 74 | 27 | 57 | --- |
| Subtotal | 445 | 545 | 758 | 1,042 | 2,790 | 1,241 |
| Less:  maintenance capex | 97 | 88 | 168 | 363 | 716 | 468 |
| Distributable cash flow (DCF) | $348 | $457 | $590 | $679 | $2,074 | $773 |
| Units outstanding (millions) | 121 | 144 | 174 | 206 | | 235 |
| DCF / unit | $2.88 | $3.18 | $3.40 | $3.30 | | $3.29 |
| Distribution / unit | $2.52 | $2.58 | $2.73 | $2.90 | | $2.90 |
| Distribution coverage ratio | 1.14x | 1.23x | 1.24x | 1.14x | | 1.13x |
| Excess cash flow (after distributions and maintenance) | $43 | $85 | $115 | $82 | $325 | $92 |

(1) These amounts were for derivatives that hedged multiple years of production and have been paid in full.  No additional amounts will be payable in the future under these contracts.

(2) Represents cash, based on contractual arrangements, the Company received from the effective date to the closing date of the transaction.  The effective date is the first date the buyer is entitled to receive the economic benefit from properties included in the transaction.

(3) Represent derivatives canceled prior to the contract settlement date.  In 2010, interest rate swaps were canceled in connection with the issuances of certain fixed-rate senior notes.  In 2011, commodity derivatives were canceled and the proceeds were reallocated within the Company's derivatives portfolio.

(4) Based on 2013E projections for LINN on a stand-alone basis as included in the proxy.  Does not reflect the recommended distribution increase in connection with the pending Berry acquisition.

212.    Defendants' statements referenced above in ¶¶ 210-211 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

a.    LINN and LNCO failed to adequately disclose how LINN's reported adjusted EBITDA, DCF, distribution coverage ratio, and Maintenance capex were derived;

b.    LINN and LNCO failed to disclose that LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio excluded the costs of premiums LINN paid for settled put options, but included the proceeds from the sale or exercise of those options;

c.     LINN and LNCO understated the capital required to maintain current

production levels at LINN's oil and natural gas properties;

d.     As a result of (a) – (c), LINN's reported adjusted EBITDA, DCF, and

distribution coverage ratio were materially overstated and the amount of available cash to cover

distributions was significantly less than reported; indeed, had LINN properly accounted for the

costs for its settled premiums in arriving at DCF, it would have been unable to make and sustain

its distributions;

e.     As a result of (a) – (c), LINN was in violation of SEC Regulations G and

S-K, Item 10(e);

f.     Defendants materially misrepresented the true risk associated with LINN's

ability to continue to issue stable or increasing distributions;

g.     LINN's and LNCO's disclosure controls were materially deficient and its

representations concerning them were materially false and misleading;

h.     SOX certifications issued by Defendants Ellis and Rockov associated with

LINN's and LNCO's disclosure controls were materially false and misleading; and

i.     Based on the foregoing, Defendants lacked a reasonable basis for their

positive statements concerning LINN and LNCO and their financial prospects.

213.    On April 9, 2013, Hedgeye posted an article on its website entitled "Linn Energy:

Tit for Tat," analyzing the April 1, 2013 Presentation, as follows, in relevant part:

> LINN has not addressed the issue of Free Cash Flow.  There just
> doesn't appear to be enough for them to reliably keep hitting the
> targets they keep setting when they announce guidance of what
> next quarter's distribution to unitholders will be.
>
> To review, we raised four fundamental issues in our March 21st
> call – and we added a new one today:
>
> 1-   Not enough Free Cash Flow (FCF)

2-    LINN's unusual accounting for its options hedging gives them dollar-for-dollar credit for what they spend as cash available to the company

3-    The "Maintenance CapEx" metric is not even appropriate to this kind of company, and it understates the actual costs of m [sic]the business

4-    Thanks for the second look: on re-examination, we have lowered our valuation for LINN shares.  On March 21st we were willing to give the shares a fair value of around $15.  We now think it may be as low as $5.

5-    New item: LINN may be providing misleading calculations of how it values its acquisitions.  We believe this continues to inflate the reported value of the company, and is part of the reason we have lowered our valuation

Here are some key points we re-emphasize from our first presentation – points that we believe LINN's April 1st response did nothing to clarify.

 Adjusted cash flows from operations: our analysis of LINN's DCF (Discounted Cash Flows) calculation indicates there was a $1.047 billion cash shortfall over the 2009-2012 period, being the difference between what we calculate to be $686 million in actual free cash flow, and $1.732 billion paid out in distributions.

When *we net out the treatment of option premiums, the numbers get worse.  The cash shortfall over the period doubles, to $2.165 billion*.

Material?  We think so.

How safe is your 8% yield looking now?

LINN management says they are no longer buying put options to hedge production.  But that still leaves over 30% of their annual production hedged with existing puts out to 2017.  The way we figure it, this could overstate future cumulative DCF by more than $600 million.

To hit their distribution guidance targets – in other words, to keep you happy getting your 8% yield – LINN needs to raise between $500 million - $850 million every year, either from the capital markets, or by selling off assets.

Maintenance Capex: Kaiser says he has questioned LINN's investor relations department on numerous occasions for clarification of their Maintenance CapEx calculation. IR says it is impossible for anyone but LINN to calculate this, because it is derived from non-public company internal data. To put it bluntly: Maintenance CapEx is unverifiable, which means it is what management says it is. The real nugget here is that LINN's asset base is much more capital intensive than investors seem to recognize. Kaiser's work indicates LINN's actual maintenance capex expense may be nearly twice what company figures indicate.

More to the point (see our write-up of Kevin's March 21st presentation) Maintenance CapEx is a metric that applies to pipeline companies, not to Exploration & Production companies.

Value: So what's LINN worth, anyway? The company claims its shares are undervalued. Says Kaiser, "Markets don't care what managements say." With so many estimates and non-public factors going into the calculation of LINN's asset base, the net asset value calculation starts to look like a free-for-all.*    *

*Acquisitions: Kaiser's work indicates LINN may have substantially overstated the value of its acquisitions. By using its method of accounting for its options, LINN does not include the options expense in the stated price of an acquisition. This makes deals look more accretive than they are, and Kaiser points to a key 2012 acquisition that LINN said was completed for 6.1 X first year EBITDA (Earnings Before Interest, Taxes and Depreciation, a key investment banking metric). On examination, Kaiser says LINN appears to have paid over 10 X EBITDA.

 Conclusion:

Nothing has changed.[29]

214.    On April 25, 2013, less than four weeks after LINN posted the April 1, 2013 Presentation on its website, LINN and LNCO issued a joint press release announcing LINN's disappointing results for the quarter ending March 30, 2013 and revealing, for the first time during the Class Period, that LINN's cash flows were insufficient to cover its declared quarterly distribution (which, for the quarter, was $0.725 per unit). Specifically, for the quarter, LINN's

---

[29] *See* Hedgeye Risk Management, *Linn Energy: Tit for Tat,* April 9, 2013, *available at* http://app.hedgeye.com/unlocked_content/27804-linn-energy-tit-for-tat.

distribution coverage ratio was only 0.88x and its DCF per unit was $0.64, which was well

below LINN's earlier guidance of a distribution coverage ratio of 0.97x and DCF per unit of

$0.70 for the quarter.  In addition, the press release included a representation purporting to

explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96

above.  On this news, the price of LINN's units dropped another 2%, from $39.15 on April 24 to

$38.33 on April 26.

215.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

> While the company experienced a challenging operating
> environment in the first quarter, the high quality and depth of our
> inventory still gives us the ability to grow organic production
> nearly 10% in 2013. This production growth will allow the
> company to **steadily increase its distribution coverage ratio**
> **throughout the year**.
>
> Furthermore, we are pleased to have announced earlier this year a
> landmark, $4.3 billion merger agreement with Berry Petroleum.
> Berry's mature, high-margin assets are an excellent fit for Linn
> Energy, and we believe the transaction provides significant value
> to investors of all three companies. LinnCo has provided us with
> the right structure and financial flexibility to merge with C-Corps
> in a tax efficient manner. Going forward, we believe LinnCo will
> continue to provide LINN the ability to benefit from acquisitions
> of both private and publicly-traded C-Corps.

