# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------------- X

IRONWORKERS LOCAL 580 – JOINT FUNDS; IRONWORKERS
LOCALS 40, 361 & 417–UNION SECURITY FUNDS;
IRONWORKERS LOCAL 40 BUILDING AND GENERAL
FUNDS; and BONNIE STEWART, individually and on behalf of all
others similarly situated,

       *Plaintiffs*,

   -against-

LINN ENERGY, LLC, LINNCO, LLC; MARK E. ELLIS; KOLJA
ROCKOV; DAVID B. ROTTINO; MICHAEL C. LINN; JOSEPH P.
MCCOY; GEORGE A. ALCORN; DAVID D. DUNLAP; JEFFREY
C. SWOVELAND; TERRENCE S. JACOBS; BARCLAYS
CAPITAL INC.; CITIGROUP GLOBAL MARKETS INC.; RBC
CAPITAL MARKETS, LLC; WELLS FARGO SECURITIES, LLC;
MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; CREDIT SUISSE SECURITIES (USA) LLC;
RAYMOND JAMES & ASSOCIATES, INC.; UBS SECURITIES
LLC; GOLDMAN, SACHS & CO.; J.P. MORGAN SECURITIES
LLC; ROBERT W. BAIRD & CO. INCORPORATED; BMO
CAPITAL MARKETS CORP.; CREDIT AGRICOLE SECURITIES
(USA) INC.; CIBC WORLD MARKETS CORP.; HOWARD WEIL
INCORPORATED; and MITSUBISHI UFJ SECURITIES (USA),
INC.,

       *Defendants.*

CIVIL ACTION NO.
13-4875 (CM)

---------------------------------------------------------------------------------- X

# MEMORANDUM OF LAW IN SUPPORT OF
## THE LINN DEFENDANTS' MOTION TO DISMISS

Judith A. Archer
Jami Vibbert
666 Fifth Avenue
New York, New York 10103-3198
Telephone: (212) 318-3000
Facsimile:  (212) 318-3400
judith.archer@nortonrosefulbright.com
jami.vibbert@nortonrosefulbright.com

Gerard G. Pecht (admitted *pro hac vice*)
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone:  (713) 651-5243
Facsimile:  (512) 536-5246
gerard.pecht@nortonrosefulbright.com

Peter A. Stokes (admitted *pro hac vice*)
600 Congress Ave., Suite 2400
Austin, Texas 78701-2978
Telephone:  (512) 536-5287
Facsimile:  (512) 536-4598
peter.stokes@nortonrosefulbright.com

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTUAL ALLEGATIONS ....................................................... 6

      A.    LINN's Purchase of Derivative Contracts ................................ 7

      B.    Accounting Treatment of Derivative Premiums ....................... 8

      C.    LINN Disclosed That Adjusted EBITDA Excludes Derivative Premiums ............................................................... 10

      D.    Maintenance Capex ............................................................... 11

      E.    The LinnCo Initial Public Offering ........................................ 12

      F.    The February 2013 Barron's Article and Follow-On Developments ...... 12

ARGUMENT AND AUTHORITIES ......................................................................... 14

    I.    PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(B) CLAIM (COUNT IV OF AMENDED COMPLAINT) ..................................... 14

      A.    PLAINTIFFS HAVE NOT ALLEGED A MISLEADING STATEMENT ............................................................... 14

      B.    PLAINTIFFS HAVE NOT PLED PARTICULARIZED FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ................. 18

      C.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ........................ 21

      D.    PLAINTIFFS DO NOT PLEAD FALSE STATEMENTS AND SCIENTER WITH PARTICULARITY AS TO THE INDIVIDUAL DEFENDANTS ............................................................... 22

    II.    PLAINTIFFS HAVE FAILED TO STATE A SECURITIES ACT CLAIM   (COUNT I OF AMENDED COMPLAINT) ..................................... 23

    III.    PLAINTIFFS HAVE FAILED TO STATE A CONTROL PERSON CLAIM (COUNTS II AND V OF AMENDED COMPLAINT) ..................... 24

CONCLUSION ..................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abely v. Aeterna Zentaris Inc.*,
  No. 12 Civ. 4711 (PKC), 2013 WL 2399869 (S.D.N.Y. May 29, 2013) .........................17, 23

*Amarosa v. Ernst & Young LLP*,
  682 F. Supp. 2d 351 (S.D.N.Y. 2010) (McMahon, J.).............................................................21

*In re Apple REITs Litig.*,
  No. 11-CV-2919 (KAM), 2013 WL 1386202 (E.D.N.Y. Apr. 3, 2013) ..........................15, 16

*In re Azurix Corp. Secs. Litig.*,
  198 F. Supp. 2d 862 (S.D. Tex. 2002) .....................................................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................................15

*Caiafa v. Sea Containers Ltd.*,
  331 F. App'x 14 (2d Cir. 2009) ................................................................................................24

*In re Citigroup Inc. Secs. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010).......................................................................................20

*City of Providence v. Aeropostale, Inc.*,
  No. 11 Civ. P. 7132, 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ...........................14, 15, 16

*City of Roseville Employees' Retirement Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)........................................................................................24

*In re CRM Holdings, Ltd. Secs. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ........................................................................20

*Dobina v. Weatherford Intern. Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012).......................................................................................22

*In re DRDGOLD Ltd. Secs. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007).......................................................................................19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)......................................................................................................21

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)..................................................................................................................18

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*,
   308 F. Supp. 2d 249 (S.D.N.Y. 2004).................................................................24

*In re Gildan Activewear, Inc. Secs. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009).................................................................20

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................................19

*Janbay v. Canadian Solar, Inc.*,
   No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ............22

*La Pietra v. RREEF America, L.L.C.*,
   738 F. Supp. 2d 432 (S.D.N.Y. 2010).................................................................19

*Lentell v. Merrill, Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)...............................................................................21

*Lighthouse Fin. Group v. Royal Bank of Scotland Group, PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012).................................................................24

*Matrixx Initiatives, Inc. v Siracusano*,
   13 S. Ct. 1309 (2011).........................................................................................17

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .....................................................................21, 22

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*,
   No. 10 Civ. 440, 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) .............................15

*In re Netflix, Inc. Secs. Litig.*,
   No. C 04-2978, 2005 WL 3096209 (N.D. Cal. Nov. 18, 2005).......................15, 17

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...............................................................................14

*In re Optionable Secs. Litig.*,
   577 F. Supp. 2d 681 (S.D.N.Y. 2008).................................................................16