216.    Following the Company's 2013 first quarter earnings announcement, LINN held a

conference call with analysts and investors to discuss the Company's earnings and operations.

During the conference call, Defendants still made positive statements about the Company's

adjusted EBITDA and cash flows. For example, Defendant Rockov stated, in pertinent part, as

follows:

> For the first quarter of 2013, **the Company increased adjusted**
> **EBITDA by 18% to $356 million compared to $302 million**
> **during the previous year. On a per unit base our distributable**
> **cash flow was $0.64 per unit for the first quarter, which resulted**
> **in a distribution coverage ratio of .88.** Adjusted net income for the
> first quarter 2013 was $0.16 per unit.

First quarter financial results were lower than expected, *we still expect coverage to continue to increase throughout the year*. We project coverage to average approximately 1.07 for the second half of 2013, assuming six months contribution from Berry and including the 6.2% distribution increase, which we intend to recommend to the board of directors following closing of the transaction.

217.    That same day, April 25, 2013, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the first quarter ended March 31, 2013 (the "LINN 2013 Q1 Form 10-Q"). The 2013 Q 1 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and cash flows, as described above, and included false or misleading SOX certifications by Ellis and Rockov, that were substantially similar to those described in ¶ 103 above.

218.    On April 29, 2013, LNCO also filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the first quarter ended March 31, 2013 (the "LNCO 2013 Q1 Form 10-Q") that incorporated LINN's 2013 Q1 Form 10-Q. The LNCO 2013 Q1 Form 10-Q also included materially false and misleading representations about the Company's adjusted EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov, that were substantially similar to those contained in the LINN 2013 Q1 Form 10-Q.

219.    LINN also posted a presentation on its website entitled "Supplemental Q1 2013 Financial and Operational Results" that reiterated its reported financial results for the first quarter and full year 2013, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the second quarter and full year 2013. The presentation also contained the following explanation of the calculation of LINN's DCF and distribution coverage ratio:

## Coverage Ratio Calculation

| | Three Months Ended | |
| --- | --- | --- |
| | March 31, 2013 | December 31, 2012 |
| | (in thousands, except unit and ratio amounts) | |
| Adjusted EBITDA [(1)] | 356,056 | 378,974 |
| Less: interest expense [(2)] | (95,224) | (96,055) |
| Less: maintenance capital expenditures | (110,298) | (106,303) |
| Distributable cash flow | $ 150,534 | $ 176,616 |
| | | |
| Distributable cash flow per unit | $ 0.64 | $ 0.77 |
| Distribution per unit [(3)] | $ 0.725 | $ 0.725 |
| Units outstanding (millions) | 235.1 | 228.4 |
| Distribution coverage ratio | 0.88x | 1.07x |

(1) Includes effects of the Company's hedge positions, cash flow adjustments from acquisition and divestiture activities, and other expenses.

(2) Includes cash payments for interest expense, and accrued interest on the Company's outstanding senior notes and credit facility.

(3) Based on quarterly distribution of $0.725 per unit, or $2.90 per unit on an annualized basis.

220.    Defendants' statements referenced above in ¶¶ 214-219 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

a.    LINN and LNCO failed to adequately disclose how LINN's reported adjusted EBITDA, DCF, distribution coverage ratio, and Maintenance capex were derived;

b.    LINN and LNCO failed to disclose that LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio excluded the costs of premiums LINN paid for settled put options, but included the proceeds from the sale or exercise of those options;

c.    LINN and LNCO understated the capital required to maintain current production levels at LINN's oil and natural gas properties;

-97-

d.      As a result of (a) – (c), LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio were materially overstated and the amount of available cash to cover distributions was significantly less than reported; indeed, had LINN properly accounted for the costs for its settled premiums in arriving at DCF, it would have been unable to make and sustain its distributions;

e.      As a result of (a) – (c), LINN was in violation of SEC Regulations G and S-K, Item 10(e);

f.      Defendants materially misrepresented the true risk associated with LINN's ability to continue to issue stable or increasing distributions;

g.      LINN's and LNCO's disclosure controls were materially deficient and its representations concerning them were materially false and misleading;

h.      SOX certifications issued by Defendants Ellis and Rockov associated with LINN's and LNCO's disclosure controls were materially false and misleading; and

i.      Based on the foregoing, Defendants lacked a reasonable basis for their positive statements concerning LINN and LNCO and their financial prospects.

221.    On May 4, 2013, *Barron's* published an article entitled "Twilight of a Stock-Market Darling."  The article, beginning with, "Linn Energy may be the country's most overpriced large energy producer," stated, in pertinent part, as follows:

> Many investors look no further than the company's large and growing distribution as a sign of health.  Linn yields 7.5%.  In the first quarter, however, it failed to produce enough cash to cover its distribution, even by its generous measure of distributable cash flow.  Should the company ever cut its payout, its units could plunge.

*             *             *

> Linn's distributable cash flow looks significantly overstated. For
> starters, it doesn't reflect the cost of financial derivatives, mainly
> in-the-money put options on natural gas. That was the subject of a
> recent, skeptical Barron's article ("Drilling Into the Numbers,"
> Feb. 18), when the stock traded at about $36. Since then, Linn has
> stated that it will stop buying puts, which allow it to sell gas for
> above-market prices.

On this news, the price of LINN units plummeted $2.69 per unit, or 7%, from their closing price

of $38.44 on May 3, 2013 to close at $35.75 on May 6, 2013, on unusually high trading volume.

LNCO shares also declined dramatically, falling $3.32 per share, or approximately 7.8%, from

their closing price of $42.56 on May 3, 2013 to close at $39.24 on May 6, 2013, on unusually

elevated trading volume.

222.    On May 6, 2013, Defendant Ellis appeared on CNBC's "Mad Money" talk show,

during which he disputed the May 4, 2013 *Barron's* article. Ellis claimed that the article was

misleading, and disputed the assertion that LINN units may be worth far less than the price at

which they were trading, stating, "[w]e've had three different analyses done. They're all coming

in with valuations in the high 30s to the mid 40s for the company. . . . None of the valuations

we've seen by any one of the independent parties is anywhere close to what was represented over

the weekend in the Barron's article." Ellis also said that LINN had never used "aggressive"

accounting and the Company's finances had never been challenged because LINN operates with

total transparency. Ellis added that the analysis cited in the *Barron's* article was apparently

based on merely "a single quarter" of LINN's results, which Ellis claimed was not a fair metric.

223.    Defendant Ellis's statements referenced above in ¶ 222 were materially false and

misleading when made because they misrepresented and failed to disclose the following adverse

facts, which were known to Defendant or recklessly disregarded by him:

a.    LINN and LNCO failed to adequately disclose how LINN's reported

adjusted EBITDA, DCF, distribution coverage ratio, and Maintenance capex were derived;

b.      LINN and LNCO failed to disclose that LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio excluded the costs of premiums LINN paid for settled put options, but included the proceeds from the sale or exercise of those options;

c.      LINN and LNCO understated the capital required to maintain current production levels at LINN's oil and natural gas properties;

d.      As a result of (a) – (c), LINN's reported adjusted EBITDA, DCF, and distribution coverage ratio were materially overstated and the amount of available cash to cover distributions was significantly less than reported; indeed, had LINN properly accounted for the costs for its settled premiums in arriving at DCF, it would have been unable to make and sustain its distributions;

e.      As a result of (a) – (c), LINN was in violation of SEC Regulations G and S-K, Item 10(e);

f.      Defendants materially misrepresented the true risk associated with LINN's ability to continue to issue stable or increasing distributions;

g.      LINN's and LNCO's disclosure controls were materially deficient and its representations concerning them were materially false and misleading;

h.      SOX certifications issued by Defendants Ellis and Rockov associated with LINN's and LNCO's disclosure controls were materially false and misleading; and

i.      Based on the foregoing, Defendants lacked a reasonable basis for their positive statements concerning LINN and LNCO and their financial prospects.