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006)...................................................................4

*Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*,
   2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) .....................................................19

*Polar Int'l Brokerage Corp. v. Reeve*,
   108 F. Supp. 2d 225 (S.D.N.Y. 2000).................................................................22

*Police and Fire Retirement Sys. v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)..................................................................23

*In re ProShares Trust Secs. Litig.*,
   728 F.3d 96 (2d Cir. 2013)...............................................................................17

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..........................................................................23, 24

*In re Satyam Computer Servs. Ltd. Secs. Litig.*,
   915 S.D.N.Y. 450, 479 (S.D.N.Y. 2013) ...........................................................23

*Sinay v. CNOOC Ltd.*,
   No. 12 Civ. 1513 (KBF), 2013 WL 1890291 (S.D.N.Y. May 6, 2013) ....................19

*Stevelman v. Alias Research, Inc.*,
   174 F.3d 79 (2d Cir. 1999)...............................................................................19

*Stockman v. Flotek Indus., Inc.*,
   2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) ......................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................................18, 20

*In re Time Warner Secs. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ................................................................................16

*Tyler v. Liz Claiborne, Inc.*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011).................................................................19

*Vladimir v. Bionenvision Inc.*,
   606 F. Supp. 2d 473 (S.D.N.Y. 2009).................................................................14

**RULES AND STATUTES**

15 U.S.C. § 78u-4(b)............................................................................................14

15 U.S.C. § 78u-4(b)(2) ........................................................................................18

Private Securities Litigation Reform Act............................................................... *passim*

FED. R. CIV. P. 8 ..........................................................................................15, 24

FED. R. CIV. P. 9(b) ..............................................................................14, 22, 24

Defendants LINN Energy, LLC ("LINN"), LinnCo, LLC ("LinnCo"), Mark E. Ellis, Kolja Rockov, David B. Rottino, Michael C. Linn, Joseph P. McCoy, George A. Alcorn, David D. Dunlap, Jeffrey C. Swoveland, and Terrence S. Jacobs (the "Individual Defendants") (together with LINN and LinnCo, the "LINN Defendants"), by their undersigned counsel, submit the following memorandum of law in support of their motion to dismiss under Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  All exhibit citations are to the Declaration of Peter A. Stokes ("Stokes Decl."), using the page numbers in the upper right-hand corner of the exhibits.

## PRELIMINARY STATEMENT

LINN is an independent energy company that acquires and develops oil and natural gas properties exclusively in the onshore United States.  It is structured as a limited liability company that pays cash distributions to its unitholders and is treated as a partnership for federal tax purposes.  LinnCo is a separate publicly-traded entity that owns LINN units as its sole asset and is treated as a corporation for federal tax purposes. LinnCo allows investors who prefer a corporate tax structure to own an indirect interest in LINN and receive cash dividends paid in accordance with LINN's distribution schedule.

To mitigate the uncertainty of fluctuating oil and natural gas prices on its business, LINN enters into derivative contracts (including swaps and "put options") to receive either a guaranteed fixed price (swaps) or minimum price (put options) for its oil and natural gas production.  The majority of LINN's derivative contracts are in the form of swaps, which are costless, and provide LINN with a fixed price regardless of whether commodity prices increase or decrease as compared to the contract price.  With respect to put options, LINN pays a fee called a premium for the contracts at the time of inception, and no further amounts are due in the

future under these contracts.  Put options provide a guaranteed minimum price, with upside opportunity if market prices exceed the contract price.  LINN specifically disclosed the amount of premiums it paid each year for derivative contracts that were purchased during that year in a variety of ways, including in its press releases and its financial statements and narratives in filings with the Securities and Exchange Commission ("SEC").

As with any public company, LINN's financial statements are prepared in accordance with United States generally accepted accounting principles ("GAAP") and include traditional balance sheet, income and cash flow statements.  In accordance with GAAP, premiums paid for derivatives purchased each year are reflected on LINN's cash flow statement during the period when the payment is made.  Also, in accordance with GAAP, put options are recorded as an asset on the balance sheet at the time of inception and amortized over the life of the contract, which reduces net operating income over time.  LINN expressly disclosed that it treated put options as assets, in accordance with GAAP, and listed precisely how much it paid in premiums each year.

Plaintiffs do not challenge the accuracy of LINN's GAAP cash flow and net operating income or LINN's treatment of derivative premiums as asset purchases that can be amortized over time for purposes of calculating net operating income.  There is no allegation, let alone any particularized allegation, that LINN's treatment of derivative premiums with respect to net operating income was improper or was insufficiently disclosed.

Instead, Plaintiffs' repetitive 135-page Amended Complaint is based almost entirely on the theory that LINN "failed to disclose" that the premiums paid for derivatives were excluded from a **non-GAAP** metric called "adjusted EBITDA."  (*See* Dkt. No. 24 ("Am. Compl.") ¶ 8.) LINN expressly defined adjusted EBITDA as net operating income (the second GAAP metric discussed above) plus certain itemized adjustments that are listed in LINN's Form 10-K annual

reports and the offering documents for the October 12, 2012 LinnCo initial public offering (the "IPO"). Plaintiffs assert that the purportedly improper exclusion of derivative premium payments from adjusted EBITDA taints several other non-GAAP metrics that are derived from adjusted EBITDA, including distributable cash flow ("DCF") and the distribution coverage ratio.

This allegation fails to state a claim. LINN expressly disclosed on the first day of the class period that premium payments for derivatives were excluded from adjusted EBITDA:

> Net cash provided by operating activities for the year ended December 31, 2009, was approximately $426.8 million and includes cash interest payments of approximately $73.9 million, ***premiums paid for commodity derivatives of approximately $93.6 million***, cash settlements on interest rate derivatives of approximately $41.7 million, realized gains on canceled derivatives of approximately $(49.0) million and other items of approximately $(20.8) million ***that are not included in adjusted EBITDA***.

(*See* Stokes Decl. Ex. A (Feb. 25, 2010 Form 10-K) at 65 (emphasis added).) LINN specifically identified the amount of premiums it paid each year for new derivative contracts and made clear that these amounts were included in the calculation of net cash from operating activities ***but not in adjusted EBITDA***. These disclosures were repeated in subsequent Form 10-Ks. (*See* Stokes Decl. Ex. B (Feb. 28, 2011 Form 10-K) at 65; Ex. C (Feb. 23, 2012 Form 10-K) at 65.)