224.    On June 3, 2013, after the market had closed, LINN and LNCO filed an amended registration statement on Form S-4/A with the SEC in connection with its proposed acquisition of Berry.  Buried in a footnote on page 257 of the registration statement, the Companies (i)

disclosed that LINN considers the cost of premiums paid for put options as an investment related

to its underlying oil and natural gas properties only for the purpose of calculating the non-GAAP

measures of adjusted EBITDA and DCF, and (ii) disclosed, for the first time, the premiums paid

for put options that had settled during several prior reporting periods—though the Company still

failed to account for these costs when computing DCF:

> Linn considers the cost of premiums paid for put options as an
> investment related to its underlying oil and natural gas properties
> only for the purpose of calculating the non-GAAP measures of
> adjusted EBITDA and DCF. ***The premiums paid for put options
> that settled during the three months ended March 31, 2013 and
> March 31, 2012 and during the years ended December 31, 2012,
> 2011 and 2010 were approximately $43 million, $26 million,
> $148 million, $88 million and $94 million, respectively***.

225.    On June 15, 2013, *Barron's* published an article entitled "Linn Comes Clean on

Derivative Costs."  The article noted that the Company wants to recognize the financial benefits

of its put options, but not the costs, stating, in pertinent part, as follows:

> A surprise disclosure from Linn Energy (ticker: LINE), buried in a
> recent regulatory filing related to its planned merger with Berry
> Petroleum (BRY), supports the view put forth in Barron's that the
> oil and natural-gas producer's distributable cash flow is overstated
> and doesn't cover its distributions to investors.
>
> One of the key controversies surrounding Linn, which is structured
> like a master limited partnership, is the accounting for its energy
> derivatives in its distributable cash flow, a key financial measure
> for MLPs.  Distributable cash flow (DCF) is the basis for Linn's
> distribution, the MLP equivalent of a dividend.  Linn has a market
> value of $7.5 billion, plus $6 billion of debt.
>
> Linn has realized above-market prices for its natural gas due to its
> use of derivatives, including in-the-money put options.  This has
> allowed the company to get more than $5 per million British
> thermal units for its gas when the market price has been $4 or
> lower.
>
> Linn argues that the put options amount to a capital investment, so
> their cost shouldn't be deducted from distributable cash flow.  The

company has leeway in computing DCF because the measure isn't governed by generally accepted accounting principles.

*Barron's* view is that Linn's accounting is aggressive, because the company wants to recognize the financial benefits of the puts, but not the costs ("Twilight of a Stock Market Darling," May 6). In its GAAP-compliant net income, it recognizes its derivative expense.

"It's the gain or loss from the derivative transaction that must be reflected in pre- tax accounting income, not merely the proceeds derived from the sale or disposition of the derivative," says New York tax expert Robert Willens. ***I can't think of an accounting principle or theory that would permit recording only the proceeds from the derivative while ignoring the cost.***[30]

On this news, LINN units declined $0.55 per unit, or nearly 2%, to close at $30.52 per unit on the next trading day, June 17, 2013, on elevated trading volume. Similarly, LNCO shares fell $1.69 per share, or 4.6%, from its closing price of $36.86 on June 14, 2013, to close at $35.17 on June 17, 2013, on unusually high trading volume.

226.    On June 18, 2013, Bloomberg published an article on the record intraday decline in the price of LINN units and LNCO shares that day, stating that "Linn Energy drops as much as 3.2% to $29.56, lowest since September 2010, worst performer in Alerian MLP index (AMZ); LNCO falls as much as 4.8% to $33.50 – shr, a record low. The article also summarized remarks by Hedgeye's Kevin Kaiser, as follows, in relevant part:

- Hedgeye Risk Mgmt analyst Kevin Kaiser says LINE is best short in oil & gas space today; LINE fair value at $17.60, LNCO $12.30 if BRY deal closes

- LINE/BRY is "bad deal" for BRY holders; LINE fair value $8.10, LNCO 7.70 if BRY deal doesn't close

- Sees no economic justification for LNCO to trade at premium to LINE

- Hosts call for clients 11 am, details not disclosed

---

[30] *See* Andrew Barry, *Linn Comes Clean on Derivatives Costs,* Barron's, June 15, 2013, *available at* http://online.barrons.com/article/SB50001424052748704878904578541271968688436.html.

- NOTE: March 21, Hedgeye said LINE business model "unsustainable"; recommended shorting LNCO, BRY[31]

227. Then, on July 1, 2013, after the market closed, the Companies issued a press release announcing that the SEC commenced an informal inquiry regarding them, as follows:

> LINN Energy, LLC (Nasdaq: LINE) ("LINN") and LinnCo, LLC (Nasdaq: LNCO) ("LinnCo") announced that they have been notified by the staff of the Securities and Exchange Commission ("SEC") that its Fort Worth Regional Office has commenced a private, non-public inquiry regarding LINN and LinnCo. The SEC has requested the preservation of documents and communications that are potentially relevant to, among other things, LinnCo's proposed merger with Berry Petroleum Company, and LINN and LinnCo's use of non-GAAP financial measures and hedging strategy. The SEC has stated that the fact of the inquiry should not be construed as an indication that the SEC or its staff has a negative view of any entity, individual or security. LINN and LinnCo are cooperating fully with the SEC in this matter.
>
> Although the impact of the inquiry on the timing of LinnCo's proposed merger with Berry Petroleum Company is difficult to predict, LinnCo and LINN remain committed to the completion of the transaction.

228. On July 2, 2013, Hedgeye published an article in response to the Companies' revelation of the pending SEC inquiry, noting that the Berry Petroleum acquisition was at "serious risk" and that at least two analysts had downgraded LINN and LNCO that morning and others would likely follow:

> We believe that the SEC inquiry puts the proposed LINN/BRY merger at serious risk. Note that the press release does not say that "LinnCo, LINN, AND BERRY remain committed to the completion of the transaction." The press release was also not jointly issued by LINN and BRY, as was the 5/31/13 joint press release title, "LINN Energy, LinnCo and Berry Petroleum Company Provide Update on Merger."

---

[31] *See* Arie Shapira, *Linn Energy Drops 3.2%; Hedgeye Remains Short, Hosts Call 11am,* Bloomberg, June 18, 2013.

For anyone bullish long-term on stand-alone BRY, we believe that this is good news. It's likely that LINN/BRY will not close the merger while the investigation is ongoing, and Berry will be free to terminate the merger without paying the $83.7MM ($1.50/share) termination fee if the merger does not close by the "End Date," October 31, 2013. It's impossible to predict how long the SEC's investigation will take, but they can be on the order of several months to quarters. This site provides a simple overview of the SEC's investigation process. Further, our interpretation of the proxy is that the SEC's investigation of LINN qualifies as an "LINN Party Material Adverse Effect," which allows Berry to terminate the merger at any time without penalty.

For LINN/LNCO, this is devastating. The SEC shining a light on LINN's non-GAAP measures will likely show investors how far they are from economic reality (net income per unit, for instance). And with the BRY merger now in serious doubt, the "LINN will buy every C-Corp E&P out there" bull case doesn't seem like such a great idea. We will also see more consecutive quarters of organic results from LINN, which we expect will show flat-to-declining production, rendering LINN's estimated maintenance capex number more and more difficult to defend. We also believe that there's a good chance that the distribution will ultimately be cut as the SEC's actions could materially reduce "DCF/unit" going forward. That's going to make it difficult to value LINN with a yield target. And there will be a wave of negative feedback. JP Morgan and Raymond James downgraded LINN/LNCO to neutral this morning; we expect other analysts to follow suit, or just suspend coverage. Recall that LINN is largely retail-owned, and for years, LINN thrived partly thanks to the constantly bullish recommendations from these analysts.[32]

Following the news on July 1 and July 2, 2013, LINN units plummeted $10.50 per unit, or

31.5%, over a two-day period to close at $22.79 per unit on July 3, 2013, on extremely high

trading volume. LNCO shares also reacted swiftly and dramatically, falling $10.12 per share, or

27.3%, over the two-day period to close at $26.95 on July 3, 2013, on extremely high trading

volume.