LINN's exclusion of these premiums from adjusted EBITDA is thus expressly disclosed. These premiums are cash payments that were made in full at the inception of the derivative contracts. No amounts are due in the future under these contracts. LINN expressly disclosed that it treated its derivative contracts as assets, in accordance with GAAP, and there is again no allegation that the amounts paid for such assets may not be capitalized and amortized over time in calculating net operating income. While the amortization of the derivative asset would reduce net operating income incrementally over each year of the contract, such costs are appropriately excluded from an adjusted EBITDA measurement given the definition of EBITDA, which stands

for "earnings *before* interest, taxes, depreciation, and *amortization*." The exclusion of derivative premiums from adjusted EBITDA was thus fully disclosed and is fully consistent with both the definition and concept of EBITDA, which is a cash-oriented earnings metric designed to provide one measurement of an entity's cash inflow, and which excludes amortization.  *See Payne v. DeLuca*, 433 F. Supp. 2d 547, 576 n.28 (W.D. Pa. 2006) ("EBITDA is one measurement of an entity's cash flow and its ability to make interest or debt payments").

LINN's exclusion of derivative premiums from adjusted EBITDA was also consistent with the approach taken by other companies.  (*See, e.g.,* Ex. J (Excerpt from Form 10-K for Memorial Production Partners LP) (showing exclusion of premiums paid for derivatives from adjusted EBITDA); Ex. K (Excerpt from Vanguard Natural Resources, LLC Form 10-K showing exclusion of "amortization of premiums paid on derivative contracts" from adjusted EBITDA).)

Plaintiffs' only other theory for liability is a conclusory allegation that DCF was overstated because "maintenance capital expenditures" ("maintenance capex") – which is one of the deductions from adjusted EBITDA that is made when calculating DCF – "understated the capital required to maintain current production levels at LINN's oil and gas properties."  (*See* Am. Compl. ¶ 212(c).)  The only fact pled in support of this claim is a statement from an April 1, 2013 LINN presentation that "[m]aintenance capex alone understates the amount of money LINN spends on maintenance activities."  *See id.* ¶ 210.  This sentence, however, does not show that maintenance was understated or that DCF was overstated.  Indeed, the next sentence in the presentation explains that "[m]aintenance activities are not all 'capital' and certain maintenance activities are included in lease operating expenses ('LOE')" rather than in the maintenance capex category.  *See id.*  LINN specifically identified the types of costs that were treated as LOE,[1]

---

[1] As set forth in LINN's February 25, 2010 Form 10-K, LOE includes "expenses such as labor, field office, vehicle, supervision, maintenance, tools and supplies, and workover expenses."  Ex.

specifically disclosed how much LOE it incurred each year, and specifically disclosed that LOE is an expense *that is already included in the calculation of net operating income*, which is the baseline number from which adjusted EBITDA and DCF are calculated.  (*See* Ex. A at 47, 50.)

The categorization of certain types of maintenance costs as LOE rather than maintenance capex therefore has no effect on DCF.  LOE is deducted at the front end in the calculation of net operating income, while maintenance capex is deducted on the back end in calculating DCF from adjusted EBITDA.  Both categories are fully incorporated in DCF.

Plaintiffs plead no facts showing that LINN incurred additional maintenance costs that were wrongfully excluded from maintenance capex, LOE, or DCF, let alone particularized facts showing what specific additional maintenance costs should have been included and why.  Maintenance capex is a subset of LINN's total capital spending budget and represents management's estimate of the cost of activities necessary to maintain current production levels and proved developed producing reserve volumes.  As LINN disclosed each year in its annual Form 10-K, "the cost of drilling, completing and operating a well is often uncertain, and cost factors can adversely affect the economics of a well;" "our efforts will be uneconomic if we drill dry holes or wells that are productive but do not produce enough oil, natural gas and NGL to be commercially viable;" and "based on a variety of factors…we may decide not to drill one or more…prospects...[and] we may not be able to increase or maintain our reserves or production."  (Ex. A at 27; Ex. B at 27; Ex. C at 27.)  The inherently uncertain nature of capital spending activities to find and produce oil and natural gas would result in years when discoveries and performance will be better than expected or worse than expected, and in most instances,

---

A at 50.  The Form 10-K further disclosed that "[e]xpenditures for maintenance and repairs necessary to maintain properties in operating condition are expensed as incurred."  *Id.* at 68. Such costs are therefore already included in net operating income, which is the starting point for the calculation of adjusted EBITDA.

ultimate reserve recoveries from capital spending activities cannot be known for many years into the future.  There are simply no well-pled facts showing that LINN understated maintenance costs or overstated overstated DCF.

This securities complaint therefore fails for the simple reason that LINN did not make any false or misleading statements, let alone with scienter.  Indeed, it is telling that Plaintiffs' entire Amended Complaint is based on public news stories about LINN's financial statements rather than from alleged LINN insiders.  The authors of those publications clearly understood from LINN's public statements that premiums paid for derivatives were not deducted from adjusted EBITDA.  The authors also fully understood that LINN treated derivative premiums as asset purchases for purposes of calculating net income and emphasized that this was perfectly lawful under GAAP.  Plaintiffs likewise cannot demonstrate loss causation because LINN disclosed the information that Plaintiffs claim was misrepresented.  The Amended Complaint comes nowhere close to meeting the strict requirements of the PSLRA, improperly lumps all of the Individual Defendants together, and fails to state a claim against any Defendant.  The Securities Act claims against LinnCo are based on the same theory about LINN's adjusted EBITDA and related non-GAAP metrics, and thus likewise fail for want of a false or materially misleading statement.  The case should therefore be dismissed with prejudice.

## STATEMENT OF FACTUAL ALLEGATIONS

While Plaintiffs' Amended Complaint spans 135 pages and refers to several non-GAAP metrics that Plaintiffs claim are misleading, Plaintiffs' entire case is premised on two arguments: (i) LINN's calculation of adjusted EBITDA is supposedly misleading because it did not deduct premium payments for derivatives, and (ii) maintenance capex is understated.  The Amended Complaint's girth results solely from Plaintiffs' decision to string together virtually every press

release and public disclosure on these issues that LINN made during the alleged class period, which runs from February 25, 2010 through September 17, 2013 for their Securities Exchange Act ("Exchange Act") claims against LINN and from October 12, 2012 (the date of LinnCo's IPO) through September 17, 2013 for their Securities Act claims.  Plaintiffs' theory for why all of these statements are supposedly false, however, is the same.