---

[32] *See* Hedgeye Risk Management, *Linn Energy & The SEC* News, July 2, 2013, *available at* http://app.hedgeye.com/unlocked_content/29463-linn-energy-the-sec-news.

229.    On August 8, 2013, before the market opened, LINN and LNCO jointly issued a press release announcing LINN's disappointing financial results for the second quarter ending June 30, 2013 and, again, revealing that LINN's cash flow was insufficient to cover its declared quarterly distribution of $0.72.  Specifically, for the quarter, LINN reported a distribution coverage ratio of only 0.89x and DCF per unit of $0.65, well below its earlier guidance of a distribution coverage ratio of 1.00x distribution coverage ratio and DCF per unit of $0.72 for the quarter.  In addition, the press release included a representation purporting to explain and reconcile LINN's adjusted EBITDA, similar to the representation reproduced in ¶ 96 above.

230.    In addition, in a footnote in the release, the Companies revealed how much LINN had paid for premiums for put options that settled during the three and six months ending June 30, 2012 and 2013, and indicated (without actually doing it, as required under SEC regulations) that "deducting" those premiums would have an impact on adjusted EBITDA and DCF:

> The premiums paid for put options that settled during the three months ended June 30, 2013, and June 30, 2012, and during the six months ended June 30, 2013, and June 30, 2012, were approximately $43 million, $36 million, $86 million and $62 million, respectively. ***Deducting the premiums paid for put options would reduce the Company's adjusted EBITDA and DCF***.

231.    Defendant Ellis commented on the results, stating, in pertinent part, as follows:

> "LINN has experienced a challenging start to the year as lower than expected returns from our capital program coupled with historically low NGL prices have weighed on year-to-date results," said Mark E. Ellis, Chairman, President and Chief Executive Officer. "While these and other challenges have made for a disappointing first half of 2013, we are optimistic about the remainder of the year and expect to deliver annual production growth of approximately 8% - 10%, as July volumes averaged approximately 815 MMcfe/d."

232.    Following the LINN's 2013 second quarter earnings announcement, the Company

conducted a conference call with analysts and investors to discuss the Company's earnings and

operations. During the conference call, Defendant Rockov stated, in relevant part, as follows:

> For the second quarter 2013, LINN reported total revenues of
> approximately $839 million compared to $801 million for the
> second quarter of 2012, which includes non-cash changes in fair
> value of unsettled commodity derivatives of approximately $271
> million and $304 million respectively, including the reduction of
> put option premium value over time. ***We achieved net income per
> unit of $1.47 per unit in the second quarter 2013 compared to
> $1.19 per unit for the second quarter of 2012. These amounts
> include non-cash changes in fair value of unsettled commodity
> derivatives of approximately $1.15 per unit and $1.52 per unit
> respectively including the reduction of put option premium value
> over time.***
>
> In addition, ***we increased adjusted EBITDA by 13% to $362
> million for the second quarter of 2013, compared to $319 million
> during the second quarter of 2012.*** On a per unit basis, our
> ***distributable cash flow was $0.65 per unit for the second quarter
> of 2013 which resulted in a distribution coverage ratio of 0.89***.
> As a reminder, adjusted EBITDA and distributable cash flow are
> non-GAAP measures, please see Schedule 1 in this morning's
> press release for a reconciliation of adjusted EBITDA and
> distributable cash flow to their most directly comparable GAAP
> measures.

In addition, during the conference call, the following exchange occurred between Defendant Ellis

and an analyst concerning LINN's guidance with respect to distributions and its distribution

coverage ratio:

> Abhi Sinha, Analyst, BOFA Merrill Lynch:
>
> Wanted to ask on this, we see last two consecutive quarters your
> coverage ratio has dropped below 1 and if ethane prices continue
> to drop or even stay where it is, current ratio in third quarter might
> still be below 1. So given the circumstances how comfortable do
> you feel in maintaining the distribution level?
>
> Mark Ellis:

Yes, Abhi, I mean we've given obviously guidance through the end of this year. We posted it for the third quarter and ***we feel confident in terms of the guidance that we posted other at about 0.9 I think through the fourth quarter, right? And growing to 0.95, I'm sorry, in the fourth quarter***.

233.     That same day, August 8, 2013, LINN filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the second quarter ended June, 2013 (the "LINN 2013 Q2 Form 10-Q"). The LINN 2013 Q2 Form 10-Q contained materially false and misleading statements about the Company's adjusted EBITDA and cash flows, as described above, and included false or misleading SOX certifications by Ellis and Rockov substantially similar to those described in ¶ 103 above.  In addition, in the "Risk Factors" section of the Form 10-Q, LINN disclosed that it might not have sufficient DCF to maintain the current level of distributions, or at all, and that future distributions might be reduced:

> ***We may not have sufficient distributable cash flow to maintain our distribution at the current distribution level, or at all, and future distributions to our unitholders may be reduced or eliminated.***
>
> For the quarters ended March 31, 2013, and June 30, 2013, our distributable cash flow was less than cash distributions to our unitholders. While the Board of Directors considers estimates of distributable cash flow both historically and prospectively when declaring a distribution for the current period, if we continue to generate distributable cash flow that is insufficient to maintain our current distribution to unitholders, our Board of Directors may determine to reduce or eliminate our distribution to unitholders. Any such reduction in distributions may cause the trading price of our units to decline. Factors that may cause us to generate distributable cash flow that is insufficient to maintain our current distribution to unitholders include, among other things, the following:
>
> • Production from existing assets: Our revenues are dependent on how much oil, natural gas and NGLs we produce. For the quarter ended June 30, 2013, our oil production volumes fell short of our expectations. If our existing assets continue to under-perform with respect to expected production, our revenues may be lower than

expected, which could result in distributable cash flow that is insufficient to maintain our current distribution to unitholders.

• NGL commodity prices: We have been and continue to be limited in our ability to effectively hedge our NGL production. As a result, we are subject to the current depressed price environment for NGLs, and in particular, ethane prices. If current price levels for NGLs continue into the future, our revenues and results of operations will be affected, which could result in distributable cash flow that is insufficient to maintain our current distribution to unitholders.

• Access to and cost of capital: Accretive acquisitions are an integral component of our business strategy. When revenues are expected to be lower as a result of under-performance of assets, weakening commodity prices on unhedged volumes or declining contract prices on unhedged volumes, we seek to make accretive acquisitions of oil and natural gas properties to cover potential shortfalls in distributable cash flow in order to maintain our distribution level. As a result of the pending SEC inquiry, we may be limited in our ability to access the capital markets at an acceptable cost; thus our ability to make accretive acquisitions may be limited.

As a result of these and other factors, the amount of cash we may distribute to our unitholders in the future may be significantly less than the current distribution level or the distribution may be suspended or eliminated.

234. On the same day, August 8, 2013, LNCO also filed with the SEC its Form 10-Q, signed by Defendant Rottino, for the second quarter ended June 30, 2013 (the "LNCO 2013 Q2 Form 10-Q") that incorporated LINN's 2013 Q2 Form 10-Q. The LNCO 2013 Q2 Form 10-Q also included materially false and misleading representations about LINN's EBITDA and cash flows, and included false or misleading SOX certifications by Ellis and Rockov, that were substantially similar to those contained in the LINN 2013 Q2 Form 10-Q.

235. LINN also posted a presentation on its website entitled "Supplemental Q2 2013 Financial and Operational Results" that reiterated its reported financial results for the second

quarter and full year 2013, including adjusted EBITDA, DCF, and distribution coverage ratio, as well as its guidance for the third quarter and full year 2013.

236.    Following the news on August 8, 2013, the price of LINN units fell $1.84 per unit, or 6.8%, from its closing price of $27.14 on August 7, 2013, to close at $25.30 on August 8, 2013, on unusually high trading volume.  Similarly, LNCO shares fell $1.51 per share, or 5.2%, from its closing price of $29.04 on August 7, 2013, to close at $27.53 on August 8, 2013, also on unusually elevated trading volume.

237.    On September 11, 2013, LINN, LNCO, and Berry Petroleum jointly issued a press release to provide an update on the merger process.  The Companies announced that the SEC had provide comments on the amended registration statement filed in connection with the Berry merger and that LINN and LNCO were working on filing another amended registration statement.