As alleged in the Amended Complaint, LINN is an independent publicly traded energy company that seeks to acquire, develop, and maximize cash flow from a portfolio of long-life oil and gas properties.  (Am. Compl. ¶ 1.)  LINN provides distributions to its unitholders that are treated as partnership distributions for tax purposes.  (*See id.* ¶¶ 1-3.)  LinnCo is a publicly traded company that solely owns LINN units but is taxed as a corporation, so that investors who prefer a corporate tax structure can own an indirect interest in LINN.  (*See id.* ¶ 4.)

A.    **LINN's Purchase of Derivative Contracts**

To mitigate the effect of fluctuating oil and gas prices, LINN enters into various derivative contracts that allow it to lock in a fixed or guaranteed floor price for its production. These transactions were primarily in the form of swap contracts, put options and collars.  (*See* Ex. A at 69-70.) A swap contract specifies a fixed price that LINN will receive from the counterparty as compared to floating market prices, and on the settlement date LINN will receive or pay the difference between the swap price and the market price.  (*Id.*)  A put option requires LINN to pay the counterparty a premium equal to the fair value of the option at the purchase date and receive from the counterparty the excess, if any, of the fixed price floor over the market price at the settlement date.  (*Id.*)  A collar specifies the range of prices that LINN will receive as compared to floating market prices and on the settlement date offers LINN the opportunity to receive up to the price ceiling while protecting against downside risk below the price floor.  (*Id.*)

With respect to the purchase of put options, LINN has paid an up-front premium in return for the right to receive the specified price terms during the life of the contract. *See id*. The premiums are paid at the time of purchase (rather than at the time of settlement), and the amount of premiums paid each year for derivatives are expressly set forth in LINN's financial statements. For example, LINN disclosed in its February 25, 2010 Form 10-K that net cash from operating activities for "[t]he years ended December 31, 2009, December 31, 2008, and December 31, 2007, include premiums paid for derivatives of approximately $93.6 million, $129.5 million and $279.3 million, respectively." (*Id.* at 51.)  LINN made similar disclosures in its subsequent Form 10-K filings.  (*See* Ex. B at 40; Ex. C at 41; Ex. G at 67.)  LINN thus specifically told investors how much it paid each year in premiums for derivative contracts.

LINN also expressly disclosed that it treated derivative contracts as assets on its balance sheet. (Ex. A at 70; Ex. B at 69; Ex. C at 70.)  The contracts are recorded at fair value, and changes in fair value are recorded in current earnings.  (*Id.*)

**B.**    **Accounting Treatment of Derivative Premiums**

Like all public companies, LINN provides traditional GAAP financial statements in its quarterly and annual SEC filings.  Those metrics include net operating cash flow from continuing operations ("net operating cash flow," which is a statement of cash flows metric) and income from continuing operations ("net operating income," which is an income statement metric).  As discussed above, net operating cash flow included the premiums paid each year for the purchase of derivative contracts, which LINN expressly disclosed.  The cash paid for those premiums flows out the door at the time of purchase; accordingly, the entire purchase price is subtracted from net operating cash flow in the year when it is paid.  (*E.g.*, Ex. A at 40-41.)

Net operating income is an earnings metric rather than a cash flow metric.  Because derivatives are treated as assets, the premium does not immediately reduce net operating income by the full amount but is instead capitalized and then expensed incrementally from net income (*i.e.*, amortized) over the life of the contract.  LINN provided a reconciliation showing that these derivative premiums were included in net cash flow ***but not in net income***.  (Ex. A at 81; Ex. B at 79; Ex. C at 74.)  The *Barron's* article states that "LINN expenses the cost of puts and other derivatives over a multiyear period when calculating net income, as mandated by accounting rules."  (Am. Comp. ¶ 197.)  Plaintiffs conspicuously fail to allege that LINN's treatment of derivatives as assets for purposes of calculating GAAP net operating income is fraudulent.

In addition to net operating cash flow and other traditional GAAP metrics, LINN also provided several non-GAAP metrics to assist investors in assessing available cash for distributions.  As Plaintiffs acknowledge (Am. Compl. ¶¶ 63-65), the SEC's "Regulation G" permits companies to include non-GAAP metrics so long as they do not make false and misleading statements (the same requirement that applies to all public disclosures) and provide a reconciliation showing how the non-GAAP number relates to the most directly comparable GAAP number.  (*See* SEC Release No. 34-47226.[2])

The principal non-GAAP metric at issue in this litigation is "adjusted EBITDA," which forms the basis for all of the other non-GAAP metrics in this case, other than maintenance capex. (*See* Am. Compl. ¶ 11 (discussing how adjusted EBITDA is the "starting point" for calculating DCF; *id.* ¶ 12 (discussing how distribution coverage ratio is based on DCF, which in turn is based on adjusted EBITDA).)  LINN described adjusted EBITDA as "a measure used by Company management to evaluate cash flow and the Company's ability to sustain or increase

---

[2] The release is available at http://www.sec.gov/rules/final/33-8176.htm.

distributions." (Ex. A at 43.) Adjusted EBITDA is defined in LINN's financial statements as net income/loss from continuing operations with the following costs added:

- Net operating cash flow from acquisitions and divestitures, effective date through closing date;
- Interest expense;
- Depreciation, depletion and amortization;
- Impairment of goodwill and long-lived assets;
- Write-off of deferred financing fees and other;
- (Gain) loss on sale of assets, net;
- Unrealized (gain) loss on commodity derivatives;
- Unrealized (gain) loss on interest rate derivatives;
- Realized (gain) loss on interest rate derivatives;
- Realized (gain) loss on canceled derivatives;
- Unit-based compensation expenses;
- Exploration costs; and
- Income tax (benefit) expense.

(*Id.* at 64.) LINN further disclosed that "[t]he most significant reconciling items between net income (loss) and adjusted EBITDA are interest expense and noncash items, including the change in fair value of derivatives and depreciation, depletion, and amortization." (*Id.* at 43.)

As noted in the Amended Complaint, DCF is calculated by subtracting interest expense and maintenance capex from adjusted EBITDA. (*See* Am. Compl. ¶ 132.) The distribution coverage ratio is calculated by dividing DCF per unit from distributions paid per unit. (*See id.*) DCF and distribution coverage ratio are thus both derived from adjusted EBITDA.