### LINN, BELATEDLY, COMES CLEAN ABOUT ITS IMPROPER ACCOUNTING

238.    On September 17, 2013, after the market closed, LINN and LNCO filed the fourth amendment to the registration statement on Form S-4/A with the SEC.  In the amended filing, LINN announced significant revisions to its accounting for and use of adjusted EBITDA, DCF, and maintenance capex, effectively conceding that the non-GAAP financial measures the Company had previously reported on were indeed misleading, and that the earlier criticism thereof by the analyst community had merit:

> EXPLANATORY NOTE REGARDING NON-GAAP
> FINANCIAL MEASURES AND DISTRIBUTION PRACTICES
>
> Historically, LINN's management has recommended, and the
> LINN board of directors has made a determination regarding, the
> appropriate level of cash distributions to unitholders by starting
> with "Adjusted EBITDA," which previously included adjustments
> for cash flows from acquisitions and divestitures between the
> effective date and the closing date and did not deduct premiums

paid for put options, and deducting interest expense, "maintenance capital expenditures" and provision for legal matters. Going forward, LINN has decided to describe its methodology for evaluating distributions in the following manner:

•      Adjusted EBITDA will no longer include adjustments for cash flows from acquisitions and divestitures between the effective date and the closing date and *will deduct the premiums paid for put options that settled during the period*.

•      Adjusted EBITDA will no longer be the starting point for explaining LINN's management's recommendation of and the LINN board of directors' determination of the appropriate level of cash distributions to unitholders.

•      In explaining LINN's management's recommendation of and the LINN board of directors' methodology for determining the appropriate level of cash distributions to unitholders, LINN's approach:

> •      *no longer uses the term "distributable cash flow"*;
>
> •      starts with net cash provided by (used in) operating activities as determined in accordance with GAAP and as set forth on LINN's statement of cash flows;
>
> •      shows the difference between net cash provided by (used in) operating activities and the amount of cash distributions actually paid to unitholders for the applicable period; and
>
> •      describes the discretionary adjustments made by the LINN board of directors when determining the amount of cash distributions to pay unitholders.
>
> LINN's intent is to describe the specific adjustments considered by LINN's management and the LINN board of directors in recommending and determining the level of distributions and to allow investors to evaluate these adjustments.
>
> LINN's limited liability company agreement requires that LINN distribute, at a minimum, all "available cash" to unitholders with respect to each quarter, subject to any limitations contained under the Delaware Limited Liability Company Act. "Available cash" is generally defined as all cash on hand as of the end of a quarter, including cash from

working capital borrowings, less the amount of any cash reserves established by the LINN board of directors to (i) provide for the proper conduct of LINN's business (including reserves for future capital expenditures including drilling and acquisitions and for anticipated future credit needs), (ii) comply with applicable law or any of LINN's agreements or obligations or (iii) provide funds for distributions with respect to any one or more of the next four quarters. It is under this broad grant of authority that the LINN board of directors makes its discretionary determinations regarding the appropriate adjustments to net cash provided by (used in) operating activities when determining the distribution.

•       LINN will discontinue the use of the term "maintenance capital expenditures" and, instead, use the term "discretionary reductions for a portion of oil and natural gas development costs." As reflected in this terminology, the LINN board of directors reduces net cash provided by (used in) operating activities for purposes of determining the appropriate level of distributions by only a portion of the total costs for "development of oil and natural gas properties" as determined under GAAP and set forth on LINN's statement of cash flows. Unlike many publicly traded partnerships, LINN's limited liability company agreement does not include the concept of "maintenance capital expenditures," but LINN has historically used this term because of its broad market acceptance among publicly traded partnerships, analysts and investors as a way of distinguishing between different types of capital expenditures for purposes of distribution payments. For more information on how the LINN board of directors views "discretionary reductions for a portion of oil and nature gas development costs," please read footnote (5) to the table beginning on page 237.

On this news, the price of LINN units fell $0.94, or approximately 3.4%, from its closing price of $27.91 on September 17, 2013, to close at $26.97 on September 18, 2013, on unusually high trading volume.  LNCO shares also fell $1.03 per share, or 3.3%, from its closing price of $30.93 on September 17, 2013 to close at $29.90 on September 18, 2013, on elevated trading volume.

239.    On September 19, 2013, the investment research blog, *Seeking Alpha,* published an article entitled "Linn Effectively Admits to Misleading Investors and Announces Key

Accounting Changes" discussing the significance of LINN's accounting changes, as follows, in

relevant part:

> The debate about Linn Energy (LINE) is basically over. In an amended S-4/A filing in response to SEC comments, Linn Energy and Linn Co (LNCO) have effectively, and for all practical purposes, implicitly admitted that they have materially misled investors in several fundamental respects over the past few years. Specifically, on page 235 of the aforementioned SEC filing, LINN has implicitly admitted that they have been effectively forced by the SEC to revamp their accounting of such fundamental items as:

> "Adjusted EBITDA"

> "Maintenance Capex"

> "Distributable Cash flow or DCF"

> "Premiums paid on put options that settled during the period"

> "Cash flows from acquisitions and divestitures between the effective date and the closing date."

> The scale and scope of Linn's effective admissions regarding misleading and/or questionable accounting practices, and the consequent changes that the company has been forced to implement, are absolutely breathtaking. These effective admissions and corrective changes are extremely significant and fundamentally alter the manner in which Linn will be forced to report its financial statements in the future (including possible restatements of financial statements of prior periods)

> The analytical victory by analysts that have been critical of LINN's accounting practices has been stunning; almost total. The only question remaining is what, if any, SEC sanctions will follow and what restatements of prior financial statements the SEC will require. Linn has reported that the SEC investigations of possible wrongdoings continue.

> **Linn's Effective Admissions And Announced Accounting Changes**

> There can be little doubt at this point that LINN is being forced to very substantially modify its accounting practices due to as of yet undisclosed formal or informal SEC findings to the effect that Linn may have misled investors in various critical respects.

*    *    *

From these statements it is clear that, with regards to the battle over accounting practices and disclosures, Linn's defeat has been resounding and profoundly humiliating; the victory of the critics has been totally decisive.

Investors should not fool themselves. Linn has not all of the sudden "seen the light" and decided voluntarily that the very core of its accounting of distributable cash flow was merely questionable or potentially confusing. It seems clear that LINN has effectively been forced to admit that its previous accounting practices were misleading and to announce that it will consequently change these misleading accounting practices.

**Future Implications For Linn**

*    *    *

It appears that Linn is being forced to cease and desist from certain past unsound practices. For example, in the future Linn will be forced to deduct premiums paid from put options that have settled in its calculation of "adjusted EBITDA." This is exactly what many analysts believe that Linn should have been doing all along and which Linn had vehemently refused to do. Indeed, if Linn had done this previously, it would have been clear that Linn's distribution coverage was below 100% -- i.e. Linn was paying out more in distribution than it was truly earning from its business in economic terms.

However, while it seems that the SEC is forcing Linn to clean some of its business practices up, in other regards, it appears that Linn intends to continue to engage in unsound business practices. The most alarming instance of this can be observed in Linn's announcement that they will stop using the term "maintenance capex," and will start using a term called, "discretionary reductions for a portion of oil and natural gas development costs." Since it appears that the SEC feels that Linn's previous use of the term "maintenance capex" was misleading, Linn has decided to simply make up a completely new non-GAAP term.

What this effectively means is that Linn will set the level of cash flow that it believes is distributable to shareholders at whatever it pleases in accordance with its discretionary definition of (a portion of) oil and gas development costs. Linn will no longer bother to adhere to any established accounting rules regarding the accounting of oil and gas development costs; it will simply report

those costs in a discretionary manner for purposes of determining its distributions.

The irony should be clear. The cash spent on oil and gas development will be very real and objectively quantifiable; however, Linn's reporting of these outlays for purposes of determining cash available for distributions will be a figment of management's discretion. But never mind. Linn figures that as long as they don't continue to mislead investors by calling this "maintenance capex," and they simply make it clear in the labeling and fine print that this is just a made-up figure that they determine at their discretion, everything is hunky dory.