### C.   LINN Disclosed That Adjusted EBITDA Excludes Derivative Premiums

Contrary to the impression left by the Amended Complaint, LINN expressly disclosed the amount of premiums paid each year and made clear that these premiums were excluded from adjusted EBITDA. (*See* Ex. A at 65 ("Net cash provided by operating activities for the year ended December 31, 2009, was approximately $426.8 million and includes cash interest payments of approximately $73.9 million, ***premiums paid for commodity derivatives of approximately $93.6 million***, cash settlements on interest rate derivatives of approximately

$41.7 million, realized gains on canceled derivatives of approximately $(49.0) million and other items of approximately $(20.8) million *that are not included in adjusted EBITDA*.") (emphasis added).)  LINN made similar disclosures in subsequent years.  (Ex. B at 65; Ex. C at 65.)

LINN thus specifically and consistently disclosed from day one of the class period that the "premiums paid for commodity derivatives" are "not included in adjusted EBITDA."  *Id.*  Plaintiffs' assertion that LINN "failed to disclose" that it "excluded the significant cost of settled put options" from adjusted EBITDA (*see* Am. Compl. ¶ 8) is simply incorrect.

### D.    Maintenance Capex[3]

Plaintiffs also assert in conclusory fashion that LINN overstated DCF because the deduction for maintenance capex -- which is one of the deductions from adjusted EBITDA that is made when calculating DCF -- "understated the capital required to maintain current production levels at LINN's oil and gas properties."  (*See* Am. Compl. ¶ 212(c).)  The sole fact pled in support of this assertion is a statement from LINN's April 1, 2013 LINN presentation that "[m]aintenance capex alone understates the amount of money LINN spends on maintenance activities." (*See id.* ¶ 210.)  As the next sentence makes clear, however, "[m]aintenance activities are not all 'capital' and certain maintenance activities are included in lease operating expenses ('LOE')" rather than in the maintenance capex category.  (*See id.*)  As stated on pages 5-6 above, the categorization of maintenance expenses as LOE rather than as maintenance capex has no effect on DCF because both categories are deducted.  LINN expressly disclosed how much it incurred in LOE during each reporting period.  (*See* Ex. A at 47, 50.)

Plaintiffs' conclusory "maintenance capex" allegation thus fails to state a claim. Moreover, as set forth on page 6 above, Plaintiffs plead no facts showing that LINN incurred

---

[3] The maintenance capex argument only pertains to the Exchange Act claims and does not apply to the Securities Act claims arising from the LinnCo IPO.

additional maintenance costs that were wrongfully excluded from, let alone particularized facts showing what specific additional maintenance costs should have been included and why.

### E.        The LinnCo Initial Public Offering

On October 12, 2012, LinnCo conducted its initial public offering and filed its IPO prospectus (the "Prospectus") and S-1 registration statement (the "Registration Statement").  *See* Ex. D and E (LinnCo Registration Statement[4]); Ex. F (Prospectus).  Because LinnCo's sole purpose is to own LINN equity units, the Registration Statement contained LINN's financial statements and repeatedly referenced LINN's Form 10-Ks.  (*See* Ex. D at 209, 265.)  The Registration Statement expressly disclosed the amounts LINN paid for derivative premiums each year.  *Id.* at 32.  LinnCo also filed an amended Form S-1 stating that the unaudited pro forma financial statements "should be considered in conjunction with income from continuing operations and other performance measures" and the "historical consolidated financial statements and the notes thereto included in its Annual Report on Form 10-K."  (Ex. D at 64, 209.)

### F.        The February 2013 *Barron's* Article and Follow-On Developments

On February 16, 2013, *Barron's* published an article suggesting that LINN's unit price was too high.  (Am. Compl. ¶ 197.)  The article further suggested that LINN "may be overstating the cash flow available for distribution" by "not deducting the cost of financial derivatives – mainly put options – from its realized gains on hedging activities in its quarterly results."  (*Id.*)  The article acknowledged that LINN "expenses the cost of puts and other derivatives over a multiyear period when calculating net income, as mandated by accounting rules," but noted that LINN "doesn't deduct such costs from distributable cash flow," which was a non-GAAP metric

---

[4]  The document entitled Amendment No. 4 (Ex. D) is the final amended version of the Registration Statement containing the full body of the document.  Exhibit E contains a subsequent amendment that supplements Amendment No. 4.

calculated based on adjusted EBITDA.  (*Id.*)  An analyst at Hedgeye made similar comments in a March 25, 2013 article and again on April 9, 2013.  (*See id.* ¶¶ 209, 213.)  *Barron's* released a similar article on May 4, 2013, which reiterated the same points.  (*Id.* ¶ 221.)

Notably, the author of the *Barron's* articles clearly understood that derivative premiums were not included in adjusted EBITDA, as LINN expressly disclosed from day one of the class period.  While the February article states that "[b]ears argue that funds invested in derivatives should be treated as an expense" and cites one unnamed competitor that follows this approach, the article does not state that LINN made any false statements that adjusted EBITDA included these premiums.  (*See id.*)

On April 25, 2013, LINN announced that its results for the first quarter of 2013 fell short of expectations and were insufficient to cover its quarterly distribution.  (*See id.* ¶ 214.)  There is no allegation that LINN's failure to meet its expected first quarter performance had anything to do with the derivative premiums issue or was the product of fraud.  (*See id.*)  Companies do not always meet performance expectations, and a disappointing quarter does not equate to fraud.

Following publication of the various articles, LINN made several presentations to discuss its treatment of derivatives and derivative premiums.  (*See id.* ¶¶ 205, 210.)  On June 3, 2013, LINN and LinnCo filed an amended registration statement in connection with a proposed acquisition of Berry Petroleum Company.  *See id.* ¶ 224.  The registration statement contained an additional disclosure listing the cost of put options that had settled during each reporting period. (*See id.*)  The disclosure did not change the calculation of adjusted EBITDA or the other metrics at issue, but simply listed the premiums paid in prior years for derivatives that settled during each applicable reporting period.  (*See id.*)  LINN provided a similar disclosure in its August 8, 2013 second quarter financial results.  (*Id.* ¶ 230.)

On July 1, 2013, LINN disclosed that the SEC had begun an informal inquiry regarding LINN's hedging strategy and use of non-GAAP measures.  (*See id.* ¶ 227.)   There is no allegation that the SEC has brought charges against LINN or has concluded that LINN's accounting or use of non-GAAP measures was wrongful.