Instead of ceasing and desisting from engaging in the unsound business practice of understating their sustainable maintenance capex and their sustainable development costs in particular, Linn has apparently decided to continue said unsound practices and simply make up a new non-GAAP accounting concept to label these practices such that it can't be accused of substantially misleading investors.

Some sell-side analysts are already trying to downplay this humiliation of Linn. For example, the analyst at Raymond James has said the following:

"So even though the categories are getting relabeled, LINN's underlying cash flow does not change. Meaning there is a lot of heartache going on but no change in the company's ability to pay its distribution or how much cash flow LINN actually generates."

This line of argumentation is extremely misleading. This isn't just about "a lot of heartache" at Linn. First of all, the humiliation of company management over accounting practices is no trivial matter; it is [sic] material to the value of the stock. Second, contrary to what the analyst suggests, the implications of "relabeling" are highly material to the value of Linn because they highlight discrepancies in Linn's measurement of cash flow which is the ultimate basis for all equity valuation. Of course it is trivially true that re-labeling accounting categories does not change the underlying amount of cash Linn generates or its ability to pay distributions. But this simply begs the question: What is Linn's sustainable free cash flow? The fact of the matter is that Linn's most recent S-4/A simply confirms by admission what had already been proven beyond any reasonable doubt by myself and a few other analysts: That Linn has systematically distributed more cash in distributions than what it legitimately earns form a [sic] economic point of view. Linn's re-labeling of accounting

-114-

categories will not change this underlying fact. Therefore, properly framed, the argument by the Raymond James analyst is hardly exculpatory of Linn; it serves to highlight the fact that re-labeling accounting items may make Linn's accounting less misleading or fraudulent; it won't make Linn's past or future distributions any more sustainable.[33]

240.    The market for LINN units and LNCO shares was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, LINN units and LNCO shares traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired LINN units and LNCO shares relying upon the integrity of the market price of LINN units and LNCO shares and market information relating to LINN and LNCO, and have been damaged thereby.

241.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LINN units and LNCO shares, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Companies, their business and operations, as alleged herein.

242.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about LINN's and LNCO's business, cash flows, prospects and operations. These

---

[33] *See* James A. Kostohryz, *Linn Effectively Admits to Misleading Investors And Announces Key Accounting Changes,* Seeking Alpha (September 19, 2013), *available at* http://seekingalpha.com/article/1702412-linn-effectively-admits-to-misleading-investors-and-announces-key-accounting-changes.

material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of LINN and LNCO and their business, cash flows, prospects and operations, thus causing LINN's units and LNCO's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing LINN units and LNCO shares at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

243.    The Individual Defendants, as directors and/or senior officers of LINN and LNCO during the Class Period, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority, as well as their stock ownership, the Individual Defendants were in a position to, and did, control LINN's and LNCO's false and misleading statements and omissions, including the contents of the Companies' SEC filings, as set forth above.

244.    Defendants Ellis, Rockov, and Rottino, who served as executive officers of both LINN and LNCO, and Defendants Ellis, Alcorn, Dunlap, Jacobs, Linn, McCoy, and Swoveland, who served as directors of both LINN and LNCO, possessed the power and authority to, and did, control the contents of both LINN's and LNCO's statements to the market during the Class Period, including the Companies' SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors.  The Individual Defendants were provided with copies of LINN's and LNCO's reports and press releases alleged herein to be materially false and misleading prior to, or shortly after, their issuance and, therefore, are liable as direct participants in the wrongful conduct by both LINN and LNCO.

245.    The LINN Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing

public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Companies, including the Individual Defendants.

246.    As already detailed herein at ¶ 103, Defendants Ellis and Rockov signed quarterly and annual SOX certifications during the Class Period attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as LINN's and LNCO's internal control over financial reporting.

247.    The Individual Defendants knew and/or recklessly disregarded that the Companies' public statements concerning their financial results were false and misleading when made.  Specifically, LINN's adjusted EBITDA, DCF, maintenance capex, and distribution coverage ratio – each of which was misleading – were key performance metrics for LINN, and knowledge of these key facts may rightfully be attributed to LINN, LNCO,  their key officers and directors, including the Individual Defendants, particularly Defendants Alcorn, Dunlap, McCoy, and Swoveland who were members of LINN's Audit Committee, and Defendants Alcorn, Jacobs and McCoy who were members of LNCO's Audit Committees.

248.    As members of the Audit Committees of LINN and/or LNCO, Defendants Alcorn, Dunlap, McCoy, Swoveland, and Jacobs were responsible for the Companies' financial reporting process.  The Audit Committee Charter of LINN and LNCO are nearly identical and provide, in relevant part, that "[e]ach member of the Committee shall be 'financially literate,' as such qualification is interpreted by the Board in its business judgment, but at a minimum must be able to read and understand fundamental financial statements of the Company, including its

balance sheet, income statement and cash flow statements."[34]  The Charters also provides that the

Audit Committee's responsibilities and duties include LINN's or LNCO's audit and accounting

process, as follows, in relevant part:

> The Committee shall review and discuss with the Company's independent auditors the reports that the independent auditors are required to provide to the Committee relating to significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including, among other things, (a) all critical accounting policies and practices used, (b) all alternative treatments of financial information within U.S. generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of such treatments and the treatment preferred by the Company's independent auditors and (c) any material written communications between the Company's independent auditors and management.

249.    The Charters also provide that Audit Committee members are responsible for

LINN or LNCO's financial report, as follows:

> *Financial Reporting Process*
>
> • The Committee shall review and discuss with members of management and the Company's independent auditors the annual audited financial statements to be included in the Company's annual reports on Form 10-K (including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") prior to the filing of each Form 10-K, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.5
>
> • The Committee shall review and discuss with members of management and the Company's independent auditors the quarterly financial statements to be included in the Company's quarterly reports on Form 10-Q (including the Company's

---

[34] *See Linn Energy, LLC, Audit Committee Charter*, *available at* http://www.linnenergy.com/_downloads/AuditCharter-revised-1-2013.pdf., and *LinnCo, LCC, Audit Committee Charter*, http://www.linnco.com/_downloads/Audit-Charter-Effective-Sept2012.pdf.

disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") prior to the filing of each Form 10-Q.

• The Committee shall review with members of management and discuss with the Company's independent auditors any registration statement of the Company that contains new or pro forma financial information prior to the initial filing of such registration statement with the SEC. The Chairperson of the Committee or a quorum of the Committee may represent the entire Committee for the purpose of these reviews.

• The Committee shall discuss with management the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be general (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and do not necessarily need to be held in advance of each release or presentation.

• The Committee shall be directly responsible for the resolution of any disagreements between management and the independent auditors regarding financial reporting.

250.    Moreover, LINN's Board of Directors, which included the Individual Defendants, was fully familiar with LINN's non-GAAP metrics and the methods used by the Company to arrive at DCF. LINN stated the Board of Directors "declare[s] [the] cash distribution" to unitholders from "all cash on hand at the end of the quarter less the amount of cash reserves established by the Board."[35] Management "used" adjusted EBITDA and adjusted net income "to analyze [the] Company['s] performance."[36] In particular, LINN's management "used" adjusted EBITDA "to evaluate cash flow and the Company's ability to sustain or increase distributions."[37]

---

[35] LINN 2012 10-K at 3, 29, 55.

[36] *Id*. at 33.

[37] *Id.*

251.    The LINN Defendants were motivated to engage in the fraudulent course of conduct alleged herein in order to facilitate LINN's numerous capital raising debt and equity offerings during the Class Period.