## ARGUMENT AND AUTHORITIES

### I.   PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(B) CLAIM (COUNT IV OF AMENDED COMPLAINT)

This is a securities class action subject to the strict requirements of Rule 9(b) and the PSLRA.  Rule 9(b) requires securities fraud plaintiffs to state "'the circumstances constituting fraud . . . with particularity.'"  *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. P. 7132, 2013 WL 1197755, at *8-9 (S.D.N.Y. Mar. 25, 2013) (McMahon, J.) (quoting FED. R. CIV. P. 9(b)). The PSLRA requires a securities complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b).

In deciding a motion to dismiss, the Court may consider "the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit."  *Aeropostale*, 2013 WL 1197755, at *9.

### A.   PLAINTIFFS HAVE NOT ALLEGED A MISLEADING STATEMENT

Plaintiffs do not and cannot allege the most basic requirement of a securities fraud claim: the making of a materially false or misleading statement.   The PSLRA requires securities plaintiffs to plead specific facts that "'support a reasonable belief as to the misleading nature of the statement or omission.'"  *Vladimir v. Bionenvision Inc.*, 606 F. Supp. 2d 473, 484 (S.D.N.Y. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000)).  Even under ordinary

Rule 8 pleading, a complaint must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiffs must therefore "show," rather than merely "say," that Defendants made materially misleading statements. *Id.* at 555 n.3 (holding that Fed. R. Civ. P. 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief").

Plaintiffs have pled no facts, let alone particularized facts, showing that LINN or LinnCo made a false or misleading statement. The exclusion of premiums paid for derivatives from adjusted EBITDA was not materially false or misleading because LINN specifically disclosed that derivative premiums were excluded from adjusted EBITDA. It is not misleading to exclude a particular metric from a calculation when it is specifically disclosed that the metric has been excluded, such that investors can decide for themselves how much weight to give the calculation. *See NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10 Civ. 440, 2012 WL 3191860, at *10 n.13 (S.D.N.Y. Feb. 9, 2012) ("Additionally, with respect to its allowance for loan and lease losses, BAC publicly disclosed that such an allowance ***excludes*** loans measured at fair value in accordance with SFAS 159 . . ."); *In re Netflix, Inc. Secs. Litig.*, No. C 04-2978, 2005 WL 3096209, at *11 (N.D. Cal. Nov. 18, 2005) (no misleading statement where company "made it clear that EBITDA incorporated" metrics that plaintiffs claimed should not have been incorporated). Plaintiffs' claim is akin to arguing that EBITDA is misleading because it omits interest, taxes, depreciation, and amortization. It is axiomatic that a defendant "cannot be alleged to have misrepresented or omitted that which they plainly disclosed." *In re Apple REITs Litig.*, No. 11-CV-2919 (KAM), 2013 WL 1386202, at *12 (E.D.N.Y. Apr. 3, 2013).

This case thus differs significantly from the omission claim in *Aeropostale*. In that case, the defendant affirmatively conveyed the false impression that a particular problem was confined

to previous quarters and had been corrected, when in fact the problem was still very much ongoing.  *Aeropostale*, 2013 WL 1197755, at *11.  By contrast, LINN expressly disclosed that premium payments were excluded from adjusted EBITDA.[5]

Indeed, the fact that Plaintiffs primarily rely on public commentary by analysts and short sellers corroborates that this is simply not a misstatement case.[6]  The authors of those articles apparently had no difficulty ascertaining from LINN's public statements that derivative premiums were excluded from adjusted EBITDA.  Investors and analysts may vigorously disagree, and frequently do, about which financial metrics are more important or how much weight to give a particular metric in assessing a particular stock.  An analyst may conclude that a particular metric is not useful without that number being misleading.

Additionally, "[a] corporation is not required to disclose a material fact merely because a reasonable investor would very much like to know that fact."  *In re Optionable Secs. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).  Plaintiffs claim that LINN should have specifically tied the settlement of derivatives in the current period to the premiums paid for those derivatives in past periods.  LINN, however, specifically disclosed the amount of derivative premiums it paid each year for new derivative contracts and made clear that those premiums were not included in adjusted EBITDA.  There is no requirement that previously paid premiums be tied back to settled derivatives in an EBITDA calculation, which makes sense:  EBITDA by definition excludes

---

[5] Moreover, unlike the plaintiff in *Aeropostale*, Plaintiffs have not bolstered their claims with statements from company insiders contending that LINN executives said one thing while doing another.  *See id.* at *3 (describing specific allegations of "confidential witnesses" showing executive knowledge of undisclosed problems).

[6] The fact that none of LINN's currently more than 40 lenders have filed suit, even though they were provided the same metrics in connection with LINN's credit facility, further corroborates that LINN's financial disclosures were not misleading.

depreciation and amortization and would thus not include the amortization of a payment for assets purchased in a prior reporting period.

Moreover, the mere fact that LINN modified its disclosures in mid-2013 to list the amount of premiums paid for derivatives that settled in the current year does not show that LINN's earlier statements were misleading.  *See In re ProShares Trust Secs. Litig.*, 728 F.3d 96, 109 (2d Cir. 2013) ("It is of no matter that ProShares came to use different, arguably clearer language.   To hold an issuer who alters disclosures deemed adequate in the first instance suddenly liable because it found a better way to say what has already been said would perversely incentivize issuers not to strive for better, clearer disclosure language").  LINN already disclosed the premiums paid for derivatives each year and specifically disclosed that those premiums were not included in adjusted EBITDA.  "Absent a regulatory obligation, an omission is actionable 'only' when additional disclosure is 'necessary "to make statements made, in light of the circumstances under which they were made, not misleading.'"  *Abely v. Aeterna Zentaris Inc.*, No. 12 Civ. 4711 (PKC), 2013 WL 2399869, at *10 (S.D.N.Y. May 29, 2013) (quoting *Matrixx Initiatives, Inc. v Siracusano*, 13 S. Ct. 1309, 1321 (2011)).  No such misstatement is pled here.

Plaintiffs' assertion that LINN should have used net cash flow rather than net operating income as the starting point for calculating adjusted EBITDA (*see* Am. Compl. ¶ 77) also fails to demonstrate a misleading statement.  *See In re Netflix*, 2005 WL 3096209, at *11 (dismissing complaint where EBITDA was reconciled to "earnings" rather than cash flow).