252.    The Officer Defendants were further motivated to engage in the fraudulent course of conduct alleged herein in order to receive additional compensation under LINN's Employee Incentive Compensation Program ("EICP").  As disclosed in the Prospectus, LINN's "EICP is an annual cash incentive program which provides guidelines for the calculation of annual cash incentive based compensation."  For 2011, EICP's award targets included Defendants Ellis, Rockov, and Linn.  The Prospectus further stated, "For 2011, 65% of each Named Officer's EICP Award opportunity was based on LINN's performance with respect to the following measures set at the beginning of 2011:

...b)  Ability to Pay Distribution – measured by

1.    LINN's cash flow (defined as Adjusted EBITDA less interest expense) compared to its budget for 2011; and

2.    LINN's Distribution Coverage Ratio as compared to its budget. Distribution coverage ratio is defines as Distributable Cash Flow for 2011 divided by total distributions.  Distributable Cash Flow is defined as Adjusted EBITDA...less cash interest expense and maintenance capital.

c)  Relative Unitholder Return – measured by LINN's total return for fiscal year 2011 compared to that of a peer group of energy master limited partnerships...."

253.    The LINN Defendants were further motivated to engage in this fraudulent course of conduct in order to allow LINN insiders to sell shares of their personally held LINN units at inflated prices yielding them proceeds of approximately $34.6 million during the Class Period:

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Alcorn George A | LINN and LNCO Director | 05-Apr-2010 | 8,000 | $25.84 | $206,720 |
| Alcorn George A | | 10-Nov-2010 | 1,280 | $36.90 | $47,232 |
| | | | 9,280 | | $253,952 |
| Linn Michael C | LINN and LNCO Director | 13-Sep-2010 | 352,900 | $30.84 | $10,883,436 |
| Linn Michael C | | 14-Sep-2010 | 408,100 | $30.49 | $12,442,969 |
| Linn Michael C | | 15-Sep-2010 | 39,000 | $30.15 | $1,175,694 |
| Linn Michael C | | 02-Aug-2011 | 44,149 | $39.69 | $1,752,274 |
| Linn Michael C | | 02-Aug-2011 | 62,500 | $39.89 | $2,493,125 |
| Linn Michael C | | 28-June-2012 | 55,625 | $36.95 | $2,055,344 |
| Linn Michael C | | 28-June-2012 | 76,875 | $36.95 | $2,803,581 |
| | | | 1,038,149 | | $33,606,423 |
| Rottino David B | LINN and LNCO Officer | 10-Aug-2012 | 20,000 | $38.86 | $777,200 |
| | | Total | 1,067,429 | | $34,637,575 |

254.     Defendant Ellis sold 42,316 shares in 2010, 38,791 shares in 2011, and 133,758 shares in 2012, but made no sales in 2008 and 2009, the two years preceding the Class Period. Likewise, Defendant Rottino sold 7,806 shares in 2010, 10,979 shares in 2011, and 29,742 shares in 2010, but made no sales in 2008 and 2009.

## ADDITIONAL ALLEGATIONS REGARDING LOSS CAUSATION

255.     Defendants' unlawful conduct alleged herein directly caused the losses incurred by Plaintiffs and the Class. Throughout the Class Period, the price of LINN units and LNCO shares was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.

256.     The true facts became known by investors and the market through a series of partial corrective disclosures, some by third parties, and some by Defendants, beginning on or around February 15, 2013. By making contemporaneous additional misstatements in the form of denials in response to partial disclosures by third parties, or by failing to reveal the falsity of all

statements at one time, artificial inflation remained in the price of LINN units and LNCO shares throughout the entirety of the Class Period.

257.    As the true facts become known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of LINN units and LNCO shares declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Plaintiffs and the members of the Class.

258.    The declines in the price of LINN units and LNCO shares and the resulting losses are directly attributable to the disclosure of information and/or materialization of risks that were previously misrepresented or concealed by Defendants.  Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind their material misstatements, they would not have purchased LINN units or LNCO shares at artificially inflated prices.

259.    From the time that the truth about Defendants' wrongful conduct first emerged, until the time the market learned of LINN's and LNCO's true financial condition, the price of LINN units and LNCO shares declined in a series of material steps.  Each disclosure and/or materialization of previously concealed risks removed a portion of the artificial inflation from the price of LINN units and LNCO shares caused by Defendants' prior material misrepresentations and omissions, and directly caused Plaintiffs to suffer damages.

### THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE APPLIES TO PLAINTIFFS' EXCHANGE ACT CLAIMS.

260.    At all relevant times, the market for LINN units and LNCO shares was an efficient market for the following reasons, among others:

a.    LINN units and LNCO shares met the requirements for listing, and were listed and actively traded on the NASDAQ Global Select Market, a highly efficient, electronic stock market;

b.    as regulated issuers, LINN and LNCO filed periodic public reports with the SEC and the NASDAQ Global Select Market;

c.    LINN and LNCO regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    LINN and LNCO were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

261.    As a result of the foregoing, the market for LINN units and LNCO shares promptly digested current information regarding LINN and LNCO from all publicly available sources and reflected such information in the prices of the units. Under these circumstances, all purchasers of LINN units and of LNCO shares during the Class Period suffered similar injury through their purchase of LINN units and/or LNCO shares at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

262.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements were made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by executive officers and/or directors of LINN and LNCO who knew that those

statements were false when made.

### GROUP PLEADING

263.    In addition to the statements they personally made, the Individual Defendants are

liable for the materially false and misleading statements pleaded herein in support of Plaintiffs'

claim under Section 10(b) (and Rule 10b-5) of the Exchange Act that were issued by or in the

name of LINN and LNCO, as each of those statements was "group-published" information, and

resulted from the collective actions of these Defendants. It is appropriate to treat the Individual

Defendants as a group and to presume that the public filings, press releases and other public

statements complained of herein are the product of the collective actions of this narrowly defined

group of Defendants.

264.    The Individual Defendants, by virtue of their high-level positions at LINN and

LNCO, directly and actively participated in the management and operations of the Companies,

and were privy to confidential non-public information concerning the business and operations of

the Companies.

265.    In addition, the Individual Defendants were involved in drafting, reviewing and/or disseminating the materially false and misleading statements issued by LINN and LNCO and approved or ratified those statements, and, therefore, adopted them as their own.

## CLASS ACTION ALLEGATIONS

266.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who (i) purchased or otherwise acquired LINN units during the LINN Class Period (February 25, 2010 through September 17, 2013, inclusive, seeking to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (ii) purchased or otherwise acquired LNCO common shares pursuant or traceable to LNCO's IPO Registration Statement and Prospectus issued in connection with LNCO's IPO on or around October 12, 2012, and/or purchased LNCO common shares in the IPO directly from one of the Underwriter Defendants or were successfully solicited by Defendants for their own financial gain, seeking to pursue remedies under Sections 11, 12(a) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; and (iii) purchased or otherwise acquired LNCO common shares during the LNCO Class Period (October 12, 2012 through September 17, 2013, inclusive), seeking to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5.  Excluded from the Class are Defendants and their families, the officers and directors of LINN and LNCO, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

267.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the LINN Class Period and the LNCO Class Period, LINN units and LNCO shares were actively traded on the NASDAQ Global Select Market. While the exact

number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by LINN and LNCO or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

268.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

269.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

270.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of LINN;

c.    whether the price of LINN units and LNCO shares were artificially inflated during the Class Period; and

d.    to what extent the members of the Class have sustained damages and the proper measure of damages.

1136128.1

271.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of § 11 of the Securities Act
### (Against LNCO, the Individual Defendants, and the Underwriter Defendants) (collectively, "the Securities Act Defendants"))

272.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein, except to the extent the allegations are based on fraud.

273.     This Count is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, against the Securities Act Defendants on behalf of Plaintiffs Ironworkers Funds, and the Class members they seek to represent, who acquired common shares representing limited liability company interests in LNCO pursuant to and/or traceable to the IPO.

274.     This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically and expressly excluded from this Count.  Plaintiffs do not allege that the Securities Act Defendants had scienter or fraudulent intent with respect to this Count, insofar as scienter or fraudulent intent are not elements of a § 11 claim.

275.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements not misleading, and omitted to state material facts required to be stated therein.

1136128.1

276.    LNCO is a registrant for the IPO and LNCO is the issuer of the offering.  The other Defendants named herein were responsible for the contents and dissemination of the IPO Registration Statement.

277.    The Securities Act Defendants are strictly liable for any misstatements or omissions in the Registration Statement.

278.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, and/or without omissions of any material facts, were not misleading.  As the issuer of the offering, LNCO is not entitled to a due-diligence defense.