Plaintiffs' conclusory claim that maintenance capex understates the amount that LINN spends "to maintain current production levels at LINN's oil and natural gas properties" fails for similar reasons.  (*See* Am. Compl. ¶¶ 133, 196(c).)  As stated on pages 5-7 above, the only fact pled in support of this claim – the statement in LINN's April 1, 2013 presentation that

maintenance capex understates total maintenance costs because some maintenance is categorized as LOE and expensed – fails to show that DCF was overstated, given that LOE was already deducted from net operating income.  Plaintiffs plead no facts showing that there were other maintenance costs that should have been included in the DCF calculation, let alone particularized facts showing what specific additional costs should be included and why.

Finally, the fact that LINN missed its expected financial performance during the first two quarters of 2013 does not demonstrate that it made misleading statements.  There are no allegations showing that LINN's underperformance had anything to do with the omission of derivative premiums from adjusted EBITDA or the alleged understatement of maintenance capex.  "The mere fact that a business does not live up to expectations is insufficient to create an inference of fraud."  *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at \*15 (S.D. Tex. Sept. 29, 2010) (quoting *In re Azurix Corp. Secs. Litig.*, 198 F. Supp. 2d 862, 882 (S.D. Tex. 2002)).

Plaintiffs have thus failed to plead a materially false or misleading statement or omission.

### B.    PLAINTIFFS HAVE NOT PLED PARTICULARIZED FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Plaintiffs' Section 10(b) claim also fails to satisfy the PSLRA's stringent scienter requirement.  A securities complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  For a Section 10(b) claim, the "required state of mind" is "'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)).  The inference of scienter must be both "cogent" and "at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 308.  A plaintiff must either show "(1) that defendants had the

motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011).

Because Plaintiffs have failed to show a misleading statement, the Amended Complaint necessarily fails to plead scienter. *See La Pietra v. RREEF America, L.L.C.*, 738 F. Supp. 2d 432, 445 (S.D.N.Y. 2010) (no scienter where complaint did not sufficiently allege false or misleading statements). It is also well-settled that outright inaccuracies in a company's financial statements – which have not been alleged here – are insufficient, standing alone, to support a strong inference of scienter. *See Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999) (allegations of GAAP violations and outright restatement of incorrect results insufficient); *Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*, 2011 WL 1198712, at 22 (S.D.N.Y. Mar. 30, 2011) ("Allegations of failure to comply with GAAP do not suffice to allege scienter); *In re DRDGOLD Ltd. Secs. Litig.*, 472 F. Supp. 2d 562, 573-74 (S.D.N.Y. 2007) (allegation of restatement insufficient).

Not only have Plaintiffs failed to plead any outright inaccuracies in LINN's financial statements, but LINN specifically disclosed that it was excluding the metrics that were supposedly misleadingly omitted. To support a strong inference of scienter, "'[d]efendants' conduct must be 'highly unreasonable and [] represent [] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Sinay v. CNOOC Ltd.*, No. 12 Civ. 1513 (KBF), 2013 WL 1890291, at *7 (S.D.N.Y. May 6, 2013) (quoting *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 334 (S.D.N.Y. 2011)). No such inference is supported here. The authors of the articles cited in the Amended Complaint apparently had no difficulty determining from LINN's financial statements that premiums paid for derivatives were excluded from

adjusted EBITDA.  There is no allegation that any of LINN's currently more than 40 lenders have complained or filed suit over these disclosures.  Moreover, the financial statements provided numerous other metrics for assessing cash available for distributions, including the GAAP cash flow and net income metrics (which Plaintiffs have not alleged to be false or misleading).  LINN specifically stated in each Form 10-K during the class period that "[a]justed EBITDA . . . should not be considered in isolation or as a substitute for GAAP measures, such as net income, operating income or any other GAAP measure of liquidity or financial performance."  (Ex. A at 64.)  LINN also specifically disclosed the amount of premiums it paid each year for derivative contracts.  These disclosures weigh heavily against inferring scienter and support a strong counter-inference that LINN did not intend to defraud anyone about this issue.  *See Tellabs*, 551 U.S. at 308 (district court must weigh nonfraudulent inferences).

Plaintiffs' failure to allege a legally sufficient motive for the LINN Defendants to commit fraud further weakens this case.  *See In re Citigroup Inc. Secs. Litig.*, 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010) ("When motive is not apparent . . . the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater").  While Plaintiffs identify various stock sales by one LINN officer and two LINN directors over a three-year period, Plaintiffs "have failed to allege anything 'unusual' or 'suspicious'" about these sales.  *In re CRM Holdings, Ltd. Secs. Litig.*, 2012 WL 1646888, at *25 (S.D.N.Y. May 10, 2012); *see also In re Gildan Activewear, Inc. Secs. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (no inference of scienter where trades occurred "many months before the release of any negative information that caused [the company's] stock price to plummet").  The fact that directors and officers who are large stockholders sold stock at various intervals between April 2010 and August 2012 – many months (if not years) before the alleged corrective disclosures in

2013 – fails to support any inference of fraud.  The generic stock sale allegations simply equate to the generalized motive "to keep stock prices high," which the Second Circuit has deemed insufficient.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as . . . the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of [the scienter] inquiry").  Plaintiffs have not pled scienter.

### C.      PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Plaintiffs also have "the burden of pleading and proving loss causation under Section 10(b)."  *Amarosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 365 (S.D.N.Y. 2010) (McMahon, J.).  A securities complaint "must at a minimum 'allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of the loss absent the fraud.'"  *Id.* at 362-63 (quoting *Lentell v. Merrill, Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)).  Plaintiffs must show "'that the market reacted negatively to a corrective disclosure'" regarding the alleged misstatement.  *Id.* (quoting *Lentell*, 396 F.3d at 175).

Plaintiffs' loss causation allegations fail for similar reasons as their misrepresentation allegations.  The alleged stock price drops at issue occurred on February 19, March 21, April 25, May 4, June 15, June 18, July 2-3, and August 8, 2013.  (*See* Am. Compl. ¶¶  197, 208, 214, 221, 225, 226, 228.)  A corrective disclosure, however, will not support loss causation if it simply repackages information already disclosed.  *See Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013) (re-packaging of information previously disclosed cannot constitute corrective disclosure).  The plaintiffs in *Meyer* argued that an analyst report claiming that the defendant's real estate holdings "should be impaired," coupled with an announced SEC investigation regarding the value of the defendants' real estate holdings, were "corrective disclosures."  *See id.*

- 21 -

at 1199-1201.  The Eleventh Circuit rejected these arguments, holding that the analyst reports simply repackaged previously disclosed information and that the SEC investigations did not "reveal to the market the falsity of" the prior disclosures.  *See id.*; *see also Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at \*15 (S.D.N.Y. Mar. 30, 2012) ("The announcement of an SEC subpoena or an internal investigation is itself insufficient. . .").

Plaintiffs' loss causation allegations similarly fail.  As stated above, LINN consistently disclosed that derivative premiums were excluded from adjusted EBITDA.  The "revelation" of this fact in the *Barron's* articles and subsequent press pieces thus did not reveal new information to the marketplace and cannot serve as a corrective disclosure.  *See id.*  The announcement of the informal SEC inquiry on July 1, 2013 likewise did not "correct" any prior alleged misstatement, given that LINN and various news articles had already disclosed that derivative premiums were excluded from adjusted EBITDA.  *See id.* (revelation of SEC inquiry not "corrective").

### D.  PLAINTIFFS DO NOT PLEAD FALSE STATEMENTS AND SCIENTER WITH PARTICULARITY AS TO THE INDIVIDUAL DEFENDANTS

Plaintiffs have compounded the deficiencies set forth above by impermissibly lumping together virtually every named officer and director of LINN and LinnCo and asserting blanket misrepresentation and scienter allegations against all of them.  The PSLRA precludes this tactic and requires specific allegations that each individual defendant made a misleading statement and acted with scienter.  *See Dobina v. Weatherford Intern. Ltd.*, 909 F. Supp. 2d 228, 240 (S.D.N.Y. 2012) ("[T]he plaintiff must allege that each defendant had the requisite scienter"); *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 236 (S.D.N.Y. 2000) ("The requirements of Rule 9(b) are 'not satisfied by a complaint in which defendants are clumped together in vague allegations") (internal citations omitted).  Plaintiffs fail entirely to provide such allegations.  Bare allegations that individual defendants served on a company's audit committee, were high-ranking

executives, or certified financial statements is insufficient.  *See In re Satyam Computer Servs. Ltd. Secs. Litig.*, 915 S.D.N.Y. 450, 479 (S.D.N.Y. 2013) (audit committee membership insufficient); *Police and Fire Retirement Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 239 (S.D.N.Y. 2009) (executive status and signing of financial statements insufficient).

## II.   PLAINTIFFS HAVE FAILED TO STATE A SECURITIES ACT CLAIM (COUNT I OF AMENDED COMPLAINT)

Plaintiffs also assert a Section 11 claim against LinnCo and the Individual Defendants based on the S-1 Registration Statement filed in connection with LinnCo's IPO.  (*See* Count I, Am. Compl. ¶¶ 272-82.)  That claim fails for the same reasons set forth in Section IA above: because there is no materially false or misleading statement and no omission of any information that LinnCo had a duty to disclose.  *See Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (affirming dismissal of Section 11 claim where plaintiff failed to plead facts showing that registration statement contained specific false and misleading statements).

As stated above, the LINN Defendants repeatedly disclosed that adjusted EBITDA did not include premiums paid for derivatives.  Those disclosures were clearly part of the "total mix" available to LinnCo investors.  *See Abely*, 2013 WL 2399869, at *6 (omissions only actionable if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available'").  In fact, LinnCo filed an amended Form S-1/A specifically stating that the unaudited pro forma financial statements contained therein "should be read in conjunction with [LINN's] historical consolidated financial statements and the notes thereto included in its Annual Report on Form 10-K," which included the disclosure that derivative premiums were excluded from adjusted EBITDA.  (Ex. D at 96.)  The Registration Statement also specifically disclosed the

amounts LINN paid in premiums for derivatives acquired each year and stated that these premium payments were included in cash flow but not in net income.  (Ex. D at 90, 221, 264).

Plaintiffs thus have failed to plead a Section 11 claim.  In addition, as stated in the Underwriter Defendants' Motion to Dismiss, Plaintiffs' Securities Act claims sound in fraud and are thus subject to Rule 9(b), which Plaintiffs have not satisfied.  *See Rombach*, 355 F.3d at 171 (2d Cir. 2004); *see also Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 16 (2d Cir. 2009). Regardless of whether Rule 9(b) applies, Plaintiffs' claim should be dismissed as stated above based on the failure to allege a misleading statement or actionable omission.  *See City of Roseville Employees' Retirement Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 425-26 (S.D.N.Y. 2011) (dismissing numerous Section 11 claims under Rule 8 standard and observing that "[w]hen the plaintiff's allegation is refuted by the document on which it relies, it cannot be considered plausible"); *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d 249, 254-55 (S.D.N.Y. 2004) (dismissing Section 11 claim for failure to show false affirmative disclosure).  Plaintiffs' Securities Act claim fails regardless of whether Rule 9(b) applies.

## III.   PLAINTIFFS HAVE FAILED TO STATE A CONTROL PERSON CLAIM (COUNTS II AND V OF AMENDED COMPLAINT)

Plaintiffs' remaining claims for control person liability fail for want of an underlying primary violation.  *See Lighthouse Fin. Group v. Royal Bank of Scotland Group, PLC*, 902 F. Supp. 2d 329, 346 (S.D.N.Y. 2012) ("As Plaintiffs have not made out an underlying violation of either the [Securities Act] or the [Exchange Act], these control person claims necessarily fail").

## CONCLUSION

Defendants therefore pray that the Court dismiss all claims against the LINN Defendants with prejudice and award all further relief to which the LINN Defendants are justly entitled.

DATED: NOVEMBER 4, 2013

FULBRIGHT & JAWORSKI LLP

/S/ Jami Vibbert
Judith A. Archer
Jami Vibbert
666 Fifth Avenue
New York, New York 10103-3198
Telephone: (212) 318-3000
Facsimile:  (212) 318-3400
Email:
Charles.Schmerler@Nortonrosefulbright.Com
Judith.Archer@Nortonrosefulbright.Com

Gerard G. Pecht (Admitted Pro Hac Vice)
1301 Mckinney, Suite 5100
Houston, Texas 77010
Telephone:  (713) 651-5243
Facsimile:  (512) 536-5246
Email:
Gerard.Pecht@Nortonrosefulbright.Com

Peter A. Stokes (Admitted Pro Hac Vice)
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701-2978
Telephone:  (512) 536-5287
Facsimile:  (512) 536-4598
Email: Peter.Stokes@Nortonrosefulbright.Com

Attorney For the LINN Defendants

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record for Plaintiff was served through the ECF system and by email on November 4, 2013.


                                        /s/ Jami Vibbert
                                        Jami Vibbert