279.    By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, § 11 of the Securities Act.

280.    This claim is asserted by Plaintiffs against the Securities Act Defendants on behalf of all persons who acquired common shares of LNCO pursuant to and/or traceable to the IPO, in which the shares registered under the Registration Statement were sold.  Plaintiffs Ironworkers Funds acquired LNCO shares pursuant and/or traceable to the Registration Statement.

281.    Plaintiffs and the Class members similarly situated have sustained damages.  The value of LNCO stock has declined substantially subsequent to and due to Defendants' violations.

282.    At the time of their purchases of LNCO shares, Plaintiffs Ironworkers Funds and other Class members who acquired common shares of LNCO pursuant to and/or traceable to the company's IPO were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to September 17, 2013.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have

discovered the facts upon which this complaint is based, to the time that Plaintiffs filed this complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public, and the time Plaintiffs filed this complaint.

### COUNT II

#### For Violation of § 15 of the Securities Act
#### (Against LINN and the Individual Defendants)

283.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein, except to the extent the allegations are based on fraud.

284.    This Count is brought pursuant to § 15 of the Securities Act against LINN and the Individual Defendants.

285.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically and expressly excluded from this Count. Plaintiffs do not allege that LINN and the Individual Defendants had scienter or fraudulent intent with respect to this Count, insofar as scienter or fraudulent intent are not elements of a § 15 claim.

286.    The Individual Defendants each were control persons of LNCO by virtue of their positions as a director and/or senior officer of LNCO.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of LNCO.   The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the prior Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

287.    LINN was a control person of LNCO because, among other things, LNCO does not engage in its own operations and has no assets other than those related to LNCO's interest in

LINN, such that its financial condition and results of operations depend entirely upon the performance of LINN; LNCO was formed by LINN for the sole purpose of owning LINN units; LNCO was created to enhance LINN's ability to raise additional equity capital to execute on its acquisition and growth strategy; LINN contributed $1,000 in exchange for a 100% limited liability company interest in LNCO; LINN owned LNCO's sole voting share and was entitled to elect LNCO's entire board of directors; LNCO's initial Board of Directors was identical to LINN's Board of Directors, and all of LNCO's officers are also officers of LINN; LINN, along with LNCO and the Underwriter Defendants, were all parties to the Underwriting Agreement governing the sale of LNCO's shares in the IPO; LINN agreed to pay on LNCO's behalf any legal, accounting, tax advisory, financial advisory and engineering fees, printing costs or other administrative and out-of-pocket expenses incurred by LNCO, along with any other expenses incurred in connection with the IPO or incurred as a result of being a publicly traded entity; LINN agreed to indemnify LNCO and its officers and directors for damages suffered or costs incurred in connection with carrying out LNCO's activities; and LINN granted a license to LNCO to utilize its trademarks.  As such, LINN was a culpable participant in the violations of § 11 of the Securities Act alleged in the prior Count above.

### COUNT III

### For Violation of § 12(a)(2) of the Securities Act
### (<u>Against the Underwriter Defendants</u>)

288.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein, except to the extent the allegations are based on fraud.

289.    This Count is brought pursuant to § 12 of the Securities Act, 15 U.S.C. §§77k, against the Underwriter Defendants.

290.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically and expressly excluded from this Count. Plaintiffs do not allege that the Underwriter Defendants had scienter or fraudulent intent with respect to this Count, insofar as scienter or fraudulent intent are not elements of a § 12 claim.

291.    The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements not misleading, and omitted to state material facts required to be stated therein.

292.    The Underwriter Defendants are strictly liable for any misstatements or omissions in the Offering Documents.

293.    None of the Underwriter Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the offering documents were true, and/or without omissions of any material facts, were not misleading.

294.    This claim is asserted by Plaintiffs against the Underwriter Defendants on behalf of all persons who acquired common shares of LNCO in the IPO directly from the Underwriter Defendants or were successfully solicited by the Underwriter Defendants, whose solicitation was for the Underwriter Defendants' own financial gain.  Lead Plaintiffs Ironworkers Funds purchased shares in the IPO, at the offering price of $36.50 per share, on October 12, 2012, the first day of the offering, directly from one of the Underwriter Defendants.

295.    Plaintiffs and the Class members similarly situated have sustained damages.  The value of LNCO stock has declined substantially subsequent to and due to Defendants' violations.

296.    At the time of their purchases of LNCO shares, Plaintiffs Ironworkers Funds and other members of the Class who acquired common shares of LNCO in the IPO directly from the

Underwriter Defendants or were successfully solicited by the Underwriter Defendants were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to September 17, 2013. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based, to the time that Plaintiffs filed this complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were sold, and the time Plaintiffs filed this Complaint.

297.    Plaintiffs and other Class members who acquired common shares of LNCO in the IPO directly from the Underwriter Defendants or were successfully solicited by the Underwriter Defendants hereby tender their shares to the Underwriter Defendants and demand rescission.

## COUNT IV

### Violation of § 10(b) of the Exchange Act, and Rule 10b-5 Promulgated Thereunder, Against LINN, LNCO, and the Individual Defendants

298.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

299.    During the Class Period, the LINN Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

300.    The LINN Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of

business which operated as a fraud and deceit upon the purchasers of the Companies' units and shares during the Class Period.

301.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LINN units and LNCO shares. Plaintiffs and the Class would not have purchased LINN units or LNCO shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the LINN Defendants' misleading statements.

302.    As a direct and proximate result of the LINN Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of LINN units and/or LNCO shares during the Class Period.

## COUNT V

### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

303.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

304.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of LINN and LNCO, were privy to confidential and proprietary information concerning LINN and LNCO, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning LINN and LNCO, as detailed in this Complaint.  Because of their positions with LINN, the Individual Defendants had access to non-public information about the business, finances, products, markets and present and future business prospects of LINN and LNCO via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and

1136128.1

committees thereof and via reports and other information provided to them in connection

therewith. Because of their possession of such information, the Individual Defendants knew or

recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were

being concealed from, the investing public.

305.    The Individual Defendants are liable as direct participants in the wrongs

complained of herein. In addition, the Individual Defendants, by reason of their status as senior

executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of

the Exchange Act and had the power and influence to cause LINN and LNCO to engage in the

unlawful conduct complained of herein. Because of their positions of control, the Individual

Defendants were able to and did, directly or indirectly, control the conduct of the business of

LINN and LNCO.

306.    The Individual Defendants, because of their positions with LINN and LNCO,

controlled and/or possessed the authority to control the contents of LINN's and LNCO's reports,

press releases and presentations to securities analysts and through them, to the investing public.

The Individual Defendants were provided with copies of LINN's and LNCO's reports and press

releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability

and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual

Defendants had the opportunity to commit the fraudulent acts alleged herein.

307.    The Individual Defendants, as senior executive officers and/or directors and as

controlling persons of a publicly traded company whose units was, and is, governed by the

federal securities laws and is registered with the NASDAQ Global Select Market, had a duty to

promptly disseminate accurate and truthful information with respect to LINN's and LNCO's

financial condition, cash flow, performance, growth, operations, financial statements, business,

products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of LINN units and LNCO shares would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

308. The Individual Defendants acted as controlling persons of LINN and LNCO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of LINN and LNCO, and their ownership of LINN units and/or LNCO shares, the Individual Defendants had the power and authority to cause LINN and LNCO to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' Co-Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  October 15, 2013

Respectfully submitted,

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP

By: _____
    Daniel P. Chiplock (DC 1137)

Steven E. Fineman
Daniel P. Chiplock
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com

Richard M. Heimann
Joy A. Kruse
Sharon M. Lee
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
rheimann@lchb.com
jakruse@lchb.com
slee@lchb.com

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
Marc Gross
Jeremy A. Lieberman
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

1136128.1

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP
Cheryl D. Hamer
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: 858-792-3481
Facsimile: 858-792-3482

*Co-Lead Counsel for Lead Plaintiffs
Ironworkers Local 580 – Joint Funds;
Ironworkers Locals 40, 361 & 417 – Union
Security Funds; Ironworkers Local 40 Building
and General Funds; and Bonnie Stewart